FILED
U.S. DISTRICT COURT
INDIANAPOLIS DIVISION

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

2013 DEC 19  PM 2: 57

SOUTHERN DISTRICT
OF INDIANA
. . . . . . . . .
CLERK

|  |  |
|---|---|
| UNITED STATES *ex rel.*<br>JUDITH ROBINSON, | CIVIL ACTION NO. _____ |
|  | JUDGE _____ |
| BRINGING THIS ACTION ON<br>BEHALF OF THE UNITED STATES<br>OF AMERICA  and THE STATE OF<br>INDIANA | Filed Under Seal Pursuant to<br>31 U.S.C. § 3730(b)(2) |
| Plaintiffs and Relator, | **DO NOT SERVE** |
| v. | **1 : 13 -cv- 2 0 0 9 TWP -MJD** |
| INDIANA UNIVERSITY HEALTH,<br>INC. |  |
| and |  |
| HEALTHNET, INC. |  |
| Defendants. |  |

## COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT & THE INDIANA FALSE CLAIMS AND WHISTLEBLOWER PROTECTION ACT

## I.      INTRODUCTION

1.   *Qui tam* relator Judith Robinson brings this action on behalf of the United

States, the State of Indiana, and herself against her former employers, Defendants Indiana

University Health, Inc. (d/b/a Methodist Hospital, and hereinafter "IU Health" or "Methodist

Hospital") and HealthNet, Inc. ("HealthNet") to recover damages and civil penalties under the

federal False Claims Act, 31 U.S.C. § 3729 *et seq.* (the "FCA") and Indiana's False Claims and

1

Whistleblower Protection Act, Ind. Code § 5-11-5.5-1 *et seq.* (the "Indiana Act"). Working

symbiotically and in concert, Defendants provide medical services, to include prenatal care, in-

hospital triage of obstetric patients, and obstetric deliveries, to indigent patients in the

Indianapolis, Indiana area. In violation of Indiana Medicaid regulations, Defendants utilize non-

physicians to provide prenatal care, to perform triage assessments, and to deliver medically-high

risk patients. Because the use of non-physicians to provide care to medically-high-risk patients is

expressly not reimbursable by Indiana Medicaid, all claims submitted or caused to be submitted

by Defendants for medical services provided to medically-high-risk patients by non-physicians

are false claims under both the FCA and the Indiana Act.

## II.   **JURISDICTION AND VENUE**

2.      This action arises under the United States Civil False Claims Act, 31 U.S.C. §

3729 *et seq.*, and the Indiana False Claims and Whistleblower Protection Act, Ind. Code § 5-11-

5.5-1 *et seq.*

3.      This Court has subject matter jurisdiction pursuant to 31 U.S.C. § 3732 and 28

U.S.C. § 1331, and the Court has personal jurisdiction over the Defendants, because they are

incorporated and do business in this District.

4.      Venue lies under 28 U.S.C. § 1391 because Defendants transact business in this

District.

5.      The facts and circumstances alleged in this Complaint have not been publicly

disclosed in a federal criminal, civil, or administrative hearing in which the Government or its

agent is a party; in a Government Accountability Office, or other, federal report, hearing audit, or

investigation; or in the news media.

2

6.     Relator is the original source of the information upon which this Complaint is based, as that term is used in the FCA.

7.     Prior to filing this action, Relator voluntarily disclosed to the United States and the State of Indiana the information on which her allegations are based. Additionally, should there have been a public disclosure of any aspect of these allegations prior to the filing of this action, Relator has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions.

III.   **PARTIES**

8.     The real parties in interest to the claims set forth herein are the United States of America and the state of Indiana.

9.     Plaintiff and Relator Judith Robinson is an Indiana resident. She lives in Carmel, Indiana. She received her Doctor of Medicine from the University of Illinois in 1981 and performed her residency in Obstetrics and Gynecology at Methodist Hospital in Indianapolis, Indiana from 1983-1987. Dr. Robinson is a Board-certified Ob/Gyn and a Fellow in the American College of Obstetrics and Gynecology. Among other laudations, she has received the Indianapolis Monthly Top Doc award for Ob/Gyn physicians since 1998.

10.    Dr. Robinson had an active private practice for nineteen years. She began employment at IU Health in 2005 as an Ob/Gyn Hospitalist. In 2010, she was appointed to the position of Medical Director, Ob/Gyn Services at Methodist Hospital. She also held the position of Chairperson of IU Health's Ob/Gyn Section and was the Manager of the HealthNet/IU Health Ob/Gyn Hospitalist Service. From 2010-2012, Dr. Robinson was also the Assistant Ob/Gyn Residency Director for IU Health. In 2011, Dr. Robinson was appointed to the position of

3

Director of Women's Services at HealthNet, Inc., a position she held concurrently with her
Medical Director position at Methodist Hospital.

11.    Defendant IU Health is an Indiana non-profit corporation and is a conglomeration
of hospitals, physicians, and allied services that provides healthcare throughout Indiana under
many names. IU Health is governed by a board of directors and employs a staff of approximately
36,000. Its current President and Chief Executive Officer is Dan Evans.

12.    Indiana's largest hospital, Methodist Hospital of Indianapolis, is an assumed name
of IU Health and is the site of all patient deliveries and triage services referenced herein. It has
its own set of executives. Its current President is James Terwilliger, and its Chief Medical
Officer is Michael Niemeier.

13.    Defendant HealthNet, Inc. is a non-profit domestic corporation with twelve clinic
locations throughout metro Indianapolis, Indiana. HealthNet, Indiana's largest Federally
Qualified Health Center, was established in 1968 and provides healthcare services primarily to
patients who live at or below the federal poverty level. HealthNet provides these services, to
include pediatrics, obstetrics, and gynecological services, on a sliding fee scale to those without
insurance, but the bulk of its patients are Medicaid beneficiaries. Its current President and CEO
is J. Cornelius Brown, and its Chief Medical Officer is Don Trainor.

IV.    **FED. R. CIV.P. 9(b) ALLEGATIONS**

14.    Some of the factual information necessary to prove the allegations set out in this
Complaint is exclusively in the possession of the Defendants, the United States, or the State of
Indiana.

15.    Having been employed by Defendants from 2005 through 2013, Dr. Robinson is
personally aware that Defendants submitted false claims to Medicaid for health services. The

4

claims were false because the services provided were performed by people unqualified under federal and state law to provide them. Claims for such services are not legally reimbursable, and therefore their submission violates the False Claims Act.

16.     The allegations in this Complaint are personally known to Dr. Robinson unless specifically identified as being made on information or belief. Each allegation made on information and belief identifies a situation in which Dr. Robinson has, based upon her knowledge and experience, a reasoned factual basis to make the allegation but lacks complete details.

## V.     LEGAL & REGULATORY BACKGROUND

17.     Expressly motivated by a desire to make as much money as possible, Defendants have structured their obstetrics business in such a way that not only leads to the submission of false claims but also poses a high risk of permanent, devastating results for the women and infants in Defendants' care. The treatment and management of medically high-risk pregnant women is performed almost exclusively by nonphysicians, in contravention of both the Indiana Medicaid requirements and the Indiana Code's dictates with respect to the scope of practice of nonphysicians.

### A. The Federal False Claims Act

18.     The False Claims Act, 31 U.S.C. § 3729(a)(1)(A) and (B), imposes liability upon, *inter alia*, those who knowingly present or cause to be presented false claims for payment or approval, and those who make or use, or cause to be made or used, false records or statements material to a false claim. Violators are liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus three times the amount of damages sustained by the government. 31 U.S.C. § 3729(a)(1).

5

19.     Employees who have been discharged, demoted, suspended, threatened, harassed, or in any manner discriminated against in terms and conditions of employment, because of lawful acts in furtherance of efforts to stop violations of the False Claims Act, are entitled to relief necessary to be made whole.  31 U.S.C. § 3730(h).

**B. Indiana's False Claims Act**

20.     Indiana's False Claims and Whistleblower Protection Act, Ind. Code § 5-11-5.5-1 *et seq.*, is modeled upon the federal False Claims Act and proscribes the same conduct.  "A person who knowingly or intentionally...presents a false claim to the state for payment or approval, [or] makes or uses a false record or statement to obtain payment or approval of a false claim from the state . . . is... liable to the state for a civil penalty of at least five thousand dollars ($5,000) and for up to three (3) times the amount of damages sustained by the state." Ind. Code § 5-11-5.5-2(b)(1)-(2).

21.     The Indiana Act also provides relief for employees who have been "discharged, demoted, suspended, threatened, harassed, or otherwise discriminated against" because the employee objected to a false claim made by the employer, or because the employee initiated or participated in an action against the employer.  Ind. Code § 5-11-5.5-8(a).  Further, relief for the employee may include reinstatement, two times the amount of back pay owed the employee, interest on back pay owed, and compensation for special damages, including litigation costs and reasonable attorney's fees.  Ind. Code § 5-11-5.5-8 (b).

**C. The Medicaid Program & Nonphysician Providers**

22.     The Medicaid program was created in 1965 as part of the Social Security Act, which authorized federal grants to states for medical assistance to low-income persons, blind, disabled, or members of families with dependent children or qualified pregnant women or

6

children. The Medicaid program is jointly financed by the federal and state governments. The Secretary of Health and Human Services administers Medicaid on the federal level through the Centers for Medicare and Medicaid Services ("CMS"). Within broad federal rules, each state decides eligible groups, types and range of services, payment levels for services, and administrative and operating procedures. The states directly pay providers, with the states obtaining the federal share of the payment from accounts which draw on the United States Treasury. 42 C.F.R. §§ 430.0-430.30. The federal share of Medicaid expenditures varies by state.

23.   In Indiana, Medicaid is funded approximately one-third by the State of Indiana and two-thirds by the federal government.

24.   The Indiana Health Coverage Program (the "IHCP") is administered by the Indiana Family and Social Services Administration, an agency of the State of Indiana, and offers both fee-for-service and managed care plans.

25.   Healthcare providers who wish to provide and be paid for services to Medicaid beneficiaries must first become approved Medicaid providers. To do so, the provider must complete an enrollment packet with the IHCP. As part of that packet, each provider must execute a "Provider Agreement." [1]

26.   The IHCP Provider Agreement expressly provides the following, set off in all capital letters immediately before the authorized signature line on the agreement:

> AS A CONDITION OF PAYMENT AND CONTINUED ENROLLMENT IN THE
> IHCP THE UNDERSIGNED, BEING THE PROVIDER OR HAVING THE SPECIFIC
> AUTHORITY TO BIND THE PROVIDER TO THE TERMS OF THIS AGREEMENT,
> AND HAVING READ THIS AGREEMENT AND UNDERSTANDING IT IN ITS
> ENTIRETY, DOES HEREBY AGREE TO ABIDE BY AND COMPLY WITH ALL

---

[1]
http://provider.indianamedicaid.com/media/63755/ihcp%20group%20and%20clinic%20provider%20enrollment%20and%20maintenance%20form.pdf

THE STIPULATIONS, CONDITIONS, AND TERMS SET FORTH HEREIN. THE UNDERSIGNED ACKNOWLEDGES THAT THE COMMISSION OF ANY INDIANA HEALTH COVERAGE PROGRAM RELATED OFFENSE AS SET OUT IN 42 USC 1320a-7b MAY BE PUNISHABLE BY A FINE OF UP TO $25,000 OR IMPRISONMENT OF UP TO FIVE YEARS OR BOTH.

27.     Among the terms of the agreement referenced above as a condition of payment

and continued enrollment in the IHCP is the following: "To abide by the Indiana Health

Coverage Programs Provider Manual, as amended from time to time, as well as all provider

bulletins and notices."

28.     One of Indiana Medicaid's programs is Hoosier Healthwise. Hoosier Healthwise

is a mandatory managed care program for low income families, pregnant women, and children.

Those eligible for Medicaid coverage under Hoosier Healthwise include children up to age 19,

parents and guardians of children under the age of 18, and pregnant women.

29.     Under Hoosier Healthwise, the Indiana Office of Medicaid Policy and Planning

contracts with three managed care entities: Anthem, Managed Health Services, and MDwise.

Beneficiaries either select from among them or are assigned membership to one entity through an

automated system.

30.     Federal law requires that services covered by these managed care entities must be

provided in an amount, duration and scope that is not less than services covered by the Indiana

Medicaid Program's fee-for-service programs. 42 C.F.R. § 438.210.

31.     In order to become an approved healthcare provider with any of the managed care

entities, the healthcare provider must first become an approved provider with IHCP by

completing the enrollment packet and agreeing to abide by the terms and conditions set forth

therein, as described above.[2]

---

[2] Page 3 of the Provider Agreement.

32.     At issue in this case are claims made for prenatal, triage, and delivery services provided to medically high-risk pregnant women by nonphysicians, outside the scope of their licensure.

33.     Indiana Medicaid regulations squarely and unequivocally condition payment of public healthcare money for the treatment of medically high-risk pregnant women on the requirement that those women be treated only by physicians.

34.     On page 8-329 of the IHCP Provider Manual, the IHCP specifically states that Indiana Medicaid will not pay for the treatment by nonphysicians of medically high-risk pregnant women: "**The IHCP reimburses only for treatment by physicians for medically high-risk pregnancy care**. Nonphysician providers that treat pregnant women on Medicaid must refer members identified as having medically high-risk pregnancies only to other appropriate physicians. **The IHCP does not permit treatment or referrals to nonphysicians for high-risk pregnancy-related services**" (bolded emphasis in original).[3]

35.     As of 2010, to fall under the category of medically high-risk, an expectant mother must have two or more medical risk factors in her current pregnancy or in her obstetrical history. "Medical risk factors" are documented conditions that place the patient at risk for a preterm birth or poor pregnancy outcome. Prior to 2010, only one medical risk factor was necessary for a pregnancy to be deemed high-risk.

36.     The Provider Manual sets forth a nonexhaustive list of examples of common high-risk pregnancy conditions. Examples of these conditions are anemia, asthma, diabetes, drug dependence, a history of low birth weight babies, multiple gestation in current pregnancy (i.e.,

---

[3] http://provider.indianamedicaid.com/ihcp/manuals/chapter08.pdf.

twins), obesity, hypertension, and a previous Caesarean delivery (also referred to herein as a C-Section).

37. Other medical conditions can complicate pregnancy and could lead to a high-risk pregnancy designation. Providers are instructed to complete a Notification of Pregnancy ("NOP") form in order to document the risks associated with a given pregnancy.[4]

38. The NOP recognizes that it is in the physician's purview to diagnose the risk to the pregnancy and allows for the physician to specify the medical conditions that may place the patient at risk.[5]

39. If a woman has a medically-high-risk pregnancy, as expressly defined by the IHCP, the healthcare provider is entitled to receive additional funds for that patient, to include an additional $10 per visit, a $60 payment for the completion of the NOP, and additional prenatal visits beyond the otherwise-standard maximum of fourteen. The Provider Manual notes that the IHCP "recognizes that care of pregnant women in the medical high-risk category requires greater physician management" and thus provides for this additional payment to "physicians practicing obstetrics."

40. As indicated in the Indiana Medicaid provider enrollment packet, the term "nonphysician" is a category of healthcare provider that includes both Nurse Practitioners and Certified Nurse Midwives ("CNMs").[6]

41. In Indiana, a CNM is a registered nurse who has graduated from a nationally-accredited midwifery school, has passed the national exam given by the American College of

---

[4] http://provider.indianamedicaid.com/ihcp/manuals/chapter08.pdf
[5] http://provider.indianamedicaid.com/media/100748/nop%20form.pdf
[6] http://provider.indianamedicaid.com/media/76299/ihcp%20opr%20provider%20enrollment%20a nd%20profile%20maintenance%20packet.pdf

Nurse-Midwives, and is licensed to practice as a nurse-midwife. CNMs are licensed in Indiana by the Indiana State Board of Nursing.

42.   Title 848, Article 3 of the Indiana Administrative Code governs the scope of practice for CNMs. The practice of nurse-midwifery is defined therein as "the practice of nursing and the extension of that practice, including well-woman gynecological healthcare, family planning, and care to the normal and expanding family throughout pregnancy, labor, delivery, and post-delivery." 848 IAC 3-1-2. The competent practice of nurse-midwifery includes the following relevant standards: utilize advanced skills and knowledge to identify abnormal conditions and diagnose health problems; make appropriate decisions commensurate with the scope of the practice of nurse-midwifery; function within the legal boundaries of the practice of nurse-midwifery; and consult and collaborate with other members of the health care team. 848 IAC 3-3-1.

## VI.   SPECIFIC ALLEGATIONS

43.   The facts alleged herein are based upon Dr. Robinson's direct and independent knowledge obtained from her personal experiences working as an employee of Defendants.

44.   Nonphysicians employed, supervised and directed by Defendants systematically and knowingly provide a wide variety of obstetric services to medically high-risk Medicaid patients. These services include deliveries, triage visits, and prenatal checkups and treatments. IU Health and HealthNet fraudulently bill these services to Medicaid, in violation of Indiana Medicaid requirements that medically high-risk patients be treated by physicians.

### A.   The Relationship Between the Defendants

45.   Defendants are distinct, separate legal entities, each a not-for-profit Indiana corporation.

11

46.     Defendants have a deeply interconnected relationship, whereby IU Health provides all employee-related infrastructure to HealthNet, and HealthNet refers all of its patients to IU Health.

47.     HealthNet does not employ its own staff. It has an arrangement with IU Health whereby all those who perform work at or for HealthNet are IU Health employees. All Human Resources functions, including hiring and firing, and all medical staff issues involving HealthNet staff are conducted, investigated, and resolved by IU Health.

48.     All policies and procedures of HealthNet are provided and/or approved by IU Health.

49.     All legal issues involving HealthNet are managed by IU Health's legal department.

50.     Employee benefits for HealthNet staff are provided through IU Health. For example, malpractice insurance is provided through the IU Health Risk Retention Group.

51.     All products, services, supplies, and equipment needed by HealthNet are ordered through IU Health.

52.     Defendants have different electronic medical records programs, but the two systems directly interface and provide dual access.

53.     All labs, x-rays, ancillary services, and referrals from HealthNet go to IU Health.

54.     Billing for outpatient and inpatient HealthNet provider services is done by the HealthNet billing department, all of whom are IU Health employees.

55.     All hospital services are billed by IU Health.

56.     IU Health provides approximately $400,000 per year to HealthNet for the funding for one Ob/Gyn hospitalist and approximately $300,000 per year for the funding of 2.5 CNM triage-staff positions.

57.     IU Health directs approximately $1.3 Million yearly in Graduate Medical Education money to HealthNet for Ob/Gyn resident training.

58.     HealthNet has an outstanding debt to IU Health of approximately $11 Million.

59.     IU Health recently built a new state-of-the-art facility for HealthNet, and IU Health will cover all expenses related to that new site for five years.

B. **Prenatal Treatment of Medically High-Risk Patients is Routinely and Almost Exclusively Provided by Nonphysicians**

60.     Prenatal care is critically important in reducing the risk of pregnancy complications and reducing the baby's risk for complications because, with competent and comprehensive treatment, conditions that can negatively impact the pregnancy or the health of the woman or the baby can be identified early. For many conditions, early diagnosis and treatment are essential to a positive outcome. Typically, prenatal care involves regular screenings and tests, measurements, exams, fetal heart monitoring, and weight-checks, among other things. The higher risk the pregnancy, the greater the necessity for close management and skillful treatment.

61.     Defendant HealthNet is a not-for-profit Indiana corporation that provides primary health services, including prenatal care, to indigent patients.

62.     HealthNet operates nine clinics throughout the Indianapolis metro area at which pregnant women receive prenatal care.

63.     According to HealthNet's annual report for 2011-2012, 3,832 women received prenatal care that year.

64.    In that same annual report, HealthNet reported revenue and grant support of $45.3 Million, with 53% of that being patient-generated revenue through Medicaid, Medicare, private insurance and self-pay patients and 30% being federal, state, and private grants and contributions. The report also identified that 65% of HealthNet's total patient population are Medicaid beneficiaries.

65.    On information and belief, approximately 90% of HealthNet's obstetric patients are Medicaid beneficiaries.

66.    J. Cornelius Brown is the current President and CEO of HealthNet, having assumed that position on June 11, 2012. He replaced Booker Thomas, who had served in that role for the preceding twelve years.

67.    Don Trainor, MD, is, and at all relevant times was, HealthNet's Chief Medical Officer.

68.    Mary Blackburn, CNM, is, and at all relevant times was, the manager of HealthNet's nonphysician-provider group, which included approximately twenty-three (23) Certified Nurse Midwives and three (3) Nurse Practitioners.

69.    Based on Dr. Robinson's personal experience as both Medical Director and a physician serving the patient population targeted by Defendants, between 70 and 90% of the obstetric patients served by Defendants have two or more conditions that put them at risk for either preterm birth or poor pregnancy outcome, thus placing them in the IHCP medically high-risk category.

70.    Defendant HealthNet requires that nonphysicians provide nearly all prenatal care, including obstetric care provided to women whose medical situation mandates that they be

treated as high-risk. This policy is endorsed and enforced by HealthNet Medical Director Don
Trainor. Ob/Gyn residents do not provide physician coverage at HealthNet's clinics.

71.     Upon information and belief, about 90% of the prenatal visits conducted at
HealthNet facilities by HealthNet and/or IU Health employees are performed by nonphysicians.

72.     Thus, if a physician was present at a HealthNet clinic, she would be assigned to
gynecological patients almost exclusively, and nonphysicians would perform essentially all
prenatal care. This business model necessarily results in nonphysicians practicing outside the
scope of their licensure by managing the care of pregnancies that fall well outside the norm.

73.     Dr. Robinson remembers being assigned to, for example, diagnose a teenager's
vaginal discharge, while a nonphysician in the next room treated a medically high-risk pregnant
woman with gestational diabetes and preeclampsia who was carrying twins.

74.     By way of example, for the week ending August 30, 2013, 123 prenatal visits
occurred at Barrington Health Center, one of the nine HealthNet clinics serving indigent
pregnant women around Indianapolis. During that week, all 123 visits were conducted by
nonphysicians, because there was no physician presence at that clinic at all that week. Therefore,
every claim submitted for prenatal services provided by a nonphysician that week to a medically
high-risk Medicaid patient was false and ineligible to be paid.

75.     During the same week, 176 prenatal visits occurred at Southwest Health Center,
another of HealthNet's clinics. A physician was at that clinic for only one day and saw 22
patients, the bulk of whom were gynecological, not obstetric, patients. Nonphysicians, then,
performed at least 154 prenatal visits, and every claim submitted for such a visit for a medically
high-risk patient was false.

76.     By way of further example, patient C.F., a Medicaid beneficiary, was seen at Care Center at the Tower, another of HealthNet's clinics. She presented with multiple health risks, to include asthma, diabetes, obesity, tobacco use, substance use, anemia, sickle cell trait, and recurrent first-trimester pregnancy loss, any two of which would put her in the Indiana Medicaid medically-high risk category. She was seen by a nonphysician for her initial visit of October 15, 2013, and for each of her subsequent four visits, which occurred on November 7, 2013; November 19, 2013; November 25, 2013; and December 3, 2013.

77.     Because C.F. was a medically-high risk patient, the claims submitted for her prenatal care provided by nonphysicians at the Care Center HealthNet facility for the dates of service noted above were all false.

78.     Dr. Robinson was not the first to alert Defendants to their improper behavior: on information and belief, the former COO of HealthNet Elvin Plank had complained about the use of nonphysicians to treat medically high-risk patients but was unable to alter their business model.

79.     Defendants also knew that physicians are required to treat high-risk pregnant patients by virtue of the limitations on nonphysician licensure.

80.     Defendants knew that IHCP would only pay for physicians to treat high-risk patients.

81.     Defendants thus knew that every claim submitted for payment where a nonphysician treated a medically high-risk pregnant Medicaid beneficiary was a false claim.

C.  **Triage Assessment of Medically High-Risk Patients is Provided by Nonphysicians**

16

82.     In addition to providing prenatal care via its clinics, Defendant HealthNet staffs a triage center on the labor and delivery floor of Defendant IU Health's Methodist hospital, the hospital where all of HealthNet's patients deliver.

83.     On information and belief, there are approximately 7,000 triage visits per year.

84.     The triage center is exclusively staffed by nonphysicians employed by Defendants.

85.     Thus, all treatment that is provided at the triage center is provided by nonphysicians, unless the nonphysician calls a physician in to provide treatment.

86.     Every treatment visit provided to a medically high-risk patient by a nonphysician and billed to IHCP is a false claim.

87.     The triage center is designed to be a place where patients can be assessed to determine whether they are in active labor.

88.     All HealthNet patients pass through triage and are assessed by nonphysicians before being admitted to IU Health's labor and delivery floor.

89.     In addition to passing through triage for labor assessment, patients use the triage center as an after-hours prenatal clinic. Thus, they present at the triage center for issues ranging from nausea, to false labor, to decreased fetal movement, to generalized pain.

90.     When any patient enters IU Health's triage for any reason, a nonphysician evaluates her in the triage center and completes a billing sheet, complete with the level of service and diagnostic codes. Stapled to that sheet is a "face sheet" for the patient, on which can be found the patient's name, date of birth, social security number, billing address, insurance, and her primary physician and admitting physician's name.

17

91.     After a patient is seen in triage, the billing sheet and the face sheet are placed in a file drawer. The physician on call signs these sheets upon completion of her 24-hour shift.

92.     A HealthNet courier then collects those sheets and delivers them to the HealthNet billing department.

93.     A physician will only actually see a patient or perform any type of supervision of a nonphysician if the nonphysician deems that physician involvement is necessary.

94.     Physicians are called into the triage area by nonphysicians to assess the status of a patient about 10% of the time. Otherwise, the physician merely co-signs the patient's chart the day following the patient's triage visit.

95.     In addition, on information and belief, Defendants bill all triage visits under the on-call physician's National Provider Identifier (the "NPI"), which is a ten-digit numeric identifier used by CMS to identify healthcare providers, despite the fact that the treatment is not actually provided by that physician.

96.     In addition to the false claims submitted for the treatment of high-risk patients by nonphysicians, and the false claims submitted under the NPI of a non-treating physician, in order to enhance reimbursement, HealthNet staff bill a consultation fee for triage visits.

97.     The IHCP's Provider Manual defines a "consultation" as a "service provided by a physician whose opinion or advice about evaluation and management of a specific problem is **requested by another physician or other appropriate source**" (bolded emphasis in original).

98.     The Provider Manual expressly limits the use of the office consultation to exclude "the evaluation of a self-referred or nonphysician-referred patient, because a consultation implies collaboration between the requesting physician and the consulting physician."

18

99.     Every claim to Medicaid submitted for a consultation fee for treatment provided by nonphysicians at the triage center was false because there were no consultation services provided, as the same are defined by the IHCP.

**D.  Deliveries of Medically High-Risk Patients are Performed by Nonphysicians**

100.    According to HealthNet's annual report for 2011-12, HealthNet staff delivered 2,436 babies at Defendant IU Health.

101.    Approximately 22% of all deliveries performed by HealthNet staff are by Caesarean section.

102.    Those deliveries are typically the only deliveries provided by physicians. Virtually all vaginal deliveries are provided by CNMs, irrespective of the patient's risk status.

103.    Medicaid pays about $850 per delivery to Defendant HealthNet.

104.    Medicaid pays about $2500 per vaginal delivery to Defendant IU Health.

105.    On information and belief, every claim for delivery is submitted under a physician's NPI, regardless of who actually delivered the baby and despite the lack of physician supervision.

106.    Every claim submitted by Defendants to Medicaid for a delivery provided by a CNM of a medically high-risk patient or under a physician's NPI for a delivery not provided or supervised by that physician is a false claim.

**E.  Mothers and Infants Have Suffered Harm as a Result of Defendants' Practices**

107.    Based on her personal knowledge, Dr. Robinson presents the following specific examples of patient harm that have resulted in the last year from Defendants' policy and practice of utilizing only nonphysicians for the treatment of medically high-risk pregnant women.

1. L.E., a Medicaid beneficiary, had a history of preterm labor, preeclampsia and anti-Kell antibody, in addition to having had a previous C-Section. Preeclampsia is a condition that can develop during pregnancy when there is a sharp rise in blood pressure, swelling, and excess protein in the urine; if untreated, it can lead to eclampsia, which can cause convulsions, coma and death. In addition, if left untreated, preeclampsia can affect the neurological development of the baby. When a woman's tests indicate that she has anti-Kell antibodies, the concern becomes whether the baby is at risk for developing hemolytic disease of the newborn, which is a condition where the mother's anti-Kell antibodies pass through the placenta and attack the red blood cells in the fetal circulation. This can lead to anemia and, in severe cases, fetal death from heart failure. Any two of L.E.'s factors place her in the Medicaid medically-high-risk category of patients, and her care should have been managed by a physician. However, she did not see a physician until her fifth prenatal visit. She went into labor and was delivered at 25 weeks. The baby had a prolonged stay in the Neonatal Intensive Care Unit, at an average cost of $3,000 per day, but ultimately died from severe prematurity.

2. S.B., a 19-year-old Medicaid beneficiary, did not see a doctor at all during her prenatal care, despite suffering from persistent hypertension that required a prolonged hospital stay, after which she was discharged on three different anti-hypertensive medications. She developed severe preeclampsia, which can be fatal to both the mother and the baby. These risk factors put her in the high-risk category. However, the nonphysician provider did not admit the patient for observation, assessment or delivery. Instead, she was sent home. No physician

was consulted, although an electronic message was sent late on a Friday afternoon asking for a physician to review the chart. By pure coincidence, Relator saw that message because she was using the electronic medical records system for another purpose. Relator immediately assessed that the patient was in real and immediate danger and admitted her. At 36.3 weeks, for her safety and that of her baby, S.B. required and received an urgent C-Section.

3. T.W., a 40-year-old Medicaid beneficiary, did not have her prenatal care managed by a physician, despite her advanced maternal age and the fact that she had an abnormal quad screen, two factors which placed her in the medically high-risk category. A quad screen is a genetic test performed between weeks 16 and 18 of a pregnancy, and the results of the test are combined with the mother's age and ethnicity in order to assess the likelihood of certain potential genetic disorders in the baby. Because it is a screening test and not a diagnostic test (that is, the results will indicate the probable risk of an abnormality but will not rule it in or out definitively), an abnormal quad screen should be followed by diagnostic tests right away. This is important for several reasons, not least because there are interventions for some abnormalities that, to be successful, must occur while the baby is still in utero. In addition, if a baby does receive a definitive diagnosis of an abnormality, the parents can make informed decisions about whether to continue with the pregnancy and how to structure their lives for the arrival of a child with special needs. At 38 weeks, far too late for either intervention or informed decision-making, T.W. had an ultrasound, which was highly abnormal. Specifically, the ultrasound showed severe growth retardation with elevated

umbilical dopplers, indicating that the baby needed to be immediately delivered. At that point, a physician was called in to give her the news and to schedule delivery.

4.  A.B., a Medicaid beneficiary, had a history of previous C-Section and she had gestational diabetes, making her a clear high-risk patient. However, the nonphysicians providing her care supported and encouraged her desire to only be managed by midwives and to have a VBAC (a vaginal birth after a C-Section), and she was only seen once by a physician during her prenatal care. Notably, the primary risk associated with a VBAC delivery is a uterine rupture. Here, A.B. was admitted to the hospital in labor, at which point a physician was contacted. Despite the physician's advice, A.B. refused a C-Section. Her uterus did, in fact, rupture, and the baby is permanently neurologically impaired.

5.  N.K., a Medicaid beneficiary, never saw a doctor during her prenatal care. She was admitted to the hospital at 40.6 weeks for induction of labor due to gestational hypertension. The overlong duration of her pregnancy and her hypertension put N.K. squarely in the Medicaid medically high-risk category. The nonphysician who managed her care at the hospital, with no physician involvement, sent N.K. home after two days of induction because there was no change in her cervix. N.K. returned to the hospital two days later in early labor. She was placed on the fetal monitor in triage, and a highly abnormal fetal heart rate tracing was noted. Only then was a physician notified, and an emergency C-Section was performed. The baby is permanently neurologically impaired. After delivery, various physicians reviewed the monitor strip from N.K.'s initial two-

day admission for induction and determined that, with the abnormal tracing that

was evident at that time, N.K. never should have been sent home.

6.  J.W., a Medicaid beneficiary, had at least two of the medically-compromising

conditions listed by Medicaid: she was morbidly obese, and she had gestational—

possibly chronic—hypertension. J.W. was not seen by a physician during her

prenatal care until she was over 37 weeks. Upon examining J.W. and reviewing

her chart, the physician suggested that the baby's heart be monitored. A long heart

deceleration was seen, and J.W. was immediately sent to the hospital, where she

received an emergency C-Section.

7.  L., a Medicaid beneficiary, entered triage with multiple medical high-risk factors:

at 36 weeks, she had uncontrolled insulin-dependent diabetes, poorly controlled

gestational hypertension, and cholestasis of pregnancy, a condition where the flow

of bile slows or stops, creating elevated levels of maternal bile, which causes

stress on the baby's liver. This can lead to fetal distress, preterm birth, or

stillbirth. Typically, close monitoring is required, and induction after the baby's

lungs have matured (typically at 36 weeks) is recommended. These medical

conditions placed L. squarely in the high-risk category. However, she was

assessed in triage with no physician involvement and was sent home with no

intervention plan.

**F.  Dr. Robinson's Employment Was Terminated Because She Questioned Defendants' Dangerous and Improper Business Model**

108.    Deeply concerned about patient safety, Dr. Robinson alerted HealthNet

management, including the former and current CEO, the former COO, and the current Medical

Director, to the dangers associated with Defendants' policy of ensuring a lack of physician

management of high-risk patients. Dr. Robinson also met with Dr. Niemeier, the Chief Medical Officer of Defendant Methodist Hospital, and informed him of her concerns about the business model of having nonphysicians provide essentially all prenatal care to such a high-risk population. She was met with resistance, obfuscation, and, at times, abusive behavior.

109.    Dr. Robinson was unable to effect a change in Defendants' approach to patient care, and on information and belief, Defendants continue to utilize nonphysicians to provide essentially all obstetric care to their medically high-risk patients and to submit false claims for those visits.

110.    On or about May 1, 2013, Dr. Robinson was called into Dr. Niemeier's office, where he informed her that Defendant HealthNet was getting agitated about Dr. Robinson's complaints about the lack of physician management of obstetric patients. He advised her to "go into hiding" because her job was in jeopardy.

111.    HealthNet's Medical Director Don Trainor was so committed to this business model that, according to Dr. Niemeier, Don Trainor met with Methodist Hospital's president James Terwilliger and informed him that the relationship between the two entities was at risk if IU Health did not get rid of Dr. Robinson.

112.    On or about June 7, 2013, Dr. Niemeier informed Dr. Robinson that "things [were] getting to a crisis stage" and that HealthNet wanted her fired.

113.    On or about June 14, 2013, Dr. Niemeier informed Dr. Robinson that she was being released from her contract because "HealthNet wants [her] out."

114.    Dr. Robinson's final day of employment by Defendants was August 9, 2013.

## COUNT I: VIOLATIONS OF THE UNITED STATES CIVIL FALSE CLAIMS ACT

115.    The allegations in the foregoing paragraphs are re-alleged as if fully set forth herein.

116.    Defendant IU Health and Defendant HealthNet knowingly presented or caused to be presented false or fraudulent claims for payment or approval to the United States in violation of 31 U.S.C. § 3729(a)(1)(A), including claims in violation of conditions of payment for prenatal, triage, and delivery services.

117.    Defendants' actions in knowingly presenting or causing to be presented false claims for payment for obstetric services were done knowingly as that term is defined by the False Claims Act, 31 U.S.C. § 3729(b)(1)(A)(i-iii), and § 3729(b)(1)(B).

118.    Defendants' violations would have a natural tendency to affect Medicaid's payment of the resulting claims, and as such are material to payment.

119.    Defendants also knowingly made, used or caused to be made or used, false records and statements material to a false or fraudulent claim in violation of 31 U.S.C. § 3729(a)(1)(B).

120.    In violation of 31 U.S.C. § 3729(a)(1)(8), Defendants knowingly created and used, or caused to be made or used, false billing records that masked violations of conditions of payment of the claim, including unqualified and unlicensed services performed by nonphysicians for obstetric services.

121.    Defendants' actions in knowingly creating and using, or causing to be made or used, false or fraudulent documents were done knowingly as that term is defined by the False Claims Act, 31 U.S. C.§ 3729(b)(1)(A)(i-iii), and § 3729(b)(1)(8).

## COUNT II: VIOLATIONS OF THE INDIANA FALSE CLAIMS AND WHISTLEBLOWER PROTECTION ACT, IND. CODE § 5-11-5.5.1

122.     The allegations of the above paragraphs are incorporated as if fully set forth herein.

123.     In performing the acts described above, Defendants knowingly or intentionally presented false claims to the State of Indiana for payment or approval and/or knowingly made or caused to be made or used a false record or statement to get a false claim paid or approved by the State of Indiana in violation of the Indiana False Claims and Whistleblower Protection Act, IC 5-11-5.5-1 *et seq.*

124.     The State of Indiana, unaware of the foregoing circumstances and conduct of the Defendants, made full payments, which resulted in its being damaged in an amount to be determined.

125.     The State of Indiana is entitled to treble damages and civil recoveries for each and every false or fraudulent claim, record or statement made, used, presented, or caused to be made, used or presented by the Defendants.

## COUNT III: RETALIATION AND WRONGFUL DISCHARGE UNDER THE FCA

126.     The allegations of the above paragraphs are incorporated as if fully set forth herein.

127.     Under the False Claims Act, section 31 U.S.C. § 3730(h), an employee who, because of her efforts to stop one or more violations of the False Claims Act, faces adverse employment action or discrimination, is entitled to relief.

128.     As alleged above, Dr. Robinson engaged in lawful acts in furtherance of efforts to stop violations of 31 U.S.C. § 3729. Defendants were on notice of Dr. Robinson's objections to Defendants' practices, which were in violation of material conditions of payment governing government healthcare claims. As a direct result of her efforts, Defendants retaliated against Dr.

26

Robinson: she was harassed, intimidated, and ultimately released from her employment contracts.

129.    As a direct and proximate result of the actions of IU Health and HealthNet, Dr. Robinson lost the benefits and privileges of employment and has suffered continuing damage to her reputation and career. She is entitled to all relief necessary to make her whole, including two times the amount of back pay, interest on the back pay, and compensation for special damages sustained as a result of the retaliation, including litigation costs and reasonable attorneys' fees.

## COUNT IV: RETALIATION AND WRONGFUL DISCHARGE UNDER IND. CODE § 5-11-5.5.8

130.    The allegations of the above paragraphs are incorporated as if fully set forth herein.

131.    Under the Indiana False Claims and Whistleblower Protection Act, Ind. Code § 5-11-5.5-8, an employee is entitled to relief when that employee has been discharged, threatened, harassed, or otherwise discriminated against in the terms and conditions of employment because the employee objected to an act or omission under the Indiana False Claims and Whistleblower Protection Act.

132.    As alleged above, Dr. Robinson engaged in lawful acts in furtherance of efforts to stop violations of the Indiana False Claims and Whistleblower Protection Act. As a direct result of her efforts, Defendants harassed and intimidated Dr. Robinson, and her employment was ultimately terminated.

133.    As a result of Defendants' actions, Dr. Robinson was harmed and is entitled to all relief necessary to be made whole.

### PRAYER FOR RELIEF

WHEREFORE, Relator prays for judgment against Defendants as follows:

A.     That the Court enter judgment against Defendants and order that they cease and desist from violating 31 U.S.C. § 3729 et seq., and the Indiana Act;

B.     That the Court enter judgment against Defendants in an amount equal to three times the amount of the damages the United States Government has sustained because of Defendants' action, plus a civil penalty of not less than $5,000 and not more than $11,000 for each action in violation of 31 U.S.C. § 3729;

C.     That the Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Indiana has sustained because of Defendants' actions, plus a civil penalty of not less than $5,000 for each violation of the Indiana Act;

D.     That the Court enter judgment against Defendants pursuant to 31 U.S.C. § 3730(h), including an award to Relator of two times the amount of her back pay, with interest, and compensation for special damages including litigation costs and reasonable attorneys' fees;

E.     That the Court enter judgment against Defendants pursuant to Ind. Code § 5-11-5.5-8, including an award to Relator of two times the amount of back pay, with interest, and compensation for special damages, including litigation costs and reasonable attorneys' fees;

F.     That the Court enter judgment against Defendants for  the costs of this action, with interest, including the costs to the United States Government and the State of Indiana for their expenses related to this action;

G.     That Relator be awarded the maximum amount allowed pursuant to § 3730(d) of the False Claims Act and the equivalent provision of the Indiana Act;

H.     That Relator be awarded all costs, attorneys' fees, and litigation expenses;

I.     That the United States Government, the State of Indiana, and Relator receive all relief, both at law and in equity, to which they may reasonably appear entitled; and

J.    That Relator recover such other relief as the Court deems proper and just.


## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands a

trial by jury.

Respectfully submitted,

Robert E. Saint, Esq.
Of Counsel:
EMSWILLER, WILLIAMS, NOLAND & CLARKE, P.C.
8500 Keystone Crossing, Suite 500
Indianapolis, Indiana 46240-2461
Phone: (317) 475-4469
Fax: (317) 257-9042
Email: rsaint@ewnc-law.com


_s/Frederick M. Morgan_____


Frederick M. Morgan Jr. (*pro hac vice pending*)
Jennifer M. Verkamp (*pro hac vice pending*)
MORGAN VERKAMP LLC
700 Walnut Street, Suite 400
Cincinnati, Ohio 45202
Phone: (513) 651-4400
Fax: (513) 651-4405
Email: rmorgan@morganverkamp.com
Email: jverkamp@morganverkamp.com


*Attorneys for Relator Dr. Judith Robinson*

# DO NOT SERVE