# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| UNITED STATES and STATE OF INDIANA *ex rel.* [Under Seal], | : | Case No. [Under Seal] |
| | : | |
| | : | **AMENDED COMPLAINT** |
| Plaintiffs/Relator, | : | |
| | : | Filed Under Seal Pursuant to |
| v. | : | 31 U.S.C. § 3730(b)(2) |
| | : | |
| [Under Seal], | : | DO NOT SERVE OR POST |
| | : | ON PACER |
| Defendants. | : | |

Filed by:

**Robert E. Saint**
rsaint@ewnc-law.com
Of counsel:
EMSWILLER, WILLIAMS, NOLAND & CLARKE, P.C.
8500 Keystone Crossing, Suite 500
Indianapolis, IN   46240
Phone: 317-475-4469
Fax:    317-257-8787

**Jillian Estes**
jestes@jameshoyer.com
**Christopher Casper**
ccasper@jameshoyer.com
JAMES, HOYER, NEWCOMER & SMILJANICH, P.A.
4830 W. Kennedy Blvd.
One Urban Center, Suite 550
Tampa, FL   33609
Phone: 813-397-2300
Fax:    813-397-2310

**Christopher Jayson**
cjayson@jfswlaw.com
JAYSON, FARTHING, SKAFIDAS & WRIGHT, P.A.
5401 W. Kennedy Blvd., Suite 600
Tampa, FL   33609
Phone: 813-321-1111
Fax:    813-321-1112

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| UNITED STATES and STATE OF INDIANA *ex rel.* JUDITH ROBINSON, | : | Case No. 1:13-cv-2009-TWP-MJD |
| | : | |
| | : | **AMENDED COMPLAINT** |
| Plaintiffs/Relator, | : | |
| | : | Filed Under Seal Pursuant to |
| v. | : | 31 U.S.C. § 3730(b)(2) |
| | : | |
| INDIANA UNIVERSITY HEALTH, INC. | : | |
| f/k/a CLARIAN HEALTH PARTNERS, INC., | : | DO NOT SERVE OR POST |
| HEALTHNET, INC., and | : | ON PACER |
| MDWISE, INC. | : | |
| Defendants. | : | |

**AMENDED COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT AND THE INDIANA FALSE CLAIMS AND WHISTLEBLOWER PROTECTION ACT**

This is an action brought by Plaintiff/Relator Judith Robinson, M.D., on behalf of the United States of America and the State of Indiana pursuant to the Federal False Claims Act, 31 U.S.C. § 3729, et seq., and the Indiana False Claims and Whistleblower Protection Act, Ind. Code § 5-11-5.5-1, et seq.  In support thereof, Relator alleges as follows:

### INTRODUCTION

1.　　High-risk, low-income pregnant women in Indianapolis, Indiana, rely on the HealthNet clinics and Indiana University Health's Methodist Hospital to care for them and their newborn babies. Yet, contrary to their carefully crafted image of offering compassionate care for the indigent, two of the largest healthcare providers in Indianapolis put poor, pregnant women and their newborn babies at risk with a fraud scheme designed to increase revenues, regardless of the law or the risks to the most medically-fragile patients.

2.      The State of Indiana specifically crafted its Medicaid program to ensure that high-risk pregnant women only receive medical care from physicians.  Yet, the scheme engineered by IU Health and HealthNet kept doctors from treating these patients, leaving their care to the lower-cost nurse-midwives.  But when it came time to bill taxpayers, IU Health and HealthNet claimed that the services were provided by Ob/Gyn physicians, even though the doctors never met or examined the patients.  As a result, HealthNet and IU Health bilked taxpayers out of hundreds of millions of dollars in false or fraudulent claims.

3.      The patients paid a price too: newborn babies with permanent neurological injuries, emergency Caesarian-sections, and even instances of maternal and fetal death.  Take, for example, the story of patient N.K.,[1] a high-risk Medicaid beneficiary who never saw a physician during her prenatal visits.  At almost 41-weeks, N.K. was evaluated at the hospital by nurse-midwives and was sent home by a nurse-midwife when efforts to induce labor didn't work, despite being overdue, suffering from gestational hypertension, and never seeing an actual physician.  When N.K. finally came back to the hospital two days later, her baby showed signs of abnormal heart tracing, and N.K. was taken to the operating room for an emergency C-section.  But, it was too late—her baby is permanently neurologically impaired.  After the delivery, physicians were finally asked to review the heart monitor strip from N.K.'s induction visit and determined that the abnormal heart tracing should have been evident to the nurse-midwife at that time.  The nurse-midwife should never have sent N.K. home.

4.      The widespread use of nonphysicians to care for high-risk pregnant Medicaid patients is one in a series of fraudulent billing schemes enabled by the intertwined corporate

---

[1] All patients referenced in this Amended Complaint are identified only by their initials to protect their identity.  More complete identifying information has been provided to the Government and is available to the Court upon request.

relationships of HealthNet, IU Health, and MDwise—a managed care entity hired by Indiana to protect taxpayer dollars and ensure high-quality medical care.  As described more fully herein, these entities worked in tandem: HealthNet and IU Health submitted false claims for payment, while MDwise authorized those claims to be fulfilled with taxpayer dollars.  The scheme not only enabled IU Health and HealthNet to receive improper Medicaid and supplemental funding payments, but also allowed MDwise to qualify for bonus payments and artificially increase the flat fee it is paid to treat Medicaid patients.

5.      When Dr. Judith Robinson learned of three instances of babies with permanent neurological injury in a six-month period, she loudly blew the whistle—alerting executives as early as February 2013 of her concerns about their business model.  Four months later, she was fired.  Despite her warnings, the revenue-driven scheme is still going strong.  Dr. Robinson learned in July 2014 of a maternal death that resulted from a certified nurse-midwife's failure to properly ascertain a patient's medical needs.  Once Dr. Robinson was pushed out of the way, HealthNet and IU Health have continued their practices—and the damages they cause to the U.S., Indiana, and high-risk mothers and their babies.

## JURISDICTION AND VENUE

6.      This action arises under the Federal False Claims Act, 31 U.S.C. § 3729, *et seq.*, and the Indiana False Claims and Whistleblower Protection Act, Ind. Code § 5-11-5.5-1, *et seq.* This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331and 31 U.S.C. § 3732(a), which specifically confers jurisdiction on this Court for actions brought under 31 U.S.C. § 3730.  Additionally, 31 U.S.C. § 3732(b) specifically confers jurisdiction on this Court for state-law claims that arise under the same transactions or occurrences as an action brought under 31 U.S.C. § 3730.

7.     This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because the Defendants can be found in, reside in, transact business in, and have committed the alleged acts in Marion County, Indiana, which is in the Southern District of Indiana.

8.     Venue is proper in this District pursuant to 28 U.S.C. § 1392(b)-(c) and 31 U.S.C. § 3732(a) because the Defendants can be found in, reside in, and transact business in the Southern District of Indiana and the alleged acts occurred in this District.

9.     Relator knows of no other complaints that have been filed against the Defendants alleging the same or similar allegations.  To Relator's knowledge, the facts and circumstances alleged in this Complaint have not been publicly disclosed in a federal criminal, civil or administrative hearing in which the Government or its agent is a party; in a Government Accountability Office or other federal report, hearing, audit, or investigation; or in the news media.

10.     Relator is an original source as defined by the False Claims Act in 31 U.S.C. § 3730(e)(4)(B) and as described in the Indiana False Claims and Whistleblower Protection Act at Ind. Code 5-11-5.5-7(f), as detailed more fully herein.  Relator has made voluntary disclosures to the United States of America and the State of Indiana prior to the filing of this lawsuit as required by 31 U.S.C. § 3730(b)(2).

**PARTIES**

11.     The real-parties-in-interest to the claims set forth herein are the United States of America and the State of Indiana.

12.     **Plaintiff and Relator Judith Robinson, M.D.,** is a resident of Carmel, Indiana. She received her Doctor of Medicine from the University of Illinois in 1981 and performed her

5

residency in Obstetrics and Gynecology at Methodist Hospital in Indianapolis, Indiana from

1983 to 1987. Dr. Robinson is a Board-certified Ob/Gyn and a Fellow in the American College

of Obstetrics and Gynecology. Among her many honors, she has received the Indianapolis

Monthly "Top Doc" award for Ob/Gyn physicians each month since 1998. Dr. Robinson had an

active private practice for nineteen years, from 1987 until 2006.

13.     Dr. Robinson began working part-time at HealthNet in or around October 2005.

In or about mid-2006, Dr. Robinson left private practice completely and began working full time

at HealthNet. At all times from 2005 until her termination in 2013, Dr. Robinson received her

W-2 from IU Health (f/k/a Clarian Health Partners, Inc.) and was eligible to participate in IU

Health's group health insurance plan, disability insurance plan, and qualified retirement plan. In

2010, Dr. Robinson was appointed to the position of Medical Director of Ob/Gyn Services at

Methodist Hospital. She also held the position of Chairperson of Methodist Hospital Ob/Gyn

Section and was the Manager of the HealthNet/IU Health Hospitalist Service. From 2010

through 2012, Dr. Robinson was also the Assistant Ob/Gyn Residency Director for the Methodist

Hospital campus. In 2011, Dr. Robinson was appointed to the position of Director of Women's

Services at HealthNet, Inc., which made her the first person to hold Director positions at both

HealthNet and Methodist Hospital concurrently.

14.     **Defendant Indiana University Health, Inc. ("IU Health")** is an Indiana non-

profit corporation that was formed in January 1997 through a consolidation of assets between the

Trustees of Indiana University and Methodist Health Group, Inc. As a result of the

consolidation, IU Health and its subsidiaries are a conglomeration of hospitals, physicians and

allied services that provide healthcare throughout Indiana under various names. IU Health was

formerly known as Clarian Health Partners, Inc. and formally changed its name to Indiana

6

University Health, Inc. on January 6, 2011, effective April 1, 2011. IU Health is governed by a Board of Directors and employs a staff of approximately 36,000. Its current President and Chief Executive Officer is Dan Evans.

15.     IU Health's largest hospital is Indiana University Health Methodist Hospital (d/b/a "Methodist Hospital") in Indianapolis, Indiana. Methodist Hospital is the site of all patient deliveries and triage services referenced herein. Although under the IU Health umbrella, Methodist Hospital has its own set of executives. The current President is Herbert Buchanan, Jr., who immediately succeeded James Terwilliger. The current Chief Medical Officer is Dr. Michael Niemeier, M.D.

16.     **Defendant HealthNet, Inc. ("HealthNet")** is a non-profit corporation with nine primary care health centers and additional specialty clinic locations throughout metro Indianapolis, Indiana. HealthNet, Indiana's largest federally qualified health center, was established in 1968 and provides healthcare services primarily to patients who live at or below the federal poverty level. HealthNet provides these services, which include pediatrics, obstetrics, and gynecological services, on a sliding fee scale to those without insurance, but the bulk of its patients are Medicaid beneficiaries. The current President and CEO of HealthNet is J. Cornelius Brown and its Chief Medical Officer is Dr. Don Trainor, M.D.

17.     According to HealthNet's 2012-2013 annual report, 4,077 women received prenatal care at HealthNet that year, including 2,422 deliveries at IU Health's Methodist Hospital. That report also identified that 61% of HealthNet's total patient population are Medicaid beneficiaries. Upon information and belief, approximately 90% of HealthNet's obstetric patients are Medicaid beneficiaries.

7

18.     **Defendant MDwise, Inc. ("MDwise")** is a non-profit managed care entity based in Indianapolis, Indiana. MDwise began operations in 1994, and purchased 100% of the stock of IU Health Plan, Inc. ("IUHP") in or about December 2006. It is jointly owned and controlled by Defendant IU Health and the Health and Hospital Corporation of Marion County, Indiana (which operates Eskenazi Health, a county hospital). In 2008, MDwise took over a contract to provide Medicaid services to qualified Indiana residents under the Hoosier Healthwise plan. In 2011, MDwise was awarded a new contract to provide managed care for recipients of both Hoosier Healthwise and the Healthy Indiana Plan. MDwise is the single largest managed care provider in Indiana with more than 270,000 members.

## Relationship Between Defendant Parties

19.     All three defendants are separate legal entities, but are inextricably intertwined.

20.     HealthNet serves as a *de facto* affiliate of IU Health. HealthNet receives funding for medical staff from IU Health, borrows money for operational needs from IU Health, obtains malpractice insurance through an IU Health subsidiary, uses IU Health laboratories, and orders its supplies through IU Health. HealthNet technically pays its own employees, but the compensation is provided using IU Health's employer identification number, such that HealthNet's approximately 700 employees receive 1099s and W-2s through IU Health. In 2012, IU Health contributed $254,100 in cash to HealthNet. IU Health did not list HealthNet as a related, tax-exempt organization. Upon information and belief, all policies and procedures at HealthNet are provided by or approved by IU Health.

21.     For example, in 2005, Dr. Robinson signed an employment contract with Clarian Health Partner, Inc., which is the former corporate name of IU Health, Inc. The contract was signed by Samuel Odle, identified as the "President and CEO of Methodist & IU Hospitals."

Clarian defined itself as the "Hospital," but then specifically appointed Dr. Robinson as a "HealthNet OB-GYN Hospitalist" who would "provide services at HealthNet Community Health Centers ('HealthNet')." The agreement further explained that, "Hospital shall employ, at its own expense, such physician and non-physician personnel as it deems necessary for the effective operation of HealthNet" and "Hospital shall furnish and maintain, at its own expense, such space, facilities, equipment, fixtures, supplies and services as it deems necessary for the effective operation of HealthNet."

     22.     Dr. Robinson's 2005 employment contract stated, "All funds collected for services rendered at the HealthNet Health Centers shall be the general, unrestricted funds of Hospital and HealthNet."

     23.     Despite Dr. Robinson's initial contract with Clarian / IU Health, HealthNet, Inc. reported Dr. Robinson as one of its five highest compensated employees on its 2012 Form 990, reported to the IRS due to its status as a non-profit, tax-exempt organization.

     24.     In return for IU Health's financial, operational, and technological support, HealthNet refers all of its patients to IU Health. For example, all lab work, x-rays, and ancillary services required for HealthNet patients are referred to IU Health.

     25.     MDwise, the managed care entity, is owned in equal parts by Defendant IU Health and by the Health and Hospital Corporation of Marion County. Upon information and belief, department directors and administrators from HealthNet (i.e. CEO, COO, and CMO) conducted regular monthly meetings with representatives from MDwise. HealthNet did not conduct the same sort of meetings with any other managed care entity.

     26.     Dr. Robinson recalls an instance wherein Don Trainor stated to her that, "Most of the HealthNet patients are MDwise. IU Health owns them so it's best to keep it all in the

family!" To accomplish Trainor's mission of keeping patients "all in the family," Dr. Robinson

was told by Trainor and Mary Blackburn, the manager of HealthNet's nonphysician-provider

group, in or around 2011 that HealthNet employees who met with new Medicaid enrollees for an

initial Financial Interview Service ("FIS") visit would steer the Medicaid recipients into selecting

MDwise from the three possible MCE choices.

## LEGAL AND REGULATORY BACKGROUND

**Federal False Claims Act**

27.     The False Claims Act, 31 U.S.C. § 3729(a)(1)(A) and (B), imposes liability upon,

*inter alia*, those who knowingly present or cause to be presented false claims for payment or

approval, and those who make or use, or cause to be made or used, false records or statements

material to a false claims.  Violators are liable to the United States Government for a civil

penalty of not less than $5,000 and not more than $10,000, plus three times the amount of

damages sustained by the Government.  31 U.S.C. § 3729(a)(1).

28.     Employees who have been discharged, demoted, suspended, threatened, harassed,

or in any manner discriminated against in terms and conditions of employment, because of

lawful acts in furtherance of efforts to stop violations of the False Claims Act, are entitled to

relief necessary to be made whole.  31 U.S.C. § 3730(h).

**Indiana's False Claims Act Indiana False Claims and Whistleblower Protection Act**

29.     Indiana's False Claims and Whistleblower Protection Act, Ind. Code § 5-11-5.5-1,

*et seq.*, is modeled upon the federal False Claims Act and proscribes the same conduct. "A

person who knowingly or intentionally…presents a false claims to the state for payment or

approval, [or] makes or uses a false record or statement to obtain payment or approval of a false

claim from the state…is…liable to the state for a civil penalty of at least five thousand dollars

($5,000) and for up to three (3) times the amount of damages sustained by the state." Ind. Code § 5-11-5.5-2(b)(1)-(2).

30.     The Indiana Act also provides relief for employees who have been "discharged, demoted, suspended, threatened, harassed, or otherwise discriminated against" because the employee objected to a false claims made by the employer. Ind. Code § 5-11-5.5-8(a). Further, relief for the employee may include reinstatement, two times the amount of back pay owed the employee, interest on back pay owed, and compensation for special damages, including litigation costs and reasonable attorney's fees. Ind. Code § 5-11-5.5-8(b).

**Indiana Medicaid**

31.     The federal Medicaid program was created in 1965 as part of the Social Security Act, which authorized federal grants to states for medical assistance to low-income persons, blind, disabled, or members of families with dependent children or qualified pregnant women or children. The Medicaid program is jointly financed by the federal and state governments. The Secretary of Health and Human Services administers Medicaid on the federal level through the Centers for Medicare and Medicaid Services ("CMS"). Within broad federal rules, each state decides eligible groups, types and range of services, payment levels for services, and administrative and operating procedures. The states directly pay providers, with the states obtaining the federal share of the payment from accounts which draw on the United States Treasury. 42 C.F.R. §§430.0-430.30. The federal share of Medicaid expenditures varies by state.

32.     The Indiana Health Coverage Program ("IHCP"), Indiana's Medicaid program, is administered by the Indiana Family and Social Service Administration, an agency of the State of Indiana. It offers both fee-for-service and capitated managed care programs.

33.     Healthcare providers who wish to provide and be paid for services to Medicaid beneficiaries must first become approved Medicaid providers.  This applies to both individual providers and to institutional providers.  To become an approved Medicaid provider, each provider must complete an enrollment packet with the IHCP.  As part of that packet, each provider must execute a "Provider Agreement," which expressly includes the following statement, set in all capital letters immediately before the authorized signature line:

> AS A CONDITION OF PAYMENT AND CONTINUED ENROLLMENT IN THE IHCP, THE UNDERSIGNED, BEING THE PROVIDER OR HAVING THE SPECIFIC AUTHORITY TO BIND THE PROVIDER TO THE TERMS OF THIS AGREEMENT, AND HAVING READ THIS AGREEMENT AND UNDERSTANDING IT IN ITS ENTIRETY, DOES HEREBY AGREE TO ABIDE BY AND COMPLY WITH ALL THE STIPULATIONS, CONDITIONS, AND TERMS SET FORTH HEREIN.

34.     Among the "stipulations, condition and terms set forth" in the agreement, compliance with which is specifically identified as a condition of payment, is the following: "To abide by the Indiana Health Coverage Programs Provider Manual, as amended from time to time, as well as all provider bulletins and notices."

35.     In Indiana, Medicaid is funded approximately one-third by the State of Indiana and two-thirds by the federal government.  For example, for FY2015, the federal government assistance percentage ("FMAP") for Indiana is 66.52%, meaning the state is responsible for the remaining 33.48%.  The FMAPs from 2009 to the present are:

| Fiscal Year | FMAP | State Share |
|---|---|---|
| FY2008 | 62.69% | 37.31% |
| FY2009 | 74.21% | 25.79% |
| FY2010 | 75.69% | 27.31% |
| FY2011 | 66.52% | 33.48% |
| FY2012 | 66.96% | 33.04% |
| FY2013 | 67.16% | 32.84% |
| FY2014 | 66.92% | 33.08% |

36.     One of Indiana Medicaid's programs is Hoosier Healthwise.  Hoosier Healthwise is a mandatory managed care program for low-income families, pregnant women, and children. Those eligible for Medicaid coverage under Hoosier Healthwise include children up to age 19, parents and guardians of children under the age of 18, and pregnant women.  Under Hoosier Healthwise, the Indiana Family and Social Services Administration, Office of Medicaid Policy and Planning contracts with three managed care entities: Anthem, Managed Health Services ("MHS"), and Defendant MDwise.  Beneficiaries are entitled to select from among the three options or may be assigned membership to one entity through an automated system.

### *Specific Indiana Medicaid Regulations Regarding the Use of Non-Physician Providers for High-Risk Obstetric Patients*

37.     Indiana Medicaid plainly and unequivocally conditions the payment of public healthcare money for the treatment of medically high-risk pregnant women on the requirement that those women be treated *only* by physicians.

38.     Chapter 8, page 8-329 *et seq.*, of the IHCP Provider Manual (as updated on January 23, 2014),[2] specifically addresses billing requirements for high-risk pregnancies.  The IHCP Provider Manual distinguishes between psychosocially high-risk pregnancies and medically high-risk pregnancies.  For purposes of this complaint, the term "high-risk" refers only to medically high-risk patients.  In reference to medically high-risk patients, the IHCP Provider Manual specifically states,

> Some pregnant members have medical risk factors that may adversely affect the outcome of the pregnancy if not adequately treated.  These complications, identified during the prenatal assessment, may place the member and the fetus in a high-risk pregnancy category that requires additional primary care management. **The IHCP reimburses only for treatment by physicians for medically high-risk pregnancy care.**  Nonphysician providers that treat pregnant women on

---

[2] http://provider.indianamedicaid.com/ihcp/manuals/chapter08.pdf

13

Medicaid must refer members identified as having medically high-risk pregnancies only to other appropriate physicians. **The IHCP does not permit treatment or referrals to nonphysicians for high-risk pregnancy-related services.**

(Emphasis in original.)

39.     The 2010 IHCP Provider manual included nearly identical language, stating,

Some pregnant members have medical risk factors that may adversely affect the outcome of the pregnancy if not adequately treated. These complications, identified during the prenatal assessment, may place the member and the fetus in a high-risk pregnancy category that requires additional primary care management. The IHCP reimburses only for treatment by physicians for medically high-risk pregnancy care. Some pregnant members have medical risk factors that may adversely affect the outcome of the pregnancy if not adequately treated. These complications, identified during the prenatal assessment, may place the member and the fetus in a high-risk pregnancy category that requires additional primary care management. The IHCP reimburses only for treatment by physicians for medically high-risk pregnancy care. Providers may refer members identified as having medically high-risk pregnancies only to other appropriate physicians. The IHCP does not permit referrals to nonphysicians for high-risk pregnancy-related services. Providers in the *Care Select* program participating in a Memorandum of Collaboration agreement my provide care for patients as defined in the agreement.

Chapter 8, page 8-300 , 2010 IHCP Provider Manual (as updated on Aug. 26, 2010).[3]

40.     As of 2010, an expectant mother must have two or more medical risk factors in her current pregnancy or obstetrical history to be considered medically high-risk. Prior to 2010, only one medical risk factor was necessary for a pregnancy to be deemed high-risk. The 2014 IHCP Provider Manual includes more than fifty common high-risk pregnancy conditions, but notes that the list is purely illustrative and not inclusive of all medical conditions that could complicate a pregnancy. Examples of the conditions presented are anemia, asthma requiring medication, diabetes (gestational or insulin-dependent), drug dependence, a history of low birth-

---

[3] http://provider.indianamedicaid.com/media/23576/chapter08.pdf

weight babies, multiple gestation in current pregnancy (i.e. twins, triplets, etc.), obesity more than 20% of weight for height, hypertension, or a previous Caesarean delivery ("C-section").

41.     Providers are required to fill out a Notification of Pregnancy ("NOP") form to risk factors in pregnant Medicaid patients. NOPs are preferably filled out at the patient's initial assessment, but can be completed at any time during a pregnancy if a patient develops conditions that would change her risk status. A provider is paid $60 every time an NOP is completed and submitted to Medicaid.

42.     If a woman has a medically high-risk pregnancy and a NOP is completed documenting the risk factors, the healthcare provider is entitled to receive additional funds for that patient, including an additional $10 per prenatal visit and additional prenatal visits beyond the otherwise-standard maximum of fourteen. The IHCP Provider Manual notes that the IHCP "recognizes that care of pregnant women in the medical high-risk category requires greater physician management" and thus provides for these additional payments to "physicians practicing obstetrics."

43.     Certified Nurse Midwives are specifically identified as "nonphysicians" in the Indiana Medicaid provider enrollment packet. Certified Nurse Midwives ("CMNs") are required to graduate from an accredited midwifery school, pass the national exam given by the American College of Nurse-Midwives, and obtain licensure as a nurse-midwife from the Indiana State Board of Nursing. The practice of nurse-midwifery is governed by Title 848, Article 3 of the Indiana Administrative Code. Nurse-midwifery is "the practice of nursing and the extension of that practice, including well-woman gynecological healthcare, family planning, and care to the normal and expanding family throughout pregnancy, labor, delivery, and post-delivery." 848 IAC 3-1-2. The competent practice of nurse-midwifery includes the following relevant

standards: utilize advanced skills and knowledge to identify abnormal conditions and diagnose health problems; make appropriate decisions commensurate with the scope of the practice of nurse-midwifery; function within the legal boundaries of the practice of nurse midwifery; and consult and collaborate with other members of the healthcare team. 848 IAC 3-3-1.

**Federally Qualified Health Centers**

44.     A Federally Qualified Health Center ("FQHC") is a health center that receives federal funding under Section 330 of the Public Health Service Act to provide comprehensive primary care services to uninsured and underinsured populations. FQHCs have featured an increasingly prominent role in public health services since the 2010 Patient Protection and Affordable Care Act, because FQHCs have picked up much of the responsibility for treating underserved, low-income communities where there was the largest growth of newly-insured patients. FQHCs must serve an underserved area or population, offer a sliding fee scale, provide comprehensive services, have an on-going quality assurance program, and have a governing board of directors.

45.     Approximately 22 states, including Indiana, offer "wrap-around" payments to compensate FQHCs for the difference between the negotiated health plan rates and the FQHC's cost-based rates. Wrap-around payments are paid by the state as supplements to certain approved Medicaid claims. In Indiana, wrap-around payments are made to an FQHC every 30 days, and reconciled at the year-end.

46.     FQHCs require a provider to engage in a face-to-face meeting to generate a billable encounter that can generate an FQHC wrap-around payment. 42 C.F.R. 405.2463. In a 2011 Policy Report assessing the status of FQHC Medicaid Prospective Payment Systems around the country, Indiana defined a "Billable Encounter (that can generate a payment at health

16

center rate)" as "a face-to-face contact between a client and a provider of health care services who exercises independent judgment in the provision of health services to the individual client."[4]

**Disproportionate Share Hospitals**

47.     The Disproportionate Share Hospital ("DSH") program is a funding mechanism for hospitals that treat indigent patients. In accordance with the Omnibus Budget Reconciliation Act of 1981, states are required to make DSH payments to hospitals that serve a disproportionate share of low-income and/or underinsured patients. Similar to standard Medicaid payments, the federal government contributes to the DSH payment through the Federal Financial Participation ("FFP") amount, which is capped by the total statewide DSH payment limits and hospital-specific limits. FFP is not available for state DSH payments that exceed the hospital's eligible uncompensated care cost, which is the cost of providing hospital services to Medicaid and uninsured patients, less the payments received by the hospital on behalf of those patients.

48.     A state must classify a hospital as eligible to receive DSH payments. Although the requirements are complex, a hospital is typically designated as a DSH if its Medicaid Inpatient Utilization Rate ("MIUR") or Low-Income Utilization Rate ("LIUR") exceeds a fixed threshold, which is typically one percent.

49.     With limited exceptions for children's hospitals or hospitals not providing obstetrics services to the general population, the DSH statute specifically states that, "no hospital may be defined or deemed as a disproportionate share hospital under a State plan under this title...unless the hospital has at least 2 obstetricians who have staff privileges at the hospital and

---

[4] McKinney, Dawn, *et al.*, "State Policy Report #40: 2011 Update on the Status of the Medicaid Prospective Payment System in the States," NATIONAL ASSOCIATION OF COMMUNITY HEALTH CENTERS, accessed at
http://www.nachc.com/client//2011%20PPS%20Report%20SPR%2040.pdf

who have agreed to provide obstetric services to individuals who are entitled to medical

assistance for such services under such State plan." 42 U.S.C. § 1396r-4(d). The statute does

not provide minimum employment requirements for any other provider specialty.

50.     Payments under the DSH program are substantial. By way of example, Indiana

reported that IU Health received the following DSH and other Medicaid "add-on" or

supplemental payments from the state under IAC 12-15-16(1-3):

| Year | Name | Amount |
|------|------|--------|
| 2010 | Clarian Health Partners, Inc.* | $165,000,000 |
| 2010 | IU Health | $42,155,265 |
| 2011 | Clarian Health Partners, Inc. | 114,760,764 |
| 2011 | IU Health | 41,639,236 |
| 2011 | IU Health | 44,921,405 |
| 2011 | IU Health | 42,765,996 |
| 2012 | IU Health | 63,261,000 |
| 2012 | IU Health** | 474,235,000 |
| 2013 | IU Health*** | 185,806,000 |
|      | Assessment**** | ($268,276,000) |
| **Total** | | $906,268,666 |

\* IU Health was formerly known as Clarian Health Partners, Inc.
\*\* Total of increased DSH revenue received in 2012, which includes
reimbursements for multiple years
\*\*\* Total of increased DSH revenue received in 2013, which includes
reimbursement for multiple years
\*\*\*\* In April 2012, the Indiana Attorney General Assembly approved a hospital
assessment fee program. Under the program, the Office of Medicaid Policy and
Planning ("OMPP") collected an assessment fee from hospitals. The fee was to
be used to increase reimbursement to eligible hospitals for fee-for-service and
managed care programs and as the state share of DSH payments. It was
retroactive to July 1, 2011.

**Anti-Kickback Statute**

51.     The federal Anti-Kickback Statute ("AKS") creates a penalty for any person who

knowingly and willfully offers or pays any remuneration, directly or indirectly, overtly or

covertly, in cash or in kind, (1) to refer an individual to a person for the furnishing or arranging

18

of an item or service for which payment can be made in part or in whole under a Federal health care program, or (2) to purchase, lease, order or arrange for or recommend purchasing, leasing, or ordering any good, facility, service or time for which payment may be made in whole or in part under a Federal health care program. 42 U.S.C. § 1320a-7b(b)(2). The commission of such an act is a felony punishable by a fine of $25,000, five years in prison or both. *Id.* Any individual who solicits or receives such an offer is equally liable and faces the same punishment. 42 U.S.C. S 1320a-7b(b)(1).

52.     Compliance with the Anti-Kickback Statute is a precondition to participation in any federal healthcare program, including Medicaid.

## DEFENDANTS' WRONGFUL CONDUCT

53.     Expressly motivated by a desire to minimize costs and maximize revenues, Defendants IU Health and HealthNet have structured their obstetrics business in such a way that it not only causes the submission of false claims, but also poses a risk of permanent, devastating injuries for pregnant women and their babies. Defendants collectively operated a complex scheme to funnel obstetric patients into MDwise as the managed care entity responsible for distributing Medicaid reimbursement, and to maximize Medicaid reimbursements by using certified nurse midwives and nurse practitioners (collectively "nonphysicians")[5] to treat all obstetric patients, regardless of risk factors that mandate physician involvement. Defendants also collaborated to submit claims for FQHC payments for services that were performed without an appropriate provider conducting a face-to-face visit with the patient. Finally, MDwise

---

[5] The majority of nonphysician care involved in this complaint relates to the use of certified nurse midwives. However, nurse practitioners also provided care to high-risk patients beyond the scope of their credentials and despite the IHCP Provider Manual's prohibition. For simplicity in pleading, the term "CNM" or "nurse-midwife" incorporates nurse practitioners as well, unless otherwise stated.

knowingly failed to identify and reject the false claims submitted under physician names but actually conducted by nonphysicians.

54.     Defendants' fraudulent conduct began or was already on-going in 2005 when Dr. Robinson began working at HealthNet. Therefore, all claims submitted since 2005 to the present by IU Health, HealthNet or MDwise as part of the fraudulent schemes described herein are false claims.

**Nonphysicians are used to treat high-risk obstetric patients in HealthNet clinics.**

55.     As the State of Indiana specifically notes in the Medicaid IHCP Provider Manual, prenatal care is critically important in reducing the risk of pregnancy complications and infant mortality because, with competent and comprehensive treatment, conditions that can negatively impact the pregnancy or the health of the woman or the baby can be identified early. For many conditions, early diagnosis and treatment are essential to a positive outcome. Typically, prenatal care involves regular screenings and tests, measurements, exams, fetal heart monitoring, and weight-checks, among other thing. The higher risk the pregnancy, the greater the necessity for close management and skillful treatment.

56.     HealthNet employs a policy that requires that CNMs provide nearly all prenatal care to its patients. HealthNet promotes its Midwifery Program as the largest midwifery practice in the state of Indiana with 21 CNMs on staff.[6] Mary Blackburn ("Blackburn"), CNM, is and at all times relevant to this complaint, was the manager of HealthNet's nonphysician-provider group. In a "Frequently Asked Questions" section on the HealthNet website, HealthNet provides, *inter alia*, the following questions and corresponding answers:

---

[6] http://www.indyhealthnet.org/OBGYN-Services/

**Is it safe to use a nurse-midwife?**
The American College of Nurse-Midwives, which certifies nurse-midwives, reports "nurse-midwifery care has outcomes that are equal to that of physicians with the same type of patients."

**Will I ever meet a doctor?**
Most women do not see a physician during their pregnancy or birth. However, a physician is available at all times for consultation. If obstetrical or general medical complications arise, a physician will become involved in your care alongside the HealthNet nurse-midwives.

**Where will I give birth?**
Births are attended by the HealthNet nurse-midwives at Methodist Hospital….

**What if complications arise?**
If a woman develops a serious health problem or high risk complication during her pregnancy or in labor, her care may need to be transferred completely to the obstetrician. If the problem is less serious, she may be collaboratively managed by both the nurse-midwives and the physicians.

**Will my insurance pay for nurse-midwife care?**
Yes, most insurance companies reimburse nurse-midwives. We can help you to obtain the necessary information to verify coverage.

57. Despite the passing acknowledgement that certain "serious health problem(s) or high risk complication(s)" merit the treatment by or consultation with a physician, CNMs performing prenatal care in the HealthNet clinics knowingly and intentionally fail to notify or consult with physicians when a patient is determined to have two or more medical complications which would cause the patient to be identified as high-risk. Additionally, within the HealthNet clinics, an intake staff member such as a medical assistant or registered nurse completes the Indiana Medicaid NOP and does not identify a patient as high-risk, so Medicaid is not put on notice that the patient should only be treated by a physician. As a result, the HealthNet clinics have created a system whereby CNMs routinely provide and bill for care to high-risk patients without notifying Medicaid that the patient is high-risk and therefore should only have received

21

care from a physician. If HealthNet properly coded the patients as high-risk, the CNMs' prenatal care would not be reimbursable by Medicaid.

58.    Upon information and belief, about 90% of the prenatal visits conducted at HealthNet and IU Health are performed by nonphysicians. Based on Dr. Robinson's personal experience as both Medical Director and a physician serving the patient population targeted by Defendants, between 70% and 90% of the obstetric patients served by HealthNet and IU Health have two or more conditions that put them at risk for either preterm birth or poor pregnancy outcome, thus placing them in the IHCP medically high-risk category.

59.    The policy of using CNMs to treat high-risk patients was developed by HealthNet Chief Medical Officer Don Trainor, but was approved and jointly implemented by IU Health executives because the systems work in tandem to provide prenatal care. In a Feb. 1, 2011 email from Trainor to Dr. Robinson and several other staff members, Trainor rhetorically asked himself, "So why a predominately Midwfery model, even still with more CNMs than Ob/Gyns?" Trainor answered his own question: "The first [reason] is largely financial." He continued, "CNMs get paid 1/3 – 1/2 what Ob/Gyns get paid but FQHCs get paid the same amount by Medicaid (our primary payor) regardless of who provides the care." (In 2010, CNMs were paid an average of $108,632, while Ob/Gyn physicians were paid an average of $349,976.)

60.    In the HealthNet clinic settings, CNMs treated as many patients as possible, regardless of the patients' risk status. On Aug. 11, 2011, CNM Patricia Furner responded to an email from Dr. Robinson inquiring about the amount of support staff available during each shift. Furner described the role of registered nurses and medical assistants during her shifts, and stated, "I could not see the volume of patients I see safely at this time with the high risk nature of many of them with diabetes, hypertension, mental illness etc without these people."

22

61.     Even though Dr. Robinson was officially the Director of Women's Services at HealthNet, Blackburn, as the head of the midwifery program, told Dr. Robinson on multiple occasions that doctors should not interfere with the nurse-midwives' practices. By way of example, on Feb. 20, 2013, Dr. Robinson, Blackburn and another CNM Carrie Bonsack had a meeting in Dr. Robinson's office adjacent to Methodist Hospital's Labor & Delivery unit. Blackburn physically approached Dr. Robinson, shook her finger and said, "This is a midwife practice, so we decide what patients you docs will see and who you won't see and we will decide what you need to know about them and what you don't need to know. Do you understand me? This is a midwife practice and you doctors need to stay out of it unless we tell you otherwise. If you don't understand this, you need to talk to Don (Trainor) and he will set all you doctors straight. Now, stay out of it!" Bonsack asked Blackburn to calm down and sit back down in her chair following the outburst.

62.     Despite the large number of high-risk pregnant patients, the HealthNet electronic medical records system only provides two options to code a new patient at the initial visit, "pregnancy normal" or "pregnancy incidental." "Pregnancy incidental" would only be used if a patient presented with a non-pregnancy related concern but also happened to be pregnant, therefore all patients presenting to a HealthNet clinic for prenatal care have to be coded as "pregnancy normal." Patricia Furner, a CNM and the former Midwife Manager, stated in an email to Dr. Robinson on Aug. 13, 2011, "I am not sure we do accurate high risk vs. low risk coding so I don't think that helps us. I am not sure if you are aware but the history nurses only have 2 choices for starting a new OB-normal pregnancy or pregnancy incidental. So most patients get marked normal pregnancy in the history and the providers never change the diagnostic code so the accuracy of this is questionable for determining risk."

23

63.     HealthNet clinics do not always have a physician physically present at the facility. By way of example, for the week ending Aug. 30, 2013, 123 prenatal visits occurred at Barrington Health Center, one of the HealthNet clinics serving indigent pregnant women around Indianapolis. During the week, there was no physician presence at the clinic at all, so all 123 prenatal visits were conducted by nonphysicians, regardless of the patient's risk factors. That same week, 176 prenatal visits occurred at Southwest Health Center, another HealthNet clinic. A physician was at that clinic for only one day and saw 22 patients, the bulk of whom were gynecological, not obstetric patients. Nonphysicians, then, performed at least 154, and possibly more, prenatal visits. Therefore, for that week, every claim for a high-risk patient from the 154 nonphysician visits at Southwest and 123 nonphysician visits at Barrington was false and ineligible to be paid.

64.     If a physician is physically present at a HealthNet clinic, he or she is typically assigned to gynecological patients almost exclusively, allowing nonphysicians to perform essentially all prenatal care. This business model necessarily results in CNMs practicing outside the scope of their licensure by managing the care of pregnancies that fall well outside the norm. By way of example, Dr. Robinson recalls an instance in or around June 2010 when she was assigned to diagnose a teenager's vaginal discharge, while, she later learned, a CNM in the room next door treated a medically high-risk woman pregnant with gestational diabetes and preeclampsia who was carrying twins.

65.     As an individual example, patient C.F., a Medicaid beneficiary, was seen at Care Center at the Tower, another of HealthNet's clinics. She presented with multiple health risks including asthma, diabetes, obesity, tobacco use, substance use, anemia, sickle cell trait, and recurrent first-trimester pregnancy loss. Any two of these complications would place her in the

24

IHCP's medically high-risk category. C.F. was seen by a nonphysician for her initial visit on

Oct. 15, 2013, and for each of her four subsequent visits on Nov. 7, 2013, Nov. 19, 2013, Nov.

25, 2013, and Dec. 3, 2013.  The patient ultimately transferred to another provider in

Indianapolis complaining that she never saw a doctor at HealthNet.  All claims submitted to

Medicaid for C.F.'s prenatal care at HealthNet were false and ineligible for payment.

**Nonphysicians are used to treat high-risk obstetric patients at Methodist Hospital.**

66.    HealthNet and IU Health also use CNMs to perform vaginal deliveries of high-

risk patients at Methodist Hospital without physician consultation, authorization or oversight.

According to HealthNet's 2012-13 annual report, HealthNet employees delivered 2,422 babies at

IU Health that year, including both vaginal and C-section deliveries.  Upon information and

belief, approximately 22% of all deliveries performed at Methodist Hospital are done by C-

section.  C-section deliveries are performed by a physician and are not at issue in this Complaint.

67.    Virtually all vaginal deliveries are performed by CNMs, irrespective of the

patient's risk status.  However, upon information and belief, every claim for delivery is

submitted under a physician's National Provider Identifier ("NPI"), which is a ten-digit numeric

identifier used by CMS to identify healthcare providers.

68.    Blackburn and Trainor informed Dr. Robinson in or about October, 2011, that

Medicaid reimburses midwives approximately 75% of what doctors are paid for obstetric

services, including deliveries.  Blackburn and Trainor explained to Dr. Robinson that this is why

IU Health and HealthNet need to submit all claims co-signed by a physician along with the

nonphysician.  Blackburn and Trainor explained that both signatures indicated the collaborative

practice and physician supervision, and Dr. Robinson objected that such a representation was not

true because there was little to no physician supervision or involvement.  Blackburn and Trainor

informed Dr. Robinson that it was not an area that she needed to be concerned about. Dr. Robinson did not know that the bills were submitted in the physician's name as though the physician had performed the delivery.

69. To conceal their fraudulent business model in the hospital setting, HealthNet and IU Health developed a system where CNMs complete the appropriate billing paperwork after each triage or delivery visit. An Ob/Gyn physician would review and sign off on all of the charts at the end of the shift regardless of whether the physician actually saw the patient. Dr. Robinson and, upon information and belief, the other physicians understood that the physician signature was a simple acknowledgement that the visit, treatment, or delivery had occurred. After her termination, Dr. Robinson read a "white paper" published by Blackburn in January 2013, where Blackburn stated, "Often CNM services may be billed under the physician at institutions where a physician is present; some believe that these arrangements are needed in order that some practices may be economically viable." After reading this, Dr. Robinson came to understand that IU Health and HealthNet used the doctor's signature to bill for the service in the doctor's name.

70. HealthNet and IU Health knew that treatment of high-risk patients is outside the scope of a CNM's licensure and is not reimbursable under the plain language of the IHCP Provider Manual. Not only are the licensure and reimbursement requirements plainly stated in the statutes and IHCP Provider Manual, but, upon information and belief, HealthNet COO Elvin Plank specifically raised concerns about using nonphysicians to treat high-risk patients with HealthNet and IU Health executives in or around October 2011.

71. Additionally, executives at Methodist Hospital were contacted by executives at another Indianapolis hospital, Community Hospital, in or around November 2011after Community was informed by Indiana Medicaid that it would not reimburse Community for using

26

CNMs to treat high-risk patients. While Community ceased the practice and had to terminate several of its CNMs, IU Health and HealthNet continued their practice.

72.     As discussed herein at ¶ 38 , *supra*, the IHCP Provider Manual specifically addresses the unique needs of high-risk obstetrical patients and mandates that IHCP **will only** reimburse physicians for the treatment of high-risk patients. Therefore, every claim submitted in a CNM's name for a patient that was improperly not identified as high-risk, or in a physician's name for the treatment of a high-risk patient wherein the treatment was actually conducted by a CNM, is a false claim because (1) it exceeds the licensure of a CNM, (2) it is falsely submitted under a physician's name when it was provided by a CNM, and (3) high-risk prenatal care is not eligible for reimbursement if provided by a CNM as expressly provided in the IHCP Provider Manual.

### *Examples of Patient Harm and "Near-Misses" as a Result of*<br>*CNMs Treating High-Risk Obstetric Patients*

73.     On November 14, 2010, Ob/Gyn physician Dr. Kendra Karner sent an email to Drs. Robinson and Trainor, and other physicians with the simple subject line, "HELP." Dr. Karner detailed a hospital shift from November 11, 2010, which she described as "chaos" due to the understaffing of physicians in the labor and delivery unit at Methodist Hospital. Dr. Karner wrote, "I can honestly say that I truly did not know our service. I did not physically lay eyes on at least 4 of the high risk patients and did not write notes on several until 8 pm." After summarizing the chaotic shift and a similar shift the following day, Dr. Karner concluded with, "It is clear to me that we are not staffed to optimize patient safety, physician safety, or patient satisfaction. Thursday and Friday were not unique days. Those situations are becoming more and more common."

74.     Despite Dr. Karner's pleas, which echoed similar requests Dr. Robinson made to HealthNet and IU Health executives in 2010, the risks of patient harm continued as a result of CNMs seeing patients in lieu of a physician. Dr. Robinson personally observed the following examples of patient harm or "near misses" as a result of improper medical care by CNMs on high-risk obstetrical patients. Upon information and belief, care for all of these patients was billed under a physician's name, but was actually provided by unqualified CNMs:

a.     L.E., a Medicaid beneficiary, had a history of preterm labor, preeclampsia, anti-Kell antibodies, and a previous C-Section. Preeclampsia is a condition that can develop during pregnancy when there is a sharp rise in blood pressure, swelling, and excess protein in the urine; if untreated, it can lead to eclampsia, which can cause convulsions, coma and death. In addition, if left untreated, preeclampsia can affect the neurological development of the baby. When a woman's tests indicate that she has anti-Kell antibodies, the baby may develop hemolytic disease of the newborn, which is a condition where the mother's anti-Kell antibodies pass through the placenta and attack the red blood cells in the fetal circulation. This can lead to anemia and, in severe cases, fetal death from heart failure. Although any two of L.E.'s risk factors would qualify her as having a high-risk pregnancy, she did not see a physician until her fifth prenatal visit. L.E. went into labor and was delivered at 25 weeks. The baby had a prolonged stay in the Neonatal Intensive Care Unit at an average cost of $3,000 per day, but ultimately died from severe prematurity.

b.     S.B., a 19-year-old Medicaid beneficiary, did not see a doctor at all during her prenatal care, despite suffering from persistent hypertension that required a

prolonged hospital stay. S.B. developed severe preeclampsia, which placed her in the high-risk category, but a CNM did not admit the patient for observation, assessment or delivery, nor seek a physician consultation.[7] Instead, the CNM unilaterally made the determination to send the patient home and an electronic message was sent late on a Friday afternoon asking for a physician to review the chart. By pure coincidence, Dr. Robinson saw that message, immediately determined that the patient was in real and immediate danger, and admitted her. At 36.3 weeks, for her safety and that of her baby, S.B. required and received an urgent C-Section.

c.      T.W., a 40-year-old Medicaid beneficiary, did not have her prenatal care managed by a physician, despite her advanced maternal age and the fact that she had abnormal quad screen, two factors which placed her in the medially high-risk category. A quad screen is a genetic test performed between weeks 16 and 18 of a pregnancy, and the results of the test are combined with the mother's age and ethnicity in order to assess the likelihood of certain potential genetic disorders in the baby. Because it is a screening test and not a diagnostic test (that is, the results will indicate the probably risk of an abnormality but will not rule it in or out definitively), an abnormal quad screen should be followed by diagnostic tests right away. This is important for several reasons, not least because there are interventions for some abnormalities that, to be successful, must occur while the

---

[7] It is beyond the scope of a nurse-midwife's licensure to admit or discharge a patient without physician collaboration, but Mary Blackburn, the head of the Nurse-Midwifery program, directed her CNMs that they were permitted to admit and discharge patients without consultation with a supervising physician.

baby is still in utero. In addition, if a baby does receive a definitive diagnosis of a severe abnormality, the parents can make informed decisions about whether to continue with the pregnancy and how to structure their lives for the arrival of a child with special needs. At 38 weeks, far too late for either intervention or informed decision-making, T.W. had an ultrasound which was highly abnormal, which showed severe growth retardation with elevated umbilical dopplers, indicating that the baby needed to be immediately delivered. Only at that point, a physician was called in to give T.W. the news of her baby's condition and to schedule delivery.

d.       A.B., a Medicaid beneficiary, had gestational diabetes and a history of previous C-Section, making her a clear high-risk patient. However, the CNMs providing her care supported and encouraged her desire to only be managed by midwives and to have a VBAC (a vaginal birth after a C-Section), and she was only seen once by a physician during her prenatal care  Notably, the primary risk associated with a VBAC delivery is a uterine rupture. A.B was admitted to the hospital in labor, at which point a physician was contacted. Despite the physician's advice for a C-section, the patient refused because she did not trust doctors in general and because her desire to have a midwife had been supported all throughout her prenatal care. A.B. refused a C-Section. Her uterus did rupture during delivery, and the baby is permanently neurologically impaired. After the delivery, one of the treating CNMs, Blythe Kinsey, emailed Dr. Robinson the following email, in which she acknowledged that she "did not feel it was necessary" to have a physician consult with A.B. during prenatal care, which may

have given the doctor an opportunity to engage the patient and allay her anxiety about having a C-section.

---

**From:** Kinsey, Blythe N
**Sent:** Mon 9/10/2012 8:29 AM
**To:** Robinson, Judith A
**Subject:** Uterine Rupture

Hi Judy,
I wanted to check in with you about A█████ B████. Anthony said you had some concerns about how little A███ saw a MD at Barrington. I just wanted to let you know that at her last appt. we had a conversation about the fact that many things were stacking up to make our goal a healthy baby and with the size and the diabetes I was feeling more concerned about her chance for a VBAC. She had very well controlled sugars throughout her pregnancy and with how hard it is to get patients in with an MD, and the fact that she really wanted Midwifery care I did not feel it was necessary. I did tell her she would need to see Dr.Seitz next week to further discuss if she continued to be a VBAC candidate and to come up with a plan of care. From what I hear much of the anger and difficulty came from her husband who I only met at the NewOB appt. I am so sad about the outcome and have talked to her on the phone yesterday and am planning to spend time with her today- workflow permitting. Just wanted to let you know...
~Blythe

---

e.   N.K., a Medicaid beneficiary, never saw a doctor during her prenatal care. She was admitted to the hospital at 40.6 weeks for induction of labor due to gestational hypertension. The overlong duration of her pregnancy and her hypertension put N.K. squarely in the Medicaid medically high-risk category. The CNM who managed her care at the hospital, with no physician involvement, sent N.K. home after two days of induction because there was no change in her cervix.  N.K. returned to the hospital two days later in early labor.  She was placed on the fetal monitor in triage, and a highly abnormal fetal heart rate tracing was noted.  Only then was a physician notified, and an emergency C-Section was performed.  The baby is permanently neurologically impaired. After delivery, various physicians reviewed the monitor strip from N.K.'s initial two-day admission for induction and determined that, with the abnormal tracing that was evident at the time, N.K. never should have been sent home.

31

f.      J.W., a Medicaid beneficiary, had at least two medically compromising

conditions:  she was morbidly obese and she had gestational—possibly chronic –

hypertension.  J.W. was not seen by a physician during her prenatal care until she

was more than 37 weeks.  Upon examining J.W. and reviewing her chart, the

physician suggested that the baby's heart be monitored.  A long heart deceleration

was seen and J.W. was immediately sent to the hospital, where she received an

emergency C-section.

g.      L., a Medicaid beneficiary, entered triage with multiple medial high-risk

factors: at 36 weeks, she had uncontrolled insulin-dependent diabetes, poorly

controlled gestational hypertension, and cholestasis of pregnancy, a condition

where the flow of bile slows or stops, creating elevated levels of maternal bile,

which causes stress on the baby's liver.  This can lead to fetal distress, pre-term

birth, or stillbirth.  Typically, close monitoring is required, and induction after the

baby's lungs have matured (typically at 36 weeks) is recommended.  These

medical conditions placed L. squarely in the high-risk category.  However, she

was assessed in triage by a CNM, identified as "supervision normal pregnancy" in

her records, and sent home with no physician involvement or an intervention plan.

Dr. Robinson was working an in the OBCC HealthNet clinic and was alerted to

this patient by a concerned registered nurse.  Dr. Robinson found out which CNM

was scheduled to see the patient and took over the care by sending the patient to

the hospital for immediate delivery.

75.     On April 27, 2013, Dr. Robinson emailed CNMs Blackburn and Bonsack with a

request that the CNMs meet with Dr. Robinson and with the entire Ob/Gyn physician group at an

upcoming meeting. The email, copied to Trainor and other executives, explained, "We, as leaders in the HealthNet Ob/Gyn services, need to help devise a process to fix a broken system...we need to work together to ensure excellence in patient care and safety. Including the situation Dr. Bowsher encountered from last night, we are now up to 14 documented near misses and 2 terrible outcomes...all within the past 6-8 months. I know you will agree with me that this is unacceptable."

76.     Despite Dr. Robinson's reference to at least sixteen instances of a risk to patient safety, Trainor responded to Dr. Robinson's email on April 27, 2013, stating, "Judy, I believe these meetings you are requesting are premature."

77.     Dr. Robinson has provided additional and ongoing examples of patient harm and near-misses to the Government, including an example from July 2014 in which a Medicaid beneficiary presented to a HealthNet clinic at 37 weeks gestation with elevated blood pressure. Her other risk factors included morbid obesity and a neurologic condition called Arnold Chiari malformation (a brainstem abnormality) for which she had previously undergone surgery. The patient was assessed by CNMs at Methodist Hospital's triage unit and determined to be preeclamptic. Despite all of the risk factors, nurse-midwives continued to manage her care without physician oversight and initiated the induction process. During early labor, a CNM permitted the patient to eat pizza. The patient ultimately needed to receive general anesthesia for an emergency C-Section, and because of the pizza in her stomach, she aspirated while under anesthesia and died. Her baby survived but suffered permanent neurological impairment.

**HealthNet operates a triage clinic inside Methodist Hospital.**

78.     In addition to providing prenatal care via its clinics, HealthNet staffs a triage center on the labor and delivery floor of IU Health's Methodist Hospital, the hospital where all

of HealthNet's patients deliver. Upon information and belief, the HealthNet triage unit has approximately 7,000 triage visits per year.

79. The triage center serves primarily as a facility for HealthNet patients to be assessed to determine whether they are in active labor and need to be admitted to Methodist Hospital for delivery. The 24-hour triage unit is also used as an after-hours prenatal clinic where HealthNet patients can be seen for all types of pregnancy-related issues such as nausea, false labor, decreased fetal movement, or generalized pain.

80. The triage center is exclusively staffed by CNMs; it is not routinely staffed by a physician. Therefore, all patients, regardless of risk factors, are treated by CNMs unless a physician is specifically called in to provide treatment. A physician will only actually see a patient or perform any type of supervision if the CNM determines that physician involvement is necessary and requests a consultation or evaluation.

81. Based on Dr. Robinson's experiences, a physician is consulted in approximately 10% of patient visits in the triage center.

82. When any patient enters the triage unit, a CNM evaluates her and completes a billing sheet, complete with the level of service and diagnostic codes. Stapled to that sheet is a "face sheet" for the patient, which includes the patient's name, date of birth, social security number, billing address, insurance, and her primary physician and admitting physician's name. After the patient is seen by a CNM in triage, the billing sheet and face sheet are placed in a designated file drawer. The Ob/Gyn physician on call signs the sheets upon completion of a 24-hour call shift. A HealthNet courier then collects the sheets and delivers them to the HealthNet billing department.

83.    Upon information and belief, HealthNet and IU Health bill all triage visits under the on-call physician's NPI despite the fact that the treatment is not provided by the physician and the physician may not have even been in the triage center at the time of the patient's visit.

84.    In addition to the submission of claims for treatment performed by a CNM but billed as though performed by a physician, HealthNet also bills a "consultation (or physician consultant) fee" for all or most triage center visits.

85.    In or around June 2010, Dr. Robinson engaged in a conversation with Martha Allen, the Nursing Director for Methodist and University Maternity Centers (now combined into IU Health's Methodist Hospital).  Allen stated to Robinson that, "When the HealthNet triage CNM model was developed in 2005, research was done as to how the greatest financial return could be captured.  The decision was made that IU Health would allow HealthNet to do all the billing for services as they could bill at a greater reimbursement rate from Medicaid by billing a physician consultant fee."  Allen further stated that Dr. Keltner (a HealthNet Ob/Gyn hospitalist and former Medical Director of the Ob/Gyn department) made the agreement wherein IU Health would pay HealthNet for 2.5 CNM FTE's (full-time equivalents) to help in staffing.

86.    The IHCP's Provider Manual defines a "consultation" as a "service provided by a physician whose opinion or advice about evaluation and management of a specific problem is **requested by another physician or other appropriate source**."  IHCP Provider Manual Chapter 8, at 8-237 (bolded emphasis in original).[8]  The IHCP Provider Manual expressly states that, "Providers should not use consultation codes for the evaluation of a self-referred or nonphysician-referred patient.  A consultation implies collaboration between the requesting and the consulting physician." *Ibid.*

---

[8] http://provider.indianamedicaid.com/media/23576/chapter08.pdf

87.     Every claim to Medicaid for a "consultation fee" for treatment provided by nonphysicians at the triage center, regardless of the patient's risk factors, was a false claim because there were no consultation services provided as defined by the IHCP Provider Manual.

88.     Additionally, upon information and belief, IU Health provides HealthNet with the facilities for the triage center inside of Methodist Hospital for no rent, and provides all equipment and supplies for the triage unit at no charge to HealthNet. (See Clarian Health's description of the arrangement between the Hospital and HealthNet in Dr. Robinson's employment agreement, *supra.* at ¶¶ 21-22.) Despite IU Health incurring all of the costs associated with the triage center, HealthNet is permitted to keep the provider component of all of the triage billings. In exchange, HealthNet refers all of its obstetric patients to IU Health's Methodist Hospital for delivery. HealthNet patients are not given a choice to deliver at another facility.

89.     IU Health's provision of a rent-free unit within Methodist Hospital (including equipment and supplies to support the rent-free unit), payment of part of the staff expenses, and the payment of the provider fee to HealthNet are kickbacks designed to ensure HealthNet continues to exclusively refer its large Medicaid patient population into IU Health's Methodist Hospital for labor and delivery. As a result of the fraudulent kickback relationship, IU Health makes additional claims for labor and delivery services, anesthesia services, routine and intensive care for newborn babies, additional physician and professional services, and additional Medicaid DSH funds, which it would not have received if not for the kickback relationship with HealthNet.

**HealthNet submits for FQHC payments when the provider did not conduct a face-to-face encounter with the patient.**

36

90.     CNMs are permitted by the scope of their licensure to order routine ultrasounds as part of the prenatal care of a normal pregnancy. However, it is beyond the scope of a CNMs licensure to review and interpret the results of an ultrasound.

91.     HealthNet developed a system where all ultrasound images were gathered in a designated drawer or similar location within a HealthNet clinic. At the end of a shift, the Ob/Gyn physician would take the ultrasounds from the drawer, review each ultrasound, and sign-off on the review. If the physician detected any abnormalities, then the patient would be notified by either the physician or HealthNet support staff. If the physician did not detect any abnormalities, then the physician would sign the attached billing sheet and give the billing sheet to the individual in each clinic who processed the claims. This procedure was employed regardless of whether the patient was high-risk or a normal pregnancy.

92.     The physician who reviewed the ultrasound did not see the patient face-to-face in association with the ultrasound review. However, each ultrasound review was billed to Medicaid and subsequently submitted for an FQHC wrap-around payment as though a face-to-face encounter with the physician occurred.

93.     Trainor and former HealthNet COO Elvin Plank routinely referred to the ultrasound review claims model as a "cash cow." Trainor specifically explained to Dr. Robinson that, "ultrasounds are reimbursed at the wrap-around rate and don't need to take away a provider from their usual work." Trainor stated to Dr. Robinson that this enabled HealthNet to "get the biggest bang for [its] buck."

94.     In 2011, Trainor sent an email to Dr. Robinson which stated that, with the wrap-around payment, Medicaid paid HealthNet the same for a patient visit as an ultrasound read that the physician could do between scheduled patients, before patient, during lunch or at the end of

the day – all times which would indicate that the physician would not have a face-to-face

encounter with the patient while reading the ultrasound. Trainor touted this as a benefit to the

physician, because the ultrasound reads would be counted towards the physician's monthly

productivity.

---

**From:** Trainor, Donald
**Sent:** Sun 2/13/2011 1:32 PM
**To:** Robinson, Judith A; Thomas, Booker; Plank, Elvin
**Cc:** Flick, Lawrence T
**Subject:** Re: important question

Thank you, Judy.

Baseline MD productivity expectations after the 1st year working at HN are 2.75 pts/hr. averaged over the course of a month. This works out to ~8.25 pts. In a 3 hour morning and 11 pts. In a 4 hour afternoon, or ~19.25 pts. in a 7 hour pt. encounter day at one of our outpatient centers. A bonus for our Ob/Gyn Physicians at the locations where we have ultrasound equipment is that, since Medicaid pays HN the same as a pt. visit with our wrap around payment, we count U/S's read toward those Physicians productivity for the month and they are paid additionally each month for reading those U/Ss between their scheduled pts. and/or before pt. care, during lunch or at the end of the day. A bit complicated but the basic message should be an ave. of 2.75 pts/day for Physicians which equates to 19-20 pts./day. CNM & NPs target is lower at 2.4 pts./hr. in part because of their lower salaries and breadth of knowledge which works out to ~17 pts/day.

Hope this helps & thanks for asking. Don

---

95.     Additionally, nonphysicians routinely performed services which did not require

physician oversight, such as the administration of a monthly Depo-Provera birth control

injection. A patient presenting for a monthly Depo-Provera shot would be placed on a provider's

schedule, but only a medical assistant ever saw the patient to administer the injection. However,

Trainor explained to Dr. Robinson that the service would be billed under the name of whatever

physician was in the building at the time the injection was administered. As a result, a bill was

submitted for the injection in the physician's name without the physician having a face-to-face

encounter with the patient.

96.     In July 2008, Trainor circulated an email to Dr. Robinson and other HealthNet

staff members which described the policy for billing encounters which did not involve a

physician face-to-face visit with a patient.

**From:** Trainor, Donald
**Sent:** Mon 7/28/2008 2:40 PM
**To:** Ashworth, Mickki; Robinson, Judith A
**Cc:** Glenn, Lorie; Plank, Elvin; Flick, Larry T
**Subject:** FW: New 99211 policy

....

H.     While the 99211 visit does not require the actual face-to-face encounter between a
patient and the physician, it is billed under the name of the supervising physician or provider
on-site for that encounter."

One very unique thing about HealthNet billing as an FQHC is that we get "wrap-
around" payments for our Medicaid visits such that **all Medicaid visits are paid the
same to us by the State by Federal mandate.**   So, regardless of what provider
billing code that is used, we are **paid the same >$100 amount** whether it is a 99211,
99215, 99201, 99205, etc.  So that is why we want to be sure that we are billing
appropriate "nurse" visits that meet the above guidelines and bill for these encounters
as 99211 and we do not have to have a provider actually see the patient for these
appropriately billed 99211 visits.

Hope this helps.

Thanks.  Don

97.     The financial compensation available to an FQHC facility is provided only for an

"encounter" which requires that an approved clinic practitioner (which does not include a

medical assistant) see a patient face-to-face.  Specifically, a physician's face-to-face meeting

with a patient could be billed under the physician's name, or a nurse practitioner's face-to-face

meeting with a patient could be billed in the nurse-practitioner's name.  But, if a medical

assistant performs a service for a patient, the service cannot be billed to an FQHC as though a

physician had the face-to-face encounter with a patient.  Therefore, each claim made for FQHC

39

reimbursement for the review of ultrasounds, a birth control injection, or other service which did not involve a face-to-face visit by an approved clinical practitioner is a false claim which resulted in an improper claim to Medicaid and a false claim for an FQHC wrap-around payment.

**MDwise failed to properly investigate and reject improper claims from HealthNet and IU Health.**

98.     When Indiana created its managed care program, the state was particularly interested in hiring managed care entities that could address the unique health challenges posed by low-income populations to manage and integrate their care. The contract between MDwise and the Indiana OMPP specifically set forth the goals for MDwise: identify high-risk members and provide effective disease management, case managements and care management programs for those that would benefit from such services; improve health outcomes; and assure the appropriate use of health care services.[9]

99.     Under its contract with the state, MDwise is required to hire case managers who coordinate care for high-risk patients. It is the role of a case manager to ensure that Medicaid recipients are receiving the proper care from appropriate providers.[10] Additionally, by contract, Indiana requires MDwise to provide prenatal care programs targeted at averting unwanted outcomes in high-risk pregnancies.

100.    MDwise is also supposed to evaluate its members to determine which services should be provided during a member's pregnancy. Among the screening tools employed by MDwise is the Notification of Pregnancy ("NOP") Form developed by Indiana Medicaid to

---

[9] https://fs85.gmis.in.gov/IDOAcontracts/public/50269-000.pdf , at 44-45.

[10] *Id.* at 53.

evaluate a patient's risk factors.[11]  Filing out the NOP creates bonuses for both the healthcare

provider who fills it out, and the managed care plan who receives it.  Indiana pays $60 to the

healthcare provider for each completed NOP, and places an additional $40 into a birth outcome

bonus pool.  MDwise is eligible to receive all of the money in the birth outcome bonus pool if

the C-section delivery rate is at or below 27%.[12]

101.    To comply with the federal Medicaid statute requirements set forth in 42 C.F.R. §

438.608, Indiana requires managed care entities to put in place an internal investigation program

to stop waste, fraud, and abuse in Medicaid programs.  The internal investigation program must

include a mandatory compliance program; written policies, procedures, and standards of conduct

that articulate the organization's commitment to comply with federal and state standards; the

designation of a compliance office and committee that are accountable to senior management; a

provision for internal monitoring and auditing; and a provision for prompt response to detected

offenses and for development of correction action initiatives.

102.    Indiana requires the immediate reporting of any suspected fraud to the state's

Indiana Medicaid Fraud Control Unit ("IMFCU"), the Surveillance and Utilization Review

("SUR") Department, and the Office of Medicaid Policy and Planning ("OMPP").  The managed

care entity must report any suspicion or knowledge of fraud and abuse, including filing false or

fraudulent claims or accepting (or failing to return) monies allowed or paid on claims known to

be false or fraudulent.

103.    As part of its contract with the state of Indiana as a Medicaid managed care entity,

MDwise has the obligation to create and utilize a Special Investigations Unit designed

---

[11] *Id.* at 150.

[12] *Id.* at 201.

specifically to identify and reject false or fraudulent claims for reimbursement. The MCE must develop written policies and procedures for referring instances of suspected or confirmed fraud and abuse to the appropriate parties. All referrals should include a description and an analysis of the suspected or confirmed fraud and abuse in question. The MCE must not attempt to investigate or resolve the suspicion, knowledge, or action without informing the IMFCU and the OMPP, and must cooperate fully in any investigation by the IMFCU or in subsequent legal action that may result from an investigation.

104.    In 2010, state health consultants reported in a quality review that efforts to detect fraud and abuse at the state's three managed care entities were "fairly stagnant."[13] In response, the MCEs enhanced their Special Investigation Units. While the consultants praised the strong process for handling investigations and rigorous training of two of the MCEs, they singled out MDwise as having "areas of opportunity" to improve its anti-fraud program. Although MDwise was the largest managed care entity in Indiana, it had the fewest fraud investigations.

105.    Upon information and belief, executives at MDwise were fully aware of the use of CNMs to treat high-risk obstetric patients in violation of the IHCP Provider Manual restrictions and outside the scope of the CNMs licensure. MDwise executives regularly scheduled and attended meetings with HealthNet department directors and, upon information and belief, would have been fully informed of the nonphysician/CNM practice model as a result of these meetings.

106.    However, even with its ostensibly strengthened anti-fraud program, and extensive internal knowledge of the nonphysician billing scheme by senior executives, MDwise failed to

---

[13] http://www.burnshealthpolicy.com/wp-content/uploads/2011/07/External-Quality-Review-of-the-Hoosier-Healthwise-and-Healthy-Indiana-Plan_Review-Year-CY2009.pdf, page 7.

identify or report the blatantly fraudulent billings related to the treatment of high-risk patients by nonphysicians submitted by IU Health and HealthNet.

107.     MDwise had an inherent conflict of interest due to IU Health's ownership stake in the company, such that MDwise was incentivized to accept all claims submitted by IU Health to maximize the revenues of its parent company.

108.     In addition to the support for its parent company, MDwise had an additional financial incentive to disregard suspected fraudulent claims. MDwise receives a capitated payment per member from the state of Indiana from which it reimburses providers for valid Medicaid claims. MDwise is entitled to keep a portion of the capitated payments not used to pay for members' claims.

## RETALIATION AGAINST DR. ROBINSON

**Dr. Robinson's employment was terminated because she questioned Defendants' dangerous and improper business model.**

109.     Deeply concerned about patient safety, Dr. Robinson first raised questions about the treatment of high-risk patients by CNMs to Booker Thomas, the former CEO of HealthNet, and Elvin Plank, the former COO of HealthNet, at various times in or about 2012.

110.     As Dr. Robinson's concerns grew, she alerted HealthNet management, including the CEO, COO and CMO, of the dangers associated with HealthNet and IU Health's policy of ensuring a lack of physician management and treatment of high-risk patients. Dr. Robinson also met with Dr. Michael Niemeier, the Chief Medical Officer of Methodist Hospital, and John Kohne, the acting Chief Medical Officer of the entire IU Health system. Dr. Robinson informed Niemeier and Kohns about her concerns about the business model of having CNMs provide essentially all prenatal care to high-risk obstetric patients. Dr. Robinson was met with resistance, obfuscation, and at time, abusive behavior, specifically by Dr. Trainor.

111. On or about May 1, 2013, Dr. Robinson was called into Dr. Niemeier's office, where he informed her that HealthNet executives were getting agitated about Dr. Robinson's complaints about the lack of physician management of obstetric patients. He advised her to "go into hiding" because her job was in jeopardy.

112. HealthNet's Chief Medical Officer Don Trainor was so committed to the CNM business model that, according to Dr. Neimeier, Trainor met with Methodist Hosptial's president James Terwilliger and informed him that the relationship between the two entities was at risk if IU Health, who managed the human resources for HealthNet, did not terminate Dr. Robinson's employment with HealthNet.

113. On or about June 7, 2013, Dr. Neimeier informed Dr. Robinson that "things [were] getting to a crisis stage" and that HealthNet wanted her fired.

114. On or about June 14, 2013, Dr. Neimeier informed Dr. Robinson that she was being released from her employment contract because "HealthNet wants [her] out."

115. Dr. Robinson's final day of employment with HealthNet was August 9, 2013.

## Count I:
## Violations of the Federal False Claims Act by Submitting Claims for Treatment of High-Risk Patients by Nonphysicians
### as to All Defendants

116. Relator incorporates paragraphs 1 - 115 of this complaint as though fully set forth herein. This count sets forth claims for treble damages and forfeitures under the federal False Claims Act, 31 U.S.C. §§ 3729-3732, as amended.

117. As Indiana Medicaid providers, Defendants have certified and continue to certify that they will comply with all applicable federal and state regulations. As described above, Defendants have engaged in false or fraudulent activities including using nonphysician certified nurse-midwives to provide treatment to medically high-risk pregnant women and disguising the

treatment by submitting claims for reimbursement in the names of physicians who did not actually treat the patients. By engaging in this conduct, Defendants not only improperly submitted claims and received reimbursement from Medicaid, but also submitted claims and received additional reimbursements because of HealthNet's characterization as a Federally Qualified Health Center. Defendants' false and fraudulent claims also enabled IU Health's Methodist Hospital to report the care for Medicaid and uninsured patients, which enabled it to qualify as a disproportionate share hospital.

118. Defendants knowingly submitted false claims to the State of Indiana as a result of this conduct. Defendants knew that submitting the false claim to the State of Indiana would, in turn, cause the State of Indiana to submit a claim for reimbursement to the federal Medicaid program.

119. In doing so, Defendants knowingly violated:

(1)     31 U.S.C. § 3729(a)(1)(A) by presenting, or causing to be presented, false and fraudulent claims for payment or approval to the United States, in the form of claims for reimbursement from the State of Indiana to the United States, claims for reimbursement as an FQHC, and claims for subsidy as a disproportionate share hospital, related to the treatment of high-risk patients by nonphysician certified nurse-midwives, and

(2)     31 U.S.C. § 3729(a)(1)(B) by making, using or causing to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the United States by submitting bills in a physician's name when the service was actually performed by a certified nurse-midwife; and

(3)     31 U.S.C. § 3729(a)(1)(C) by conspiring with one another to commit a

violation of 31 U.S.C. § 3729(a)(1)(A) and (B).

120.     To the extent any of the conduct alleged herein occurred on or before May 20,

2009, Relator alleges that Defendants knowingly violated 31 U.S.C. § 3729(a)(1), (a)(2) and

(a)(3), prior to amendment, by engaging in the conduct described in Paragraph 119(1), (2), and

(3), respectively.

121.     Because of the false or fraudulent claims made by Defendant, the United States

has suffered, and continues to suffer damages and is therefore entitled to recovery as provided by

the False Claims Act of three times the amount of damages sustained by the United States, plus a

civil penalty of $5,500 to $11,000 for each violation.

**Count II:**
**Violations of the Indiana False Claims Act by Submitting Claims for Treatment of High-Risk Patients by Nonphysicians**
***as to All Defendants***

122.     Relator incorporates paragraphs 1 - 115 of this complaint as though fully set forth

herein. This count sets forth claims for treble damages and forfeitures under the Indiana False

Claims Act, Ind. Code 5-11-5.5.

123.     As Indiana Medicaid providers, Defendants have certified and continue to certify

that they will comply with all applicable federal and state regulations. As described above,

Defendants have engaged in false or fraudulent activities including using nonphysician certified

nurse-midwives to provide treatment to medically high-risk pregnant women and disguising the

treatment by submitting claims for reimbursement in the names of physicians who did not

actually treat the patients. By engaging in this conduct, Defendants not only improperly

submitted claims and received reimbursement from Medicaid, but also submitted claims and

received additional reimbursements because of HealthNet's characterization as a Federally

46

Qualified Health Center.  Defendants' false and fraudulent claims also enabled IU Health's Methodist Hospital to report the care for Medicaid and uninsured patients, which enabled it to qualify as a disproportionate share hospital.

124.   Defendants knowingly submitted false claims to the State of Indiana as a result of this conduct.

125.   In doing so, Defendants knowingly violated:

(1)   Ind. Code 5-11-5.5-2(b)(1) by presenting a false claim to the state for approval;

(2)   Ind. Code 5-11-5.5-2(b)(2) by making or using a false record or statement to obtain payment or approval of a false claim from the state; and

(3)   Ind. Code 5-11-5.5-2(b)(7) by conspiring with one another to perform acts described in Ind. Code 5-11-5.5-2(b)(1) and (2).

126.   Because of the false or fraudulent claims made by Defendant, the State of Indiana has suffered, and continues to suffer damages and is therefore entitled to recovery as provided by the Indiana False Claims Act of an amount to be determined at trial, plus a civil penalty of at least $5,000 and up to three times the amount of damage sustained by the state.

**Count III:**
**Violations of the Federal False Claims Act by Offering and Accepting Kickbacks in**
**Violation of the Anti-Kickback Statute**
*as to Defendants IU Health and HealthNet*

127.    Relator incorporates paragraphs 1 - 115 of this complaint as though fully set forth herein. This count sets forth claims for treble damages and forfeitures under the federal False Claims Act, 31 U.S.C. §§ 3729-3732, as amended.

128.    As described above, Defendants have engaged in false or fraudulent activities including offering, accepting, and entering into financial compensation arrangements that were made for the purpose of inducing referrals from Defendant HealthNet to Defendant IU Health. This conduct is in direct violation of the Anti-Kickback Statute and therefore every claim made as a result of an improper referral is tainted as a false claim.

129.    By engaging in this conduct, Defendants knowingly violated:

(1)    31 U.S.C. S 3729(a)(1)(A) by presenting, or causing to be presented, false and fraudulent claims for payment or approval to the United States and the State of Indiana, in the form of claims for reimbursement for services rendered to patients who were referred as a direct result of a prohibited financial relationship in violation of the Anti-Kickback Statute, and

(2)    31 U.S.C. § 3729(a)(1)(B) by making, using or causing to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the United States and the State of Indiana, in the form of certifying that the hospital was in compliance with all applicable laws and regulations, and

(3)    31 U.S.C. § 3729(a)(1)(C) by conspiring with one another to commit a violation of 31 U.S.C. § 3729(a)(1)(A) and (B).

130.    To the extent any of the conduct alleged herein occurred on or before May 20, 2009, Relator alleges that Defendants knowingly violated 31 U.S.C. § 3729(a)(1), (a)(2) and

(a)(3) , prior to amendment, by engaging in the conduct described in Paragraph 129 (1), (2) and (3), respectively.

131.     Because of the false or fraudulent claims made by Defendant, the United States has suffered, and continues to suffer damages and is therefore entitled to recovery as provided by the False Claims Act of three times the amount of damages sustained by the United States, plus a civil penalty of $5,500 to $11,000 for each violation.

### Count IV:
### Violations of the Indiana False Claims Act by Offering and Accepting Kickbacks in Violation of the Indiana Anti-Kickback Statute
### *as to Defendants IU Health and HealthNet*

132.     Relator incorporates paragraphs 1 - 115 of this complaint as though fully set forth herein. This count sets forth claims for treble damages and forfeitures under the Indiana False Claims Act, Ind. Code 5-11-5.5.

133.     As described above, Defendants have engaged in false or fraudulent activities including offering, accepting, and entering into financial compensation arrangements that were made for the purpose of inducing referrals from Defendant HealthNet to Defendant IU Health. This conduct is in direct violation of the Indiana Anti-Kickback Statute, Ind. Code § 12-15-24-2, and in accordance with Ind. Code §12-15-24-1, is prima facie evidence of the intent to deprive the state of part of the value of the money or benefits. Therefore, every claim made as a result of an improper referral is tainted as a false claim.

134.     By engaging in this conduct, Defendants knowingly violated:

(1)      Ind. Code 5-11-5.5-2(b)(1) by presenting a false claim to the state for approval;

(2)      Ind. Code 5-11-5.5-2(b)(2) by making or using a false record or statement to obtain payment or approval of a false claim from the state; and

49

(3)     Ind. Code 5-11-5.5-2(b)(7) by conspiring with one another to perform acts

described in Ind. Code 5-11-5.5-2(b)(1) and (2).

135.    Because of the false or fraudulent claims made by Defendant, the State of Indiana

has suffered, and continues to suffer damages and is therefore entitled to recovery as provided by

the Indiana False Claims Act of an amount to be determined at trial, plus a civil penalty of at

least $5,000 and up to three times the amount of damage sustained by the state.

**Count V:**
**Violations of the Federal False Claims Act by Submitting Claims for Reimbursement for**
**FQHC Payments Without Conducting a Face-to-Face Encounter**
*as to Defendant HealthNet*

136.    Relator incorporates paragraphs 1 - 115 of this complaint as though fully set forth

herein. This count sets forth claims for treble damages and forfeitures under the federal False

Claims Act, 31 U.S.C. §§ 3729-3732, as amended.

137.    As an FQHC, HealthNet was entitled to submit claims for additional "wrap-

around" payments in addition to the standard Medicaid reimbursement for certain services, so

long as the service was rendered during a patient "encounter" which required face-to-face

interaction between the physician and patient. By submitting claims for wrap-around payments

which required that a physician have a face-to-face encounter with the patient, when Defendant

knew that the physician did not have a face-to-face encounter, Defendant HealthNet submitted

false and fraudulent claims for reimbursement.

138.    Defendants knowingly submitted false claims to the State of Indiana as a result of

this conduct. Defendants knew that submitting the false claim to the State of Indiana would, in

turn, cause the State of Indiana to submit a claim for reimbursement to the federal Medicaid

program.

139.    In doing so, Defendants knowingly violated:

50

> (1)     31 U.S.C. § 3729(a)(1)(A) by presenting, or causing to be presented, false
>
> and fraudulent claims for payment or approval to the United States, in the form of
>
> claims for reimbursement as an FQHC related to review of ultrasounds without a
>
> face-to-face patient encounter, and
>
> (2)     31 U.S.C. § 3729(a)(1)(B) by making, using or causing to be made or
>
> used, a false record or statement to get a false or fraudulent claim paid or
>
> approved by the United States by submitting bills which certified a proper face-to-
>
> face encounter occurred.

140.    To the extent any of the conduct alleged herein occurred on or before May 20,

2009, Relator alleges that Defendants knowingly violated 31 U.S.C. § 3729(a)(1) and 31 U.S.C.

§ 3729(a)(2), prior to amendment, by engaging in the conduct described in Paragraph 139(1) and

(2), respectively.

141.    Because of the false or fraudulent claims made by Defendant, the United States

has suffered, and continues to suffer damages and is therefore entitled to recovery as provided by

the False Claims Act of an amount to be determined at trial, plus a civil penalty of $5,500 to

$11,000 for each violation.

**Count VI:**
**Violations of the Indiana False Claims Act by Submitting Claims for Reimbursement for**
**FQHC Payments Without Conducting a Face-to-Face Encounter**
*as to Defendant HealthNet*

142.    Relator incorporates paragraphs 1 - 115 of this complaint as though fully set forth herein.  This count sets forth claims for treble damages and forfeitures under the Indiana False Claims Act, Ind. Code 5-11-5.5.

143.    As an FQHC, HealthNet was entitled to submit claims for additional "wrap-around" payments in addition to the standard Medicaid reimbursement for certain services, so long as the service was rendered during a patient "encounter" which required face-to-face interaction between the physician and patient.  By submitting claims for wrap-around payments which required that a physician have a face-to-face encounter with the patient, when Defendant knew that the physician did not have a face-to-face encounter, Defendant HealthNet submitted false and fraudulent claims for reimbursement.

144.    Defendants knowingly submitted false claims to the State of Indiana as a result of this conduct.

145.    In doing so, Defendants knowingly violated:

(1)    Ind. Code 5-11-5.5-2(b)(1) by presenting a false claim to the state for approval; and

(2)    Ind. Code 5-11-5.5-2(b)(2) by making or using a false record or statement to obtain payment or approval of a false claim from the state.

146.    Because of the false or fraudulent claims made by Defendant, the State of Indiana has suffered, and continues to suffer damages and is therefore entitled to recovery as provided by the Indiana False Claims Act of an amount to be determined at trial, plus a civil penalty of at least $5,000 and up to three times the amount of damage sustained by the state.

**Count VII:**
**Violation of the Federal False Claims Act by Failing**
**to Identify and Reject Claims for Service**
***as to Defendants MDwise and IU Health***

52

147.    Relator incorporates paragraphs 1 - 115 of this complaint as though fully set forth herein. This count sets forth claims for treble damages and forfeitures under the federal False Claims Act, 31 U.S.C. §§ 3729-3732, as amended.

148.    Defendant MDwise had an obligation to review and identify claims that it knew or suspected to be false or fraudulent claims due to the treatment of high-risk patients by nonphysicians. Due to the conflict of interest that arose because IU Health, as the parent company, stood to increase its revenues if MDwise approved its false or fraudulent claims, Defendant MDwise failed to properly investigate claims from IU Health and HealthNet. As a result, MDwise knowingly processed and paid claims which should not have been paid, thereby reducing the amount of the capitated payment returned to the State of Indiana and the United States.

149.    In doing so, Defendants knowingly violated:

(1)    31 U.S.C. § 3729(a)(1)(A) by presenting, or causing to be presented, false and fraudulent claims for payment or approval to the United States;

(2)    31 U.S.C. § 3729(a)(1)(B) by making, using or causing to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the United States;

(3)    31 U.S.C. § 3729(a)(1)(C) by conspiring with one another to commit a violation of 31 U.S.C. § 3729(a)(1)(A) , (B), and (G); and

(4)    31 U.S.C. § 3729(a)(1)(G) by knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealing or

knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the Government.

150.     To the extent any of the conduct alleged herein occurred on or before May 20, 2009, Relator alleges that Defendants knowingly violated 31 U.S.C. § 3729(a)(1), (a)(2), (a)(3) and (a)(7), prior to amendment, by engaging in the conduct described in Paragraph 149(1), (2), (3) and (4), respectively.

151.     Because of the false or fraudulent claims made by Defendant, the United States has suffered, and continues to suffer damages and is therefore entitled to recovery as provided by the False Claims Act of three times the amount of damages sustained by the United States, plus a civil penalty of $5,500 to $11,000 for each violation.

### Count VIII:
### Violation of the Indiana False Claims Act by Failing to Identify and Reject Claims for Service
### *as to Defendant MDwise and IU Health*

152.     Relator incorporates paragraphs 1 - 115 of this complaint as though fully set forth herein. This count sets forth claims for treble damages and forfeitures under Indiana False Claims Act, Ind. Code 5-11-5.5.

153.     Defendant MDwise had an obligation to review and identify claims that it knew or suspected to be false or fraudulent claims due to the treatment of high-risk patients by nonphysicians. Due to the conflict of interest that arose because IU Health, as the parent company, stood to increase its revenues if MDwise approved its false or fraudulent claims, Defendant MDwise failed to properly investigate claims from IU Health and HealthNet. As a result, MDwise processed and paid claims which should not have been paid, thereby reducing the amount of the capitated payment returned to the State of Indiana and the United States.

154.     By engaging in this conduct, Defendants knowingly violated:

(1)     Ind. Code 5-11-5.5-2(b)(1) by presenting a false claim to the state for

approval;

(2)     Ind. Code 5-11-5.5-2(b)(2) by making or using a false record or statement

to obtain payment or approval of a false claim from the state;

(3)     Ind. Code 5-11-5.5-2(b)(6) by making or using a false record or statement

to avoid an obligation to pay or transmit property to the state; and

(4)     Ind. Code 5-11-5.5-2(b)(7) by conspiring with one another to perform acts

described in Ind. Code 5-11-5.5-2(b)(1) and (2).

155.    Because of the false or fraudulent claims made by Defendant, the State of Indiana

has suffered, and continues to suffer damages and is therefore entitled to recovery as provided by

the Indiana False Claims Act of an amount to be determined at trial, plus a civil penalty of at

least $5,000 and up to three times the amount of damage sustained by the state.

**Count IX:**
**Retaliation and Wrongful Discharge Under the Federal False Claims Act**
*as to Defendants IU Health and HealthNet*

156.    Relator incorporates paragraphs 1 - 115 of this complaint as though fully set forth

herein.  This count sets forth claims for treble damages and forfeitures under the federal False

Claims Act, 31 U.S.C. §§ 3729-3732, as amended.

157.    Under the False Claims Act, 31 U.S.C. § 3730(h), an employee who, because of

her efforts to stop one or more violations of the False Claims Act, faces adverse employment

action or discrimination, is entitled to relief.

158.    As alleged above, Dr. Robinson engaged in lawful acts in furtherance of efforts to

stop violations of 31 U.S.C. § 3729.  Defendants IU Health and HealthNet were on notice of Dr.

Robinson's objections to Defendants' practices, which were in violation of material conditions of

payment governing government healthcare claims. As a direct result of her efforts, Defendants retaliated against Dr. Robinson by harassing, intimidating, and ultimately terminating her employment contract.

159.   As a direct and proximate result of the actions of IU Health and HealthNet, Dr. Robinson lost the benefits and privileges of her employment and has suffered continuing damages to her reputation and career. She is entitled to all relief necessary to make her whole, including two times the amount of back pay, interest on back pay, and compensation for special damages sustained as a result of the retaliation, including litigation costs and reasonable attorney's fees.

**Count X:**
**Retaliation and Wrongful Discharge Under the Indiana False Claims Act**
*as to Defendants IU Health and HealthNet*

160.   Relator incorporates paragraphs 1 - 115 of this complaint as though fully set forth herein. This count sets forth claims for treble damages and forfeitures under the Indiana False Claims Act, Ind. Code 5-11-5.5

161.   Under the Indiana False Claims and Whistleblower Protection Act, Ind. Code § 5-11-5.5-8, an employee is entitled to relief when that employee has been discharged, threatened, harassed, or otherwise discriminated against in the terms and conditions of employment because the employee objected to an act or omission under the Indiana False Claims and Whistleblower Protection Act.

162.   As alleged herein, Dr. Robinson engaged in lawful acts in furtherance of efforts to stop violations of the Indiana False Claims and Whistleblower Protection Act. As a direct result of her efforts, Defendant HealthNet and IU Health harassed and intimidated Dr. Robinson, and her employment was ultimately terminated.

163.    As a result of Defendants' actions, Dr. Robinson was harmed and is entitled to all relief necessary to be made whole.

## PRAYER

**WHEREFORE**, Relator Dr. Judith Robinson respectfully prays for judgment against Defendants as follows:

A.    That the Court enter judgment against Defendants and order that they cease and desist from violating 31 U.S.C. § 3729, *et seq.*, immediately;

B.    That the Court enter judgment against Defendants and order that they cease and desist from violating 5-11-5.5-2 immediately;

C.    That the Court enter judgment against Defendants in an amount equal to three times the amount of damages that the United States has sustained because of Defendants' action, plus a civil penalty of not less than $5,500 and not more than $11,000 for each claim submitted in violation of 31 U.S.C. § 3729;

D.    That the Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Indiana has sustained because of Defendants' action, plus a civil penalty of not less than $5,000 for each violation of the Indiana False Claims Act;

E.    That the Court enter judgment against Defendants IU Health and HealthNet pursuant to 31 U.S.C. § 3730(h), including an award to Relator of two times the amount of her back pay, with interest, and compensation for special damages including litigation costs and reasonable attorneys' fees;

F.      That the Court enter judgment against Defendants for the cost of this

action, with interest, including the costs to the United States and the State of Indiana for

their expenses related to this action;

G.      That Relator be awarded the maximum amount allowed pursuant to

$3730(d) of the False Claims Act and the equivalent provision of the Indiana Act;

H.      That Relator be awarded all costs, attorneys' fees, and litigation expenses;

I.      That the United States, the State of Indiana and Relator receive all relief,

both at law and in equity, to which they may reasonably be entitled; and

J.      That the Court order any other relief which it deems to be appropriate and

just.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator Dr. Judith Robinson

demands a trial by jury on all issues so triable.


Respectfully submitted this 29th day of October, 2014.

_____ /s/ Robert E. Saint
**Robert E. Saint**
rsaint@ewnc-law.com
Of counsel:
EMSWILLER, WILLIAMS, NOLAND &
CLARKE, P.C.
8500 Keystone Crossing, Suite 500
Indianapolis, IN   46240
Phone: 317-475-4469
Fax:    317-257-8787

**Jillian Estes**
jestes@jameshoyer.com
**Christopher Casper**
ccasper@jameshoyer.com

58

JAMES, HOYER, NEWCOMER & SMILJANICH,
P.A.
4830 W. Kennedy Blvd.
One Urban Center, Suite 550
Tampa, FL   33609
Phone: 813-397-2300
Fax:    813-397-2310

**Christopher Jayson**
cjayson@jfswlaw.com
JAYSON, FARTHING, SKAFIDAS & WRIGHT,
P.A.
5401 W. Kennedy Blvd., Suite 600
Tampa, FL   33609
Phone: 813-321-1111
Fax:    813-321-1112

*Counsel for Relator Dr. Judith Robinson*

## CERTIFICATE OF SERVICE

I, Robert Saint, hereby certify that the foregoing Amended Complaint was served on the

United States of America and State of Indiana at the following addresses, via U.S. Priority Mail,

appropriately marked "Under Seal Pursuant to Court Order" on this 29th day of October, 2014:

The Honorable Eric H. Holder, Jr.
Attorney General of the United States
United States Department of Justice
950 Pennsylvania Ave., N.W.
Washington, DC  20530-0001

Deputy Indiana Attorney General Lawrence Carcare
Office of Indiana Attorney General
8005 Castleway Drive
Indianapolis, IN  46250

David O. Thomas
Inspector General, State of Indiana
315 W. Ohio St., Room 104
Indianapolis, IN  46202

AUSA Jonathan A. Bont
United States Attorney's Office, Southern District of Indiana
10 W. Market St., Suite 2100
Indianapolis, IN  46204

The foregoing Amended Complaint was not served on any Defendants pursuant to 31

U.S.C. § 3730(b)(2) and this Court's order extending the seal deadline until Nov. 14, 2014 or

until further order of the Court.

_____/s/ Robert E. Saint_____
**Robert E. Saint**