**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| UNITED STATES and STATE OF INDIANA *ex rel.* JUDITH ROBINSON,<br><br>Plaintiffs/Relator,<br><br>v.<br><br>INDIANA UNIVERSITY HEALTH, INC. f/k/a CLARIAN HEALTH PARTNERS, INC. HEALTHNET, INC., and MDWISE, INC.,<br><br>Defendants. | Case No. 1:13-cv-2009-TWP-MJD<br><br>Judge Tanya Walton Pratt<br><br>Magistrate Judge Mark J. Dinsmore |

**DEFENDANT INDIANA UNIVERSITY HEALTH, INC.'S**
**MEMORANDUM OF LAW IN SUPPORT OF ITS**
**MOTION TO DISMISS THE AMENDED COMPLAINT**

Pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6), Defendant Indiana University Health, Inc. f/k/a Clarian Health Partners, Inc. ("IU Health") moves to dismiss all claims asserted in Relator Judith Robinson's Amended Complaint.

## INTRODUCTION

Relator Judith Robinson is attempting to convert vague allegations of purported medical malpractice into a federal fraud case. Yet as courts nationwide have recognized, allowing a relator to bring a False Claims Act action supposedly on behalf the government in an attempt to privately enforce Medicaid rules "would likely be catastrophic for hospitals that provide medical services to the financially disadvantaged and the elderly." *United States ex rel. Conner v. Salina Reg'l Health Ctr., Inc.*, 543 F.3d 1211, 1221 (10th Cir. 2008) (cited in *United States v. Sanford-Brown, Ltd.*, No. 14-2506, 2015 WL 3541422, at *12 (7th Cir. June 8, 2015)). This Court likewise should not sanction such a result.

As non-profit entities, defendants IU Health and HealthNet, Inc. offer care for "[h]igh-risk, low income pregnant women in Indianapolis," including "care for . . . their newborn babies." (Am. Compl. ¶ 1.) HealthNet is "Indiana's largest federally qualified health center," servicing primarily "patients at or below the federal poverty level." (*Id*. ¶¶ 16-17, 20.) Likewise, IU Health, both through its own efforts and also by partnering with HealthNet, provides a range of medical services (including delivery services) to underserved populations. (*Id*. ¶¶ 14-15, 47.)

In providing obstetrics services to low-income patients, defendants, Relator alleges, engaged in medical staffing practices that "pose[d] a risk of permanent, devastating injuries for pregnant women and their babies." (*Id*. ¶ 53.) Specifically, Relator asserts that defendants' medical care for high-risk pregnant women resulted in "newborn babies with permanent neurological injuries, emergency Caesarian-sections, and even instances of maternal and fetal death." (*Id*. ¶ 3.)

While Relator's allegations (accepted as true at this threshold stage) reflect tragic circumstances experienced by certain low-income, obstetric patients, they do not equate to fraud. The FCA is not a proper vehicle for addressing allegations that amount to malpractice claims. Put differently, the FCA simply is "not designed for use as a blunt instrument to enforce compliance with all medical regulations," a means to "promote the federalization of medical malpractice," or a mechanism for placing the relator improperly in the shoes of the patient as plaintiff. *United States ex. rel. Mikes v. Straus*, 274 F.3d 687, 699-700 (2d Cir. 2001) (quoted in *Sanford-Brown*, 2015 WL 3541422, at *12). The FCA's reach does not extend to "every physician who committed malpractice on a Medicare/Medicaid patient and then submitted a claim for reimbursement for the procedure." *United States v. NHC Health Care Corp.*, 163 F. Supp. 2d 1051, 1055 n.3 (W.D. Mo. 2001). *See also United States ex rel. Phillips v. Permian*

*Residential Care Ctr.*, 386 F. Supp. 2d 879, 884 (W.D. Tex. 2005) ("this Court holds the False Claims Act should not be used to call into question a health care provider's judgment regarding a specific course of treatment.").  The Court should thus reject Relator's attempt to dress up potential medical malpractice claims in False Claims Act clothing.

In view of Relator's misapplication of the FCA, it is no surprise that her Amended Complaint fails to plead even the most basic requirements under Rules 9(b) and 12(b)(6) to allege an FCA action.  At the outset, the complaint lacks any details regarding purportedly false claims for payment that somehow were submitted to the government, the dates of services of such claims, and the alleged falsity in each, let alone the specifics of which patients were treated as part of the alleged fraudulent scheme, by whom, and when.  These are key deficiencies, as liability under the FCA hinges not upon mere regulatory violations, but instead upon the *knowing submission of false claims for payment to the government*.  Nor has Relator alleged, other than in vague and conclusory terms, any false certification made by IU Health to the government.  The same is true for Relator's conspiracy counts—the Amended Complaint makes only generalized, imprecise allegations that defendants "conspired with one another."  Relator's Anti-Kickback Statute-based claims fail for the same reason as they too lack the details required.  Finally, Relator's retaliation claim fails to allege that she engaged in protected activity in furtherance of an FCA action, that IU Health had knowledge of this protected activity, or that her discharge was motivated by the protected activity.

In view of these flaws in Relator's theories, the Amended Complaint should be dismissed with prejudice.

### RELATOR ASSERTS FIVE THEORIES OF LIABILITY BASED UPON
### IU HEALTH'S SERVICING OF LOW-INCOME OBSTETRICS PATIENTS

Relator filed her initial Complaint under seal on December 19, 2013. (Filing No. 1.) She amended her Complaint on October 29, 2014. (Filing No. 38, "Am. Compl.") Both complaints remained under seal while the United States and the State of Indiana investigated Relator's allegations. On February 27, 2015, the United States notified the court that "it is not intervening at this time" (Filing No. 53) but Relator has decided to move forward with the litigation. The Court in turn ordered that the seal be lifted on both complaints, and that defendants be served. (Filing No. 54.)

In her Amended Complaint, Relator asserts claims under two federal statutes, the False Claims Act and the Anti-Kickback Statute, and their Indiana corollaries, the Indiana False Claims Act and the Indiana Anti-Kickback Statute.

**False Claims Acts**. The federal False Claims Act prohibits one from knowingly presenting or causing to be presented a false or fraudulent claim for payment (31 U.S.C. § 3729(a)(1)(A)); knowingly making, using, or causing a false record or statement that is material to a false or fraudulent claim paid by the government (31 U.S.C. § 3729(a)(1)(B)); conspiring to do either (31 U.S.C. § 3729(a)(1)(C)); or knowingly concealing or knowingly and improperly avoiding an obligation to pay the government (31 U.S.C. § 3729(a)(1)(G)). "The FCA may be enforced not just through litigation brought by the Government itself, but also," as here, "through civil *qui tam* actions that are filed by private parties, called relators, in the name of the Government," even when the government declines to participate. *Kellogg Brown & Root Servs., Inc. v. United States ex rel. Carter*, 135 S.Ct. 1970, 2015 WL 2456621, at *3 (May 26, 2015) (citations omitted). In contrast to *qui tam* claims under the FCA, a plaintiff may also bring retaliation claims on the plaintiff's own behalf under the FCA. 31 U.S.C. § 3730(h). The

Indiana False Claims Act (IFCA), for its part, "mirrors the Federal FCA in all material respects." *See, e.g., United States ex rel. Herron v. Indianapolis Neurosurgical Grp., Inc.*, No. 1:06-cv-1778-JMS-DML, 2013 WL 652538, at *7 n.9 (S.D. Ind. Feb. 21, 2013) (citing *Kuhn v. LaPorte Cnty. Comprehensive Mental Health Council*, No. 3:06-cv-317 CAN, 2008 WL 4099883, at *3 n.1 (N.D. Ind. Sept. 4, 2008)).  Therefore, analysis of Relator's claims under the FCA applies equally to the IFCA, unless otherwise noted.

**Anti-Kickback Statutes**.  The federal Anti-Kickback Statute is a criminal law that prohibits any party from "knowingly and willfully" offering or paying remuneration "to induce such person to refer an individual" to another for services that may be paid under a federal health care program.  42 U.S.C. § 1320a-7b(b)(2)(A).  It has no private right of action nor does the Indiana Anti-Kickback Statute that has a general scope similar to that of the AKS.  Specifically, the Indiana law prohibits any person who "furnishes items or services to an individual for which payment is or may be made" through the Indiana Medicaid program from soliciting, offering, or receiving a "kickback or bribe in connection with the furnishing of the items or services or the making or receipt of the payment," or a "rebate of a fee or charge for referring the individual to another person for the furnishing or items or services."  Ind. Code § 12-15-24-2.

**Relator's Theories**.   Based on these statutes, Relator asserts five theories of liability (spanning eight counts against IU Health).  *First*, Relator claims IU Health knowingly presented factually false claims for payment to the State of Indiana by "submitting claims for reimbursement in the names of physicians who did not actually treat the patients" (Am. Compl. ¶ 117), in violation of both the FCA, 31 U.S.C. § 3729(a)(1)(A), and the IFCA, Ind. Code § 5-11-5.5-2(b)(1).  *Second*, Relator claims IU Health knowingly presented legally false claims for payment to the State of Indiana by falsely certifying compliance with all applicable federal and

state regulations, in violation of both the FCA, 31 U.S.C. § 3729(a)(1)(B), and the IFCA, Ind.
Code § 5-11-5.5-2(b)(2).  *Third*, Relator claims IU Health conspired with other defendants to
commit these FCA violations, in violation of both the FCA, 31 U.S.C. § 3729(a)(1)(C), and the
IFCA, Ind. Code § 5-11-5.5-2(b)(7).  (*See* Counts I, II, III, IV, VII, and VIII.)  *Fourth*, Relator
claims IU Health knowingly and improperly avoided an obligation to pay the government, in
violation of both the FCA, 31 U.S.C. § 3729(a)(1)(G), and the IFCA, Ind. Code § 5-11-5.5-
2(b)(6).  (*See* Counts VII & VIII.)  *Fifth*, Relator claims IU Health retaliated against her in
violation of both the FCA, 31 U.S.C. § 3730(h), and the IFCA, Ind. Code § 5-11-5.5-8.  (*See*
Counts IX & X.)

## MOTION TO DISMISS LEGAL STANDARD

Rule 12(b)(6) of the Federal Rules of Civil Procedure demands that a complaint be
dismissed if it does not allege facts that, when "accepted as true . . . state a claim [for] relief that
is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).  A
plaintiff must offer more than "labels and conclusions" or a "formulaic recitation of the elements
of a cause of action," and a court need not accept legal conclusions as true.  *Id.*  Moreover, in
addition to meeting the familiar *Iqbal* pleading standards, for all but her retaliation claims,
Relator must also satisfy Rule 9(b) by pleading "with particularity the circumstances constituting
fraud."  *United States ex rel. Gross v. AIDS Research Alliance-Chi.*, 415 F.3d 601, 604 (7th Cir.
2005).

## ARGUMENT

### I.   RELATOR'S FCA AND IFCA CLAIMS FAIL AS A MATTER OF LAW.

Relator's *qui tam* claims against IU Health should be dismissed for several reasons.  First,
the Amended Complaint fails to plead Relator's claims with the requisite particularity.  Second,
Relator's certification theory fails to plead that IU Health submitted any claim for payment that

was *false*.  Third, beyond those deficiencies, her conspiracy claims also fail independently because the Amended Complaint (i) lacks any conspiracy allegations; and (ii) ignores the well-settled rule that a defendant cannot conspire with itself.

### A.      Relator Fails To Satisfy Rule 9(b).

The Amended Complaint's *qui tam* claims against IU Health first merit dismissal because they disregard Rule 9(b)'s requirement that relators plead claims "with particularity."  Detailed pleading of fraud is necessary "to assure that the charge of fraud is responsible and supported, rather than defamatory and extortionate."  *Ackerman v. Nw. Mut. Life Ins. Co.*, 172 F.3d 467, 469 (7th Cir. 1999).   As the Seventh Circuit made clear this month, one purpose of the rule "is to force the plaintiff to do more than the usual investigation before filing his complaint."  *Sanford-Brown*, 2015 WL 3541422, at *5 (citations omitted).  Rule 9(b) applies to both traditional FCA claims brought under sections (a)(1)(A) and (a)(1)(B), along with conspiracy claims under section (a)(1)(C) and "reverse" FCA claims under section (a)(1)(G).  *Gross*, 415 F.3d at 604; *United States ex rel. Wood v. Applied Research Assocs.*, 328 F. App'x 744, 748 (2d. Cir. 2009) (applying Rule 9(b) to dismiss "reverse false claims" count).

To overcome Rule 9(b) for all FCA claims, Relator must plead "the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated."  *United States ex rel. Grenadyor v. Ukrainian Vill. Pharm., Inc.*, 772 F.3d 1102, 1106 (7th Cir. 2014) (applying Rule 9(b) in FCA action).  In other words, she must establish "the who, what, when, where and how" of the alleged fraud.  *Gross*, 415 F.3d at 605 (applying Rule 9(b) in FCA action).

These details, moreover, must be pled "*at an individualized transaction level*."  *United States ex rel. Fowler v. Caremark RX, L.L.C.*, 496 F.3d 730, 741-42 (7th Cir. 2007) (affirming dismissal of FCA claim on Rule 9(b) grounds), *overruled on other grounds*,

*Care Consultants, Inc.*, 570 F.3d 907 (7th Cir. 2009). Thus, "a complaint of fraudulent billing does not meet the heightened standards of Rule 9(b) if it does not identify specific fraudulent transactions" for each type of alleged fraud. *United States ex rel. Coots v. Reid Hosp. & Health Care Servs., Inc.*, No. 1:10-cv-0526-JMS-TAB, 2012 WL 3949532, at *2 (S.D. Ind. Sept. 10, 2012). In *Coots*, for instance, this Court dismissed FCA claims that "had too many details unaccounted for" in its "'gestalt' method of alleging a qui tam claim." *Id. See also United States ex rel. Soulias v. Northwestern Univ.*, No. 10 C 7233, 2013 WL 3275839, at *3-4 (N.D. Ill. June 27, 2013) (dismissing FCA claim for failure to allege "some actual examples of the [alleged fraud] with enough specificity to satisfy Rule 9(b)"). And "because it is the claim for payment that is actionable under the Act, not the underlying fraudulent or improper conduct," "[a]ctual claims must be specifically identified" in an FCA relator's complaint. *United States ex rel. Lusby v. Rolls-Royce Corp.*, No. 1:03-CV-0680-SEB/WTL, 2007 WL 4557773, at *5 (S.D. Ind. Dec. 20, 2007).

Measured against these heightened pleading standards, Relator's fraud-based claims fail to satisfy Rule 9(b) for three reasons. First, they fail to provide the required who, what, when, where, and how of the alleged fraud. Second, Relator fails to identify any specific fraudulent statement, transactions, or claims IU Health made to the government. Third, Relator improperly lumps all defendants together and fails to allege any specifics to IU Health.

The lack of "who, what, when, where and how" details dooms Relator's *qui tam* claims. Nowhere does she plead specifics regarding who made the false claims, when the false claims were made, and whether the claims were even submitted to the government. Nor does Relator provide details on a single false statement used to conceal, avoid, or decrease "an obligation to pay or transmit money or property to the Government." *United States ex rel. Yannacopoulos v.*

*Gen. Dynamics*, 652 F.3d 818, 835 (7th Cir. 2011).  Relator broadly alleges that IU Health among all "Defendants… us[ed] nonphysician certified nurse-midwives [CNMs] to provide treatment to medically high-risk pregnant women and disguise[ed] the treatment by submitting claims for reimbursement in the names of physicians who did not actually treat the patients." (Am. Compl. ¶¶ 117, 123.)  But Relator identifies no "actual examples" of a date on which an allegedly fraudulent claim was submitted for any high-risk pregnant woman seen by a certified nurse-midwife (not a physician), or any service that allegedly generated a Medicaid claim, submitted in the name of a physician, by IU Health to the government for payment.  *See Lusby*, 2007 WL 4557773, at *4-6 (entering judgment on the pleadings where the complaint relied only on a "chain of logic to establish what should have, must have, or likely resulted in false claims or statements" without providing the particulars of any actual claim submitted).

Indeed, Relator's "examples" provide no specifics at all and are entirely based "upon information and belief" that "care for all of these patients was billed under a physician's name, but was actually provided by unqualified CNMs."  (Am. Compl. ¶ 74.)  Pleading "upon information and belief" is insufficient under Rule 9(b).  *Lusby*, 2007 WL 4557773, at *6.  In other words, Relator has acknowledged she has no personal knowledge on any of the billing facts regarding these patients.  Still, without any actual basis for these claims, Relator provides a list of patients, identified by initials, generally described as "Medicaid beneficiar[ies]."  But Relator provides no detail as to whether one, two, or more visits by any one of these patients actually resulted in a claim submitted to Medicaid.

Relator's pleading, moreover, is at odds with its claim that billing under a physician's name is inappropriate:  all eight examples provided *do* allege that the patient saw a physician.[1]

---

[1] Given, in part, that Relator excepts all C-Sections from her Amended Complaint as involving a physician (Am. Compl. ¶ 66), Patient L.E. saw a physician at least by her fifth prenatal visit, Patient S.B. had a C-Section, a

And Relator's use of the term "care" to refer to any number of prenatal visits and claims generated is far from precise. A maternity patient, after all, receives "care" through multiple prenatal visits as well as delivery. (*See* Am. Compl. ¶ 42.) The Amended Complaint admits that all of these patients were seen by physicians at some point, including for some deliveries. The Amended Complaint, however, fails to provide the required details to support the precise occasions of "care" at which a physician was *not* present—the crux of the alleged fraud—or whether these patient visits generated a bill to Medicaid.

Similarly, her allegations that a particular Ob/Gyn physician *did not* see high-risk patients does little to plead fraud with particularity, as there is no indication *who* (if anyone) did see the unidentified patients or whether any claims were submitted to Medicaid from these patients. (*Id.* ¶ 73.) In fact, the Amended Complaint contains no treatment dates for any IU Health patient, let alone any dates on which IU Health allegedly submitted claims to the government.

The lack of detail is particularly apparent as to IU Health, who is lumped in frequently with other defendants. Rule 9(b) prohibits such sloppy pleading. An FCA plaintiff may not lump defendants together without specifying who was involved in what activity or "which counts are asserted against which defendants, and by asserting claims against defendants to which it attributes no wrongful conduct at all." *United States ex rel. Dolan v. Long Grove Manor, Inc., No. 10 C 368, 2014 WL 3583980, at *4 (N.D. Ill. July 18, 2014)* (dismissing FCA claims). *See also Sanford-Brown*, 2015 WL 3541422, at *7 (affirming dismissal of FCA claim and noting "defendants 'are entitled to be apprised of the roles they each played in the alleged scheme, and that absent a compelling reason, the plaintiff is normally not entitled to treat multiple corporate

_____

(continued…)

physician met with Patient T.W., a physician met with A.B. at least once during her prenatal care, Patient N.K. had a C-Section, Patient J.W. was seen by a physician at least by 37 weeks and had a C-Section, Patient L was seen by the Relator herself, and an unidentified eighth patient had a C-Section. (*Id.* ¶¶ 74, 77.)

defendants as one entity.'" (citing *Jepson, Inc. v. Makita Corp.*, 34 F.3d 1321, 1329 (7th Cir. 1994))); *Sears v. Likens*, 912 F.2d 889, 893 (7th Cir. 1990) (dismissing complaint on Rule 9(b) grounds).  The rule does not allow a plaintiff to merely "sue a group of defendants and conduct discovery to sort it out." *Pardo v. Mecum Auction, Inc.*, No. 12 C 08410, 2014 WL 627690, at *7 (N.D. Ill. Feb. 18, 2014) (dismissing complaint and applying Rule 9(b) standards).

Yet the Amended Complaint's allegations fail to delineate between defendants.  Even if one accepts that each of the alleged patients gave birth at an IU Health facility, the Amended Complaint gives no locations for the prenatal "care" that underlies the alleged false claims and no plausible basis for tying IU Health to that care.  (Am. Compl. ¶¶ 74, 77.)  To the extent any locations can be gleaned from Relator's pleading, the allegations concerning prenatal care presumably occurred at a HealthNet clinic, not an IU Health facility.  (*Id*. at p. 20, "Nonphysicians are used to treat high-risk obstetric patients in HealthNet clinics" & ¶¶ 55-65.)  Similarly for the triage clinic, Relator makes no specific allegations against IU Health, and the Amended Complaint makes clear that the triage clinic is operated and staffed by HealthNet, that all billing sheets are delivered to the HealthNet billing department, and that "IU Health would allow HealthNet to do all the billing for services."  (*Id*. ¶¶ 78-85.)  Not a single allegation details "an individualized transaction" that resulted in a fraudulent bill to Medicaid from the triage center, let alone from IU Health.  *Fowler*, 496 F.3d at 741-42.

In the end, as in *Coots*, all of Relator's *qui tam* claims warrant dismissal because she attempts to plead a scheme without providing particularized details to support it.  *Coots*, 2012 WL 3949532, at *2 (finding allegations of a flawed electronic billing system did not "lead to an inescapable conclusion that inaccurate bills were submitted and not corrected").  But without specifying the details—who saw these patients, which CNMs were involved, which physicians

were involved, where these patients presented for each visit, any dates of service, and whether *any* claims were presented for Medicaid for any of these visits, what the claims reflected, the amounts billed, and who submitted these claims—the allegations fail to satisfy Rule 9(b), and thus should be dismissed.  *Fowler*, 496 F.3d at 742 (affirming dismissal of FCA claim on Rule 9(b) grounds).

> **B.     Relator Fails To Plead IU Health Made A Requisite Express False Certification.**

In addition to lacking particularized details as required by Rule 9(b), Relator also attempts to pursue a flawed false certification theory under the FCA, alleging that IU Health certified compliance with "all applicable federal and state regulations" but submitted claims for services performed in violation of certain laws and regulations.  (Am. Compl. ¶¶ 117, 123.)

FCA plaintiffs often pursue two different false certification theories:  1) implied certification, in which any bill submitted to the government acts as an implicit assurance that it presents a lawful claim for payment; and 2) express certification, in which the defendant certified in writing that it would follow certain laws and then violated those laws.  *See Sanford-Brown, 2015 WL 3541422, at *12 n.7; United States ex rel. Absher v. Momence Meadows Nursing Ctr., Inc., 764 F.3d 699, 712 (7th Cir. 2014).*  The Seventh Circuit, however, has rejected the implied certification theory.  *Sanford-Brown, 2015 WL 3541422, at *12* ("Although a number of other circuits have adopted this so-called doctrine of implied false certification, we decline to join them").  *See also United States ex rel. Yannacopoulos v. Gen. Dynamics, 652 F.3d 818, 824 n.4 (7th Cir. 2011)* ("Violations of laws, rules, or regulations alone do not create a cause of action under the FCA.  It is the false certification of compliance which creates liability when certification is a prerequisite to obtaining a government benefit." (citation omitted)).  Thus,

Relator can only sustain her certification theory against IU Health if she has pled an express false certification.  She has not.

In order to pursue an express false certification theory, Relator must make three threshold showings: (1) the defendant made a statement to receive money from the government; (2) the statement was false; and (3) the defendant knew it was false.  *See Gross*, 415 F.3d at 604.  But these claims cannot stand solely on purported regulatory violations; Relator also must show that the false "certification of compliance [was] a condition of or prerequisite to government payment," *id.*, as opposed to simply a condition of participation in a government program, which cannot serve as the basis for an FCA claim.  *See United States ex rel. Hoffman v. Nat'l Coll.*, No. 3:12-CV-237-TLS, 2013 WL 3421931, at *9 (N.D. Ind. July 8, 2013) (dismissing FCA claims where relator alleged fraudulent conduct relating to a condition of participation only, not a condition of payment such that the government would have refused payment).  Relator must allege that certification was essential to payment—that is, Indiana Medicaid would not have paid the claim without IU Health's certification of compliance.  *See Gross*, 415 F.3d at 605 ("where an FCA claim is based upon an alleged false certification of regulatory compliance, the certification must be a condition of the government payment in order to be actionable.").  But Relator alleges neither a false certification by IU Health, nor that certification of compliance was a condition of payment.  As a result, Relator's false certification theory fails as a matter of law.

### 1.    Relator Fails To Allege A Statement Containing A Certification By IU Health To The Government.

Relator's false certification theory fails from the outset, as the Amended Complaint does not allege even the first element of a false certification, namely, that IU Health made a statement to the government to receive money.  Relator asserts that, in general, "each [Indiana health care] provider must execute a 'Provider Agreement'" to participate in Medicaid (Am. Compl. ¶ 33).

But Relator makes no specific allegations regarding IU Health or IU Health's Provider Agreement and nothing about any statements to the government.  Rather, Relator alleges in conclusory fashion that "[a]s Indiana Medicaid providers, Defendants have certified and continue to certify that they will comply with all applicable federal and state regulations" (*id.* ¶¶ 117, 123).  The Amended Complaint neither alleges that IU Health executed a Provider Agreement nor where, or when, or to whom, or how IU Health allegedly certified to comply with "all applicable federal and state regulations."  Even the Provider Agreement language, as claimed in the Amended Complaint, does not reference compliance with "all applicable federal and state regulations."  (*Id.*  ¶¶ 33-34.)  At most, the complaint leaves the reader to connect general allegations to conclude there may be a "sheer possibility" of unlawful conduct, an approach that is plainly insufficient in this context.  *Iqbal*, 556 U.S. at 678 ("Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'")  At a minimum, the complaint must detail when IU Health made the false certification, as "the falsity of a claim is determined at the time of submission."  *United States ex rel. Hobbs v. MedQuest Assocs., Inc.*, 711 F.3d 707, 714 (6th Cir. 2013).  And Relator has not done so.  Absent factual allegations of an express certification, Relator's false certification claim fails as a matter of law.

Further, even if these allegations were sufficiently detailed as a factual matter, they still would fail to sustain an FCA certification theory as a matter of law.  Courts have refused to allow such overly broad and vague language to convert any regulatory violation, no matter how miniscule, into an FCA claim.  *See Connor*, 543 F.3d at 1218-20; *United States ex rel. Gudur v. Deloitte Consulting LLP*, 512 F. Supp. 2d 920, 947 (S.D. Tex. 2007) ("A general statement of adherence to all regulations or statutes governing participation in a program . . . is an insufficient

basis on which to premise FCA liability.").  Without adequately pleading a false certification, Relator cannot pursue her certification theory of FCA liability.

> **2.      Relator Fails To Allege That IU Health Did Not Comply With Laws, And That Any Subsequent Statement To The Government Was False.**

Even if Relator could link IU Health to a false certification (which she has not), she also would need to assert that IU Health violated certain laws with which it certified compliance. Relator's allegations do not raise even a plausible claim that IU Health did not comply with these laws.  *See United States ex rel. Crews v. NCS Healthcare of Ill., Inc.*, 460 F.3d 853 (7th Cir. 2006) (finding that where there was no applicable regulatory requirement, the claim was not false when submitted); *United States ex rel. Luckey v. Baxter Healthcare Corp.*, 183 F.3d 730 (7th Cir. 1999) (finding that none of the regulations at issue required what relator pled was required (and falsely certified)).  Specifically, the Amended Complaint asserts three failed theories, namely, that IU Health violated: 1) state licensure requirements; 2) payment requirements for Federally Qualified Health Center ("FQHC") reimbursements; and 3) payment requirements for Disproportionate Share Hospital ("DSH") reimbursements.  (Am. Compl. ¶¶ 72, 119, 123.)

> **(a)      Relator fails to allege that IU Health CNMs operated outside the scope of their licensure.**

Under Relator's first theory, she alleges that CNMs acted outside the scope of their licensure, thereby resulting in fraudulent claims for service being submitted to the government. (Am. Compl. ¶ 72.)  Specifically, Relator asserts that CNMs, at least at HealthNet clinics, engaged in the "treatment of high-risk patients," an activity outside the scope of CNM licensure. (*Id*. ¶¶ 64, 70.  *See also* ¶¶ 72, 105.)  Relator, however, cites no statutory, regulatory, or other legal authority that so limits CNM practice, let alone whether IU Health CNMs engaged in those practices.  In contrast, the Indiana administrative law regulating CNMs even cited by Relator has

no restrictions on CNMs' treatment of high-risk patients.  *See* 848 Ind. Admin. Code § 3-3-1;

Am. Compl. ¶ 43.  Nor, it bears reminding, does Relator identify any example of a CNM treating

a high-risk patient that resulted in IU Health billing the government.

Equally unavailing is Relator's general allegation that "it is beyond the scope of a CNMs

licensure to review and interpret the results of an ultrasound."  (Am. Compl. ¶ 90.)  This claim

fails because she never alleges that IU Health CNMs reviewed ultrasounds; the Amended

Complaint alleges that the "Ob/Gyn physician would … review each ultrasound, and signoff on

the review."  (Am. Compl. ¶¶ 91-92.)  Her other claim that, "[i]t is beyond the scope of a nurse-

midwife's licensure to admit or discharge a patient" (Am. Compl. p.29, n.7) fares no better, as

Relator does not allege that any IU Health CNM actually admitted or discharged a patient.

### (b)      Relator fails to allege that IU Health received FQHC payments.

Next, Relator alleges that false claims led to improper FQHC wrap-around payments.

Relator, however, does not make this allegation against IU Health.  *See* Am. Compl. p. 36,

("HealthNet submits for FQHC payments"), ¶ 94 ("Medicaid paid HealthNet"), ¶ 96 ("One very

unique thing about HealthNet billing as an FQHC is…..").  Nor would such an allegation make

sense.  After all, IU Health does not have a FQHC site, nor does it receive FQHC payments.  *See*

U.S. Dep't of Health and Human Services, HRSA Data Warehouse, Health Centers and Look-

alike Sites Site Directory (dated June 15, 2015) (attached as Exhibit A) (listing all FQHC sites in

Indiana).[2]  Thus, any purported false claims allegations against IU Health for FQHC payments

fail as a matter of law.

---

[2] "Judicial Notice of public records available on court and government websites is permissible." *Travelers Cas. & Sur. Co. of Am. v. Consol. City of Indianapolis, Ind.*, No. 1:13-CV-01276-MJD, 2014 WL 5509312, at *2 n.2 (S.D. Ind. Oct. 31, 2014) (quotation omitted).  *See also Pickett v. Sheridan Health Care Ctr.*, 664 F.3d 632, 648 (7th Cir. 2011); *Denius v. Dunlap*, 330 F.3d 919, 926 (7th Cir. 2003).

**(c)      Relator does not allege that IU Health failed to meet the requirements for receiving DSH payments.**

Finally, Relator asserts that IU Health's false claims enabled it to "qualify as a disproportionate share hospital," or "DSH." (Am. Compl. ¶¶ 117, 123.)  Absent from the Amended Complaint, however, is any explanation of when, how, or why alleged false claims would result in inappropriate DSH payments.  This allegation too thus fails to state a cognizable claim.

Characterizing the requirements regarding DSH payments as "complex," Relator alleges that a hospital is "typically designated as a DSH" based on its Medicaid or low-income utilization rate, and where it has at least two obstetricians on staff who have agreed to provide services to low-income individuals.  (*Id.* ¶¶ 48-49.)  Yet when it comes to IU Health, Relator does not allege that IU Health failed to meet these standards or that Methodist Hospital is even qualified as a DSH.  Further, Relator's generalized allegation that IU Health received DSH payments (*id.* ¶ 50) is far from legally sufficient.  After all, as Relator herself notes, IU Health is a "conglomeration of hospitals … throughout Indiana," only one of which is Methodist Hospital, the hospital at issue here.  (*Id.* ¶¶ 14, 15.)  In short, Relator's failure to link her alleged fraudulent claims to DSH payments as well as her failure to allege that the hospital in question is DSH-qualified makes deficient any claims or damages based on DSH payments.

**C.      Relator Fails To Plead An FCA Conspiracy Claim.**

Relator similarly falls short in alleging that IU Health engaged in a conspiracy to submit false claims to the government.  To state a cognizable FCA conspiracy claim, Relator must plead that "(1) [IU Health] conspired with one or more persons to get a false or fraudulent claim allowed or paid by the United States, and (2) one or more conspirators performed any act to effect the object of the conspiracy."  *United States ex rel. Durcholz v. FKW Inc.*, 997 F. Supp.

1143, 1158 (S.D. Ind. 1998). "An agreement among two or more persons is the essence of the conspiracy." *Id*. Here too, Relator fails to satisfy settled pleading requirements.

      **1.**      **Relator fails to state conspiracy claims given the absence of factual allegations regarding the conspiracy.**

Relator peppers her Amended Complaint with the broad allegation that all defendants "conspir[ed] with one another to commit" FCA violations. (Am. Compl. ¶¶ 119, 125, 129, 134, 149, 154 in Counts I, II, III, IV, VII, and VIII.) Beyond that conclusory statement, however, Relator offers no facts or details to support her conspiracy claim. Indeed, Relator fails to plead the very essence of the conspiracy, namely, an agreement between two or more defendants, let alone the particulars of the conspiratorial agreement. *See United States ex rel. Capella v. Norden Sys., Inc.*, No. 3:94-CV-2063 (EBB), 2000 WL 1336487, at *11 (D. Conn. Aug. 24, 2000) (dismissing complaint that did not specify the "particulars of how and when that alleged conspiracy arose, who entered into it, or what act was committed in furtherance of the conspiracy"); *United States ex rel. Sanders v. E. Ala. Healthcare Auth.*, 953 F. Supp. 1404, 1410 (M.D. Ala. 1996) (dismissing FCA conspiracy claims lacking an allegation of an agreement among the parties). Accordingly, all FCA and IFCA conspiracy claims must be dismissed. *See United States ex rel. Grenadyor v. Ukrainian Vill. Pharmacy, Inc.*, 895 F. Supp. 2d 872, 879 (N.D. Ill. 2012) (dismissing FCA conspiracy claims that lacked detail).

      **2.**      **Relator's conspiracy claims in Counts VII and VIII also fail lacking any allegations against IU Health and due to the intracorporate conspiracy doctrine.**

Relator also includes FCA conspiracy allegations in Counts VII and VIII against both IU Health and MDwise, Inc. (Am. Compl. ¶¶ 149, 154), notably though all allegations relate to MDwise. There is nothing alleged as to IU Health. For instance, Relator alleges that "MDwise failed to properly investigate claims" and "knowingly processed and paid claims which should

not have been paid." (*Id*. ¶¶ 148, 153. *See, generally,* ¶¶ 98-108.) Relator neither ties IU Health

to the purported activities nor alleges IU Health made false claims for payment, false

certifications, or improperly retained overpayments. *See* 31 U.S.C. § 3729(a)(1)(A), (B), (G).

Moreover, Relator's conspiracy claims in Counts VII and VIII fail because of the

intracorporate conspiracy doctrine. *See United States ex rel. Miller v. SSM Health Care Corp.,*

*No. 12-cv-885-bbc, 2014 WL 2801234, at *4 (W.D. Wis. June 19, 2014)* (dismissing FCA

conspiracy claims under the intracorporate conspiracy doctrine); *United States ex rel. Chilcott v.*

*KBR, Inc., No. 09-cv-4018, 2013 WL 5781660, at *10 (C.D. Ill. Oct. 25, 2013)* (finding the

intracorporate conspiracy doctrine applies to FCA conspiracy claims and dismissing such claims

with prejudice). According to the Amended Complaint, MDwise is "owned in equal parts by

Defendant IU Health" and another entity, making IU Health the "parent company" of MDwise.

(Am. Compl. ¶ 25; *see also id.* ¶¶ 107-108 (referring to IU Health's "ownership stake" in

MDwise)). Under settled law, a company cannot conspire with itself, including within the same

corporate entity. *See United States ex rel. McGinnis v. OSF Healthcare Sys., No. 11-cv-1392,*

*2014 WL 2960344, at *10 (C.D. Ill. July 1, 2014)* (dismissing FCA conspiracy claims under the

intracorporate conspiracy doctrine). Thus, Counts VII and VIII should be dismissed as to IU

Health.

## II.   RELATOR'S FCA AND IFCA CLAIMS PREMISED ON FEDERAL AND STATE ANTI-KICKBACK STATUTES FAIL AS A MATTER OF LAW (COUNTS III-IV).

Relator's attempt in Counts III and IV to premise an FCA (or IFCA) claim on alleged

violations of the federal Anti-Kickback Statute or the Indiana Anti-Kickback Statute likewise fail

as a matter of law. These allegations theorize that "Defendants" entered into "financial

compensation arrangements" to induce referrals, in violation of the AKS and Indiana AKS.

(Am. Compl. ¶¶ 128, 133.) The Amended Complaint, however, fails to identify any details of

this alleged scheme.  Even if it did, the alleged kickbacks fall under Congress's explicit exceptions in the AKS for relationships with FQHCs, and Relator does not plead otherwise.

Furthermore, even if the Court were to find that Relator's AKS claims are viable under Rules 9(b) and 12(b)(6), those claims arising prior to March 23, 2010, fail to allege a false certification with the AKS, as before that date the statute did not cover the kinds of claims asserted here.  Finally, the Indiana AKS, lacking any exceptions or safe harbors, is preempted by the federal AKS.

### A.  Relator's AKS Allegations In Counts III And IV Fail To Satisfy Rule 9(b).

Again, Relator's broad, conclusory statements regarding IU Health's purported violation of the AKS and Indiana AKS fall short of Rule 9(b)'s particularity requirements.  The AKS is a criminal statute that prohibits medical providers from "knowingly and willfully" paying remuneration to induce Medicaid referrals.  42 U.S.C. § 1320a–7b.  The AKS creates no private right of action.  Relator, here, alleges that IU Health's supposed AKS violation rendered the entity ineligible to receive payments from Medicaid, thereby rendering any claims it submitted for payment as false claims, in violation of the FCA and IFCA.

In all of two paragraphs, Relator alleges a scheme by which "IU Health provides HealthNet with the facilities … equipment and supplies for [HealthNet's] triage unit at no charge to HealthNet" with HealthNet in return referring "all of its obstetrics patients to IU Health's Methodist Hospital for delivery."  (Am. Compl. ¶¶ 88-89.)  According to Relator, this arrangement violates the AKS because IU Health can make "additional claims" for various labor and delivery services and DSH funds.  (*Id*. ¶ 89.)

Once again, absent from Relator's allegations are "specific details" of the arrangement underlying the fraud, for instance, dates, amounts, identities of patients allegedly referred and specific treatments or services provided as a result of the "facilities … equipment and supplies"

IU Health allegedly provided to HealthNet.  Similarly, Relator fails to allege with particularity a

single illegal referral that IU Health received as part of this purported scheme.  Rule 9(b),

however, demands such details.  *See United States ex rel. Grandeau v. Cancer Treatment Ctrs. of*

*Am.*, No. 99 C 8287, 2005 WL 2035567, at *2 (N.D. Ill. Aug. 19, 2005) (dismissing FCA anti-

kickback claims that failed to provide identity of any person involved, dates, general time frame,

or any representative examples); *United States ex rel. Obert-Hong v. Advocate Health Care*, 211

F. Supp. 2d 1045, 1049 (N.D. Ill. 2002) (dismissing FCA anti-kickback claims because

"[p]ermitting relator to make bald allegations of unreasonableness, without any details

demonstrating how or why, would defeat Rule 9(b)'s purposes"); *Grenadyor*, 895 F. Supp. 2d at

879, *FCA claim dismissal affirmed by* 772 F.3d 1102 (7th Cir. 2014) (dismissing complaint

where there were no linkages of specific kickbacks to a specific patient, specific doctor, or

specified date).

To establish an FCA AKS violation, courts are clear that an alleged kickback must be tied

to claims for government payment.  *See Mason v. Medline Indus., Inc.*, No. CIV.A. 07 C 5615,

2009 WL 1438096, at *4 (N.D. Ill. May 22, 2009) (dismissing FCA AKS claims not tied to any

false claims).  Yet Relator fails to provide even the most basic elements.  She fails to identify a

single patient that was referred and she fails to point to even a single claim that resulted from the

alleged referral.  Without these, she cannot establish an AKS or Indiana AKS violation, much

less an FCA or IFCA violation.

### B.    Relator's AKS Allegations Fall Under A Statutory Exception To AKS Violations (Count III).

Relator's AKS-based claims also fail for an independent reason, namely that they fall

under a statutory safe harbor exception to the AKS.  In drafting the AKS, Congress included

express "safe harbor" provisions aimed at exempting from the AKS's scope certain payment and

business practices that, although potentially implicating the AKS, are not treated as offenses under the statute.  *See Klaczak v. Consol. Med. Transp.*, 458 F. Supp. 2d 622, 686 (N.D. Ill. 2006) (The various "'safe harbors' define a subset of clearly legal conduct, but that does not mean that anything outside of the 'safe harbors' violates the AKS.").  Accordingly, to survive a motion to dismiss an FCA claim based on AKS violations, a relator must allege sufficient facts to "support an inference or render plausible that [the defendant] acted while knowing that its [conduct] fell outside the Safe Harbor Provision on which it was entitled to rely."  *United States v. Corinthian Colleges*, 655 F.3d 984, 997 (9th Cir. 2011) (affirming dismissal of an FCA AKS allegation where relator failed to plead the defendant had the requisite scienter that its conduct fell outside of the relevant safe harbor provision).

Here, IU Health's alleged conduct fits within the AKS safe harbor provisions. Specifically, the AKS provides exceptions for relationships with federally qualified health centers (FQHC), like HealthNet, including "remuneration" between a FQHC and any "entity providing goods, items, services, donations, loans, or a combination thereof … pursuant to a contract, lease, grant, loan, or other agreement, if such agreement contributes to the ability of the [FQHC] to maintain or increase the availability, or enhance the quality of services provided to a medically underserved population served by the [FQHC]."  42 U.S.C. § 1320a-7b(b)(3)(I).  *See also* 42 U.S.C. § 1320a-7b(b)(3)(H) and 42 C.F.R. § 1001.952(w) for additional exemptions and safe harbor provisions.  And Relator has acknowledged that HealthNet is a FQHC, providing "healthcare services primarily to patients who live at or below the federal poverty level" and IU Health and HealthNet "enter[ed] into financial compensation arrangements" regarding the exchange of goods and services to this population (Am. Compl. ¶¶ 16, 128.)  Accordingly, Relator's AKS claims fall under a safe harbor provision, and thus fail as a matter of law.

-22-

At the very least, Relator has not pled that the exceptions and safe harbors did not apply to IU Health.  *See United States ex rel. Fox Rx, Inc. v. Dr. Reddy's Inc.*, No. 13cv3779 (DLC), 2014 WL 6750786, at *8-9 (S.D.N.Y. Dec. 1, 2014) (dismissing AKS claims that failed to allege a plausible unlawful kickback).  As a result, Relator's claims that IU Health violated the AKS also fail Rule 9(b).

### C.     Relator's AKS-Based FCA Claims Prior To March 23, 2010 Fail (Count III).

At a minimum, Relator's attempt to impose FCA liability premised upon alleged AKS violations prior to March 23, 2010 fails.  For AKS violations prior to March 23, 2010, Relator must allege both that a defendant expressly certified compliance with the AKS and that it submitted claims resulting from a violation of the AKS.[3]  *See Grenadyor*, 895 F. Supp. 2d at 880 (dismissing FCA anti-kickback claims that failed to allege that defendant filed a false certification); *United States ex rel. Kennedy v. Aventis Pharm., Inc.*, 610 F. Supp. 2d 938, 946-47 (N.D. Ill. 2009) (dismissing FCA anti-kickback claims where plaintiff failed to allege that the hospitals falsely certified compliance with AKS on Medicare claims).  Relator does not point to any writing by IU Health where IU Health certified compliance with the AKS, or any specific law or regulation for that matter.  And to the extent that Relator is relying on an implied certification theory for her AKS-based claims, the Seventh Circuit made clear this month that such claims fail as a matter of law. *Sanford-Brown*, 2015 WL 3541422, at *12 ("Although a number of other circuits have adopted this so-called doctrine of implied false certification, we decline to join them").  *See supra* I.B.

---

[3] As of March 23, 2010, the AKS was amended so that any claim for "items or services" resulting from a "kickback, bribe, or rebate" "constitutes a false or fraudulent claim" under the FCA.  *See* Patient Protection and Affordable Care Act, Pub. L. No. 111-148 § 6402(f), 124 Stat. 119, 759 (2010), codified at 42 U.S.C. § 1320a-7b(g) ("PPACA").

In sum, given the unavailability in the Seventh Circuit of an implied false certification theory, Relator's failure to plead that IU Health falsely certified compliance with the AKS as a condition of payment bars her claims prior to March 23, 2010.  Those claims fail as a matter of law and should be dismissed.

### D.      The Indiana AKS Is Preempted By Federal Law (Count IV).

Count IV alleges IU Health violated the IFCA by violating the Indiana Anti-Kickback Statute, Ind. Code § 12-15-24-2.  This additional theory fails because the Indiana AKS, by lacking any exceptions or safe harbors, is preempted by the federal AKS, and is thus unconstitutional under the Supremacy Clause.  U.S. Const. art. VI, cl. 2.

The entirety of the Indiana AKS states:

> A person who furnishes items or services to an individual for which payment is or may be made under this chapter and who solicits, offers, or receives a:
>
>> (1) kickback or bribe in connection with the furnishing of the items or services or the making or receipt of the payment; or
>>
>> (2) rebate of a fee or charge for referring the individual to another person for the furnishing of items or services;
>
> commits a Class A misdemeanor.

Ind. Code § 12-15-24-2.  Notably, the Indiana AKS contains no exceptions or safe harbors, unlike the federal AKS, which, as already explained, lists over twenty safe harbors, including a safe harbor for certain payments and transfers made to a FQHC.  *See* 42 U.S.C. § 1320a-7b(b)(3); 42 C.F.R. § 1001.952(a)-(y).  Accordingly, there are numerous opportunities for actions to fall under one of the federal AKS's safe harbors, and thus not violate federal law, while at the same time violating the plain terms of the Indiana AKS.

Where a state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," the law is deemed preempted by federal law.  *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98 (1992).  In evaluating "conflict preemption," a court has to determine "whether state regulation is consistent with the structure and purpose of the statute as a whole," including "looking to 'the provisions of the whole law, and to its object and policy.'"  *Id.* (citation omitted), *accord Hines v. Davidowitz*, 312 U.S. 52, 67 (1941).  A state law is preempted if "it interferes with the methods by which the federal statute was designed to reach this goal."  *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 494 (1987).

Indiana's prohibition of conduct through its AKS interferes with the comprehensive regulatory scheme enacted by Congress in the federal AKS, which expressly authorizes such conduct.  As explained in the final rule from the Office of Inspector General of the U.S. Department of Health and Human Services ("HHS-OIG"), Congress enacted the "safe harbor" provisions in the FCA in response to the concern that some "relatively innocuous commercial arrangements" were "potentially subject to criminal prosecution."  Medicare and State Health Care Programs: Fraud and Abuse; Safe Harbor for Federally Qualified Health Centers Arrangements Under the Anti-Kickback Statute, 72 Fed. Reg. 56632, 56632-33 (Oct. 4, 2007) (explaining the statutory background for proposed safe harbor regulations to permit non-abusive, beneficial arrangements safe from AKS prosecution).

This safe harbor is especially applicable to FQHCs that frequently enter into arrangements with hospitals to better serve communities with limited access to health care resources, including instances where hospitals "agree to provide health centers with capital development grants, low cost (or no cost) loans, reduced price services, or in-kind donations of supplies, equipment, or space."  *Id.* at 56634.  Congress foresaw that these relationships, as

advantageous to the community and presenting little risk to federal dollars, might bring anti-kickback charges, and that FQHCs' "vital role" cannot be met if FQHCs are not permitted to enter into arrangements to enhance "cost effective care for communities with limited access to health care resources." *Id.* at 56633.  As a result, HHS-OIG issued a safe harbor excepting certain contractual arrangements with FQHCs.  42 C.F.R. § 1001.952(w).

In direct contrast and conflict, under Relator's theory, the Indiana AKS *punishes* arrangements where a hospital commits to provide resources to an FQHC to serve underserved populations and better meet the needs of its low-income community.  *See* Ind. Code § 12-15-24-2 (lacking any exceptions to the anti-kickback provisions).  In other words, the Indiana AKS criminalizes the beneficial arrangements the federal government expressly authorized.   In similar circumstances, the Florida Supreme Court held that the Florida Anti-Kickback Statute was preempted by federal law because Florida's law (like Indiana's) failed to include safe harbors, and thus criminalized "conduct that federal law specifically intended to be lawful and shielded from prosecution."  *State v. Harden*, 938 So. 2d 480, 492-93 (Fla. 2006).

Just like the Florida AKS, the lack of any safe harbor provisions in the Indiana AKS sets the law at odds with the purposes and objectives of the federal government.  In view of this direct conflict, the Indiana AKS is preempted by federal law and Count IV should be dismissed.

## III.   RELATOR'S CLAIMS ARE LIMITED FURTHER BY FEDERAL AND STATE STATUTES OF LIMITATIONS.

### A.   Both The FCA And IFCA Foreclose Relator's Claims Prior To December 19, 2007 (Counts I-IV, VII-VIII).

Putting aside the pleading defects that warrant dismissal of Relator's FCA and IFCA claims, her attempt to seek damages for "all claims submitted since 2005 to the present" (Am. Compl. ¶ 54) ignores the FCA's and the IFCA's statute of limitations.  The FCA and the IFCA provide that a suit may not be brought more than six years after the date of the violation.  31

U.S.C. § 3731(b)(1); Ind. Code § 5-11-5.5-9(b)(1).  Because Relator filed her initial complaint

on December 19, 2013 (Filing No. 1), any FCA and IFCA claims prior to December 19, 2007

should be dismissed as a matter of law.

Further, Relator cannot rely on the equitable tolling provision in 31 U.S.C. § 3731(b)(2)

or Ind. Code § 5-11-5.5-9(b)(2) to gain a ten-year limitations period.  That is so because the

tolling provision is not available unless the government has intervened.  *See United States ex rel.*

*Lusby v. Rolls-Royce Corp.*, No. 1:03-cv-680-SEB-WGH, 2012 WL 4357438, at *10 (S.D. Ind.

Sept. 24, 2012); *United States ex rel. Leveski v. ITT Educ. Servs. Inc.*, No. 1:07-cv-867-WTL-

JMS, 2010 WL 1936118, at *4 (S.D. Ind. May 12, 2010), *rev'd on other grounds*, 719 F.3d 818

(7th Cir. 2013).  As the government has not intervened here (Filing No. 53), Relator cannot hold

IU Health liable for claims for payment submitted before December 19, 2007.

### B.    At A Minimum, The IFCA Is Applicable Only For Claims Between July 1, 2005 And June 30, 2014 (Counts II, IV, VIII).

Even if the Court does not apply the limitations period in the FCA and IFCA, all of

Relator's claims under the IFCA should be limited, at the very least, to those submitted on or

after July 1, 2005, and only up to June 30, 2014, at the latest.

The IFCA became effective July 1, 2005.  *See* 2005 Ind. Legis. Serv. P.L. 222-2005,

Section 23 (H.E.A. 1501).  The law does not apply retroactively.  "[It] does not contain a

retroactivity provision, nor does it appear to apply retroactively."  *United States ex rel. Herron v.*

*Indianapolis Neurosurgical Grp., Inc.*, No. 1:06-cv-1778-JMS-DML, 2013 WL 652538, at *6

(S.D. Ind. Feb. 21, 2013), citing *United States ex rel. McCoy v. Madison Ctr.*, No. 3:10-CV-259

RM, 2011 WL 1791710, at *2-3 (N.D. Ind. 2011) (dismissing any claims prior to the enactment

of the Indiana FCA).  Relator's Amended Complaint therefore must be dismissed with prejudice

to the extent it is based on claims, records, or statements made prior to July 1, 2005.

More recently, the IFCA was amended to remove any "claim, request, demand, statement, record, act, or omission" to the Medicaid program "made or submitted after June 30, 2014." Ind. Code § 5-11-5.5-2. Notably, all of the counts in the Amended Complaint are based solely upon Medicaid claims. *See, e.g.,* Am. Compl. ¶¶ 4, 123 (alleging IU Health "receive[d] improper Medicaid" funding and "improperly submitted claims and received reimbursement from Medicaid"). Accordingly, any IFCA allegation in Counts II, IV, and VIII based on Medicaid claims made or submitted after June 30, 2014 fail as a matter of law and should be dismissed.[4]

## IV.   RELATOR'S RETALIATION CLAIMS FAIL TO STATE A PLAUSIBLE CLAIM FOR RELIEF (COUNTS IX AND X).

Finally, Relator's retaliation claims fare no better than her *qui tam* claims. The FCA and the IFCA[5] forbid employer retaliation against those who report FCA violations, creating a cause of action for an employee "discharged . . . harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee . . . in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter." 31 U.S.C. § 3730(h)(1). *See also* Ind. Code § 5-11-5.5-8. To sustain her retaliation action, Relator must show that "(1) h[er] actions were taken 'in furtherance of' an FCA enforcement action and were therefore protected by the statute; (2) that [IU Health] had knowledge that [s]he was engaged in this protected conduct; and (3) that the discharge was motivated, at least in part, by the protected conduct." *Brandon v. Anesthesia & Pain Mgmt. Assocs., Ltd.*, 277 F.3d 936, 944 (7th Cir. 2002). Relator fails to allege any of these elements.

---

[4] The cause of action for false Medicaid claims now resides in Ind. Code § 5-11-5.7-1. Relator does not plead a cause of action under this provision of Indiana law.

[5] As discussed above, the IFCA "mirrors the Federal FCA in all material respects." *See, e.g., Herron,* 2013 WL 652538, at *7 n.9 (citing *Kuhn v. LaPorte Cnty. Comprehensive Mental Health Council,* No. 3:06-cv-317 CAN, 2008 WL 4099883, at *3 n.1 (N.D. Ind. Sept. 4, 2008))*. Therefore, analysis of Relator's retaliation claims under the FCA applies equally to the IFCA.

**A.    Relator Has Not Pled That She Engaged in Protected Activity Under The FCA and IFCA By Raising Internal "Questions" and "Concerns."**

Relator's Amended Complaint fails to allege the first element of an FCA retaliation claim: that she engaged in protected activity.  Specifically, her Amended Complaint lacks any allegations that she complained of the submission of *fraudulent claims for payment to the government*.  Instead, she made general, internal complaints about clinical practices (Am. Compl. ¶¶ 5, 110) and, after leaving IU Health and learning more information about Medicaid billing practices (*id.* ¶ 69), now tries to recast those complaints as the basis for an FCA retaliation claim.  As a result, her FCA retaliation claims fail.

To pursue an FCA retaliation claim, a plaintiff must first show she engaged in protected activity "in furtherance of" an FCA enforcement action.  31 U.S.C. § 3730(h)(1).  In other words, Relator must plead facts to set forth "situations in which a *qui tam* action is a 'distinct possibility,' or 'litigation could be filed legitimately—that is, consistently with Fed. R. Civ. P. 11.'" *Brandon,* *277 F.3d at 944* (citing *Neal v. Honeywell, 33 F.3d 860 (7th Cir. 1994)*) (finding plaintiff had not engaged in protected activity).  As to the requirement of pleading protected activity, "[s]imply making internal complaints or pointing out problems to supervisors is not sufficient." *United States ex rel. Batty v. Amerigroup Ill., Inc., 528 F. Supp. 2d 861, 877 (N.D. Ill. 2007).*  Put another way, "[s]aber-rattling is not protected conduct." *Luckey, 183 F.3d at 733.*

Here, Relator's allegations amount to nothing more than internal complaints, not complaints regarding alleged false claims submitted to the government.  Relator makes no allegations she complained that CNMs caring for high-risk patients constituted fraud upon the government.  Instead, Relator claims she "raised questions about the treatment of high-risk patients," raised "concerns about the business model of having CNMs provide essentially all prenatal care to high-risk obstetric patients," and raised "complaints about the lack of physician

management of obstetric patients."  (Am. Compl. ¶¶ 109-111.)  At most, these allegations

(accepted as true at this threshold stage) show that Relator questioned certain clinical practices.

But those complaints are not protected activity, and thus do not support a viable retaliation claim

against IU Health.

> **B.      Relator Has Not Pled That IU Health Was On Notice Of Her Purported
>          Protected Activity By Alleging She "Informed" IU Health About "Her
>          Concerns."**

Relator's FCA retaliation claim also fails because she does not adequately plead that IU

Health was notified that she engaged in protected activity.  In addition to protected activity,

Relator must also allege a sufficient factual basis that IU Health knew she was preparing for an

FCA *qui tam* action.  *Brandon*, 277 F.3d at 944-45.  The employee must "supply[] information

that could prompt an investigation or conduct[] their own internal investigation even where an

action is never filed." *Herron*, 2013 WL 652538, at *7 (citations omitted).  "[U]nless the

employer is aware that the employee is investigating fraud, …the employer could not possess the

retaliatory intent necessary to establish a violation of § 3730(h)."  *United States ex rel. Brown v.

Aramark Corp.*, 591 F. Supp. 2d 68, 77 (D.D.C. 2008) (dismissing FCA retaliation claim).

The clearest example of placing an employer on notice is where the employee tells the

employer that she has informed or intends to inform government officials of the alleged

fraudulent practice.  *See Abner v. Jewish Hosp. Healthcare Servs., Inc.*, No. 4:05-cv-0106-DFH-

WGH, 2008 WL 3853361, at *8 (S.D. Ind. Aug. 13, 2008) (relators told defendant employers

they planned to notify government officials of fraudulent billing practices and were fired the very

next day); *Chomer v. Logansport Mem'l Hosp.*, No. 1:03-CV-0733 SEB-VSS, 2003 WL

23009014, at *4 (S.D. Ind. Oct. 29, 2003) (plaintiff threatened to report and did report

employer's actions to the government before he was discharged).  At the very least, Relator must

plead she was investigating facts "as a prelude to this lawsuit," told IU Health she was "planning

a lawsuit," or IU Health "suspected by any other means that a lawsuit was in store." *United States ex rel. Wildhirt v. AARS Forever, Inc.*, No. 09 C 1215, 2011 WL 1303390, at *6 (N.D. Ill. Apr. 6, 2011)* (dismissing FCA retaliation claims where relators "merely allege[d] that they repeatedly complained to their superiors about the deficient services").  On the other hand, retaliation claims fail where reports to an employer are limited to internal complaints aimed at bringing the employer into compliance with its legal obligations.  *See Luckey*, 183 F.3d at 733 ("An employer is entitled to treat a suggestion for improvement as what it purports to be rather than as a precursor to litigation."); *Batty*, 528 F. Supp. 2d at 878 (granting motion to dismiss where plaintiff alleged that she advised her superiors that defendants were not in compliance with contractual obligations and insisted on bringing their practices into compliance); *United States ex rel. Kennedy v. Aventis Pharm., Inc.*, 512 F. Supp. 2d 1158, 1168 (N.D. Ill. 2007) (granting motion to dismiss where plaintiff complained about off-label marketing but did not inform her employers that she suspected they were defrauding the government or she was pursuing an FCA claim).

In *Brandon*, the Seventh Circuit found that the defendant employer could not have realized that it faced the "distinct possibility" of an FCA action, even though the plaintiff had used terms including "illegal," "improper," and "fraudulent," when the plaintiff was merely "trying to convince the shareholders to comply with the Medicare billing regulations." *Brandon*, 277 F.3d at 944-45.  Such conduct neither is protected by the FCA nor puts "an employer on notice of potential FCA litigation." *Id.* at 945.

So too here.  Relator claims she "informed" IU Health leadership regarding "her concerns about their business model."  (Am. Compl. ¶¶ 5, 110.)  But she does not bridge the gap between her "concerns" regarding the business model and any fraud upon the government or potential

FCA suit.  Relator even alleges that she learned more of the fraudulent "scheme" *after* her firing (*id*. ¶ 69), clearly preventing her from putting IU Health on notice.  Without alleging that Relator notified IU Health she was engaged in efforts to prevent fraud upon the government, her claim must be dismissed.

      **C.**      **Relator Does Not Adequately Plead That She Was Discharged Because She Was Engaged In Protected Activity.**

To satisfy the third element of an FCA retaliation claim, Relator must show she was discharged because she was engaged in protected activity.  *Brandon*, 277 F.3d at 944.  Here, Relator has not adequately pled that she was engaged in protected activity (*see supra* IV.A) or that IU Health knew she was engaged in protected activity and even alleged she learned details of the scheme after her dismissal (*see supra* IV.B).  Therefore, logically, her Amended Complaint cannot plead adequately that IU Health terminated her for engaging in protected activity under the FCA or IFCA.

<u>**CONCLUSION**</u>

For the foregoing reasons, IU Health respectfully requests that the Court enter an order dismissing with prejudice all claims against IU Health and granting such further relief the Court deems necessary and appropriate.

Dated: June 15, 2015     Respectfully submitted,

           */s/ Stephen G. Sozio*
          Stephen G. Sozio (admitted *pro hac vice*)
          JONES DAY
          North Point
          901 Lakeside Avenue
          Cleveland, Ohio  44114-1190
          Telephone: (216) 586-3939
          Facsimile: (216) 579-0212
          Email:  sgsozio@jonesday.com

          Heather M. O'Shea (admitted *pro hac vice*)
          JONES DAY
          77 West Wacker Drive
          Chicago, Illinois 60601-1692
          Telephone: (312) 269-4009
          Facsimile: (312) 782-8585
          Email:  hoshea@jonesday.com

          Laura A. Hartnett (admitted *pro hac vice*)
          JONES DAY
          325 John H. McConnell Blvd.
          Suite 600
          Columbus, Ohio  43215
          Telephone: (614) 469-3939
          Facsimile: (614) 461-4198
          Email:  lhartnett@jonesday.com

          Alan L. McLaughlin (#10182-49)
          LITTLER MENDELSON, P.C.
          111 Monument Circle, Suite 702
          Indianapolis, Indiana 46204
          Telephone: (317) 287-3600
          Facsimile: (317) 636-0712
          E-mail:  amclaughlin@littler.com

          *Counsel for Defendant Indiana University Health,*
          *Inc. f/k/a Clarian Health Partners, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on June 15, 2015 a copy of the foregoing Defendant Indiana University Health, Inc.'s Memorandum Of Law In Support Of Its Motion To Dismiss the Amended Complaint was filed electronically.  Service of this filing will be made on all ECF-registered counsel by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

*/s/ Stephen G. Sozio*
Stephen G. Sozio

*Counsel for Defendant Indiana University Health, Inc. f/k/a Clarian Health Partners, Inc.*
