**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| UNITED STATES and STATE OF INDIANA | \| |
| ex rel. DR. JUDITH ROBINSON, | \| |
| | \| |
| Plaintiffs/Relator, | \| |
| | \| |
| v. | \|  Case No. 1:13-cv-2009-TWP-MJD |
| | \| |
| INDIANA UNIVERSITY HEALTH, INC. | \| |
| f/k/a CLARIAN HEALTH PARTNERS, INC., | \| |
| and HEALTHNET, INC. | \| |
| | \| |
| Defendants. | \| |

---

**SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT, THE INDIANA FALSE CLAIMS AND WHISTLEBLOWER PROTECTION ACT AND THE INDIANA MEDICAID FALSE CLAIMS AND WHISTLEBLOWER PROTECTION ACT**

---

This is an action brought by Plaintiff/Relator Judith Robinson, M.D., on behalf of the United States of America and the State of Indiana pursuant to the Federal False Claims Act, 31 U.S.C. § 3729, *et seq*., the Indiana False Claims and Whistleblower Protection Act, Ind. Code § 5-11-5.5-1, *et seq*., and Indiana Medicaid False Claims and Whistleblower Protection Act, Ind. Code § 5-11-5.7-1, *et seq*.  In support thereof, Relator alleges as follows:

**I.      INTRODUCTION**

1.      The United States of America and the State of Indiana have set up a dense network of programs and resources intended to protect Indiana's most vulnerable citizens and to ensure their access to quality healthcare at every stage of life.  Yet, two of Indianapolis' largest

entities tasked with caring for the poor have deliberately and systematically abdicated their legal and medical obligations in favor of padding their financial gains. Indiana University Health, Inc. ("IU Health") and HealthNet, Inc. ("HealthNet") have conspired with one another for more than a decade to enter into a series of illegal referral-based relationships designed to ensure HealthNet's steady stream of Medicaid beneficiaries are directed to IU Health's Methodist Hospital for lucrative procedures, in-patient admissions and ancillary services. In return, over the last seven years alone, IU Health spent more than $24 million to expand and prop up the HealthNet chain of community clinics.

2.      IU Health lavishes HealthNet with financial incentives not available in any commercially-reasonable, arms-length transaction: an ever-increasing $13.7 million loan with no interest and no repayment schedule, virtually free leases for valuable clinic space, more than $2 million per year for physician coverage, and millions more in subsidies. In public, IU Health touts its contributions to HealthNet as generous contributions to its charitable mission. But in private, executives at the two non-profits calculate how much money can be generated by poaching patients from other healthcare delivery systems and forcing care of Indianapolis' poorest citizens to IU Health's Methodist Hospital.

3.      Where money's concerned, nothing is sacrosanct – not even critically ill newborns. When looking to open a high-risk maternity clinic for HealthNet, Methodist Hospital stood to lose money in the deal *unless* HealthNet guaranteed all of the patients from the clinic would go to Methodist Hospital. The real value wasn't just those pregnant patients, but more so their newborns, expected to be born critically ill and needing extremely expensive care in Methodist's Neonatal Intensive Care Unit. IU Health and HealthNet treated these babies as commodities that would take the financial arrangement from the red to the black. IU Health

2

eagerly marched forward with the plan, creating the HealthNet clinic while picking up the tab for any losses as long as HealthNet acted as a feeder for Methodist's NICU.

4.      Profiting on newborns fighting for their lives is just one poignant example of the conspiracy put in place more than a decade ago by IU Health and HealthNet to bilk taxpayers at any cost.  The scheme is simple and effective: IU Health pays HealthNet to be a feeder system to fill beds in the Methodist NICU, on the Methodist Labor & Delivery unit, and in the corresponding emergency care and triage unit; HealthNet collects enhanced payments on each and every clinic visit as an "independent" federally-qualified health center; IU Health secures the billings for in-patient care, intensive care, and any tests or other ancillary services that a HealthNet patient might need.  As a result, IU Health and HealthNet broke state and federal laws, as well as the confidences of patients who should be able to trust that two safety-net providers will always do what is best for the patient, not the bottom line.

5.      The money-focused approach isn't limited to kickbacks between the entities.  The State of Indiana, struggling to reduce one of the worst infant mortality rates in the country, has set forth clear and exception-free Medicaid requirements recognizing the urgency of appropriate prenatal care *by physicians* for high-risk pregnant women to prevent harm to mothers and their babies.  IU Health and HealthNet conspired to create and operate a system wherein low-cost Certified Nurse Midwives provided and billed for the treatment of high-risk pregnant Medicaid recipients.  To circumnavigate the rules and collect millions of dollars for improper care, IU Health and HealthNet routinely failed to properly identify patients as high-risk *and* billed midwives' services under physicians' name to conceal the true service-providers.

6.      Women and babies in Indiana have paid a hefty price: Dr. Judy Robinson, the Relator, documented more than fifteen instances of bad outcomes and near-misses as a result of

care to high-risk patients by Certified Nurse Midwives ("CNMs") in just six months. For example, patient N.K. was sent home from Methodist Hospital's triage center by a CNM after the CNM failed to ascertain fetal heart distress during an induction attempt and never asked a physician to review the baby's condition; N.K.'s baby was born two days later via emergency cesarean section with severe, permanent neurological impairments. Patient S.B., a teenager with severe preeclampsia, was more fortunate – when a CNM tried to send her home without a physician evaluation, Dr. Robinson happened to see an electronic message and determined that S.B. needed to deliver immediately for the safety of herself and her baby. After months of repeatedly seeking guidance from both IU Health and HealthNet executives about these issues, Dr. Robinson was fired in 2013. Less than a year later, Patient T.T. died during childbirth at Methodist Hospital as a result of a CNM's failure to ascertain T.T.'s medical needs.

7.     This Complaint does not seek redress for the devastation caused to any one woman or baby. But their stories highlight the wreckage created when two healthcare providers push aside regulations designed to ensure safe, reliable care to indigent patients in favor of financial gain. This Complaint seeks to hold IU Health and HealthNet accountable for their conscious decision to value financial gain over all else by requiring them to pay back hundreds of millions of dollars bilked from taxpayers when the Defendants knowingly and intentionally violated the federal Anti-Kickback Act, Indiana's Medicaid billing rules and laws, regulations put in place by the Health Resources and Services Administration, and the federal and state False Claims Acts.

## II.    JURISDICTION AND VENUE

8.     This action arises under the federal False Claims Act, 31 U.S.C. § 3729, et seq., the Indiana False Claims and Whistleblower Protection Act ("IFCWPA"), Ind. Code § 5-11-5.5-

1, *et seq*. (for claims arising July 1, 2005 through June 30, 2014), and Indiana Medicaid False Claims and Whistleblower Protection Act ("IMFCWPA"), Ind. Code § 5-11-5.7-1, *et seq*. (for claims arising July 1, 2014 through the present). This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732(a), which specifically confers jurisdiction on this Court for actions brought under 31 U.S.C. §3730. Additionally, 31 U.S.C. § 3732(b) specifically confers jurisdiction on this Court for state-law claims that arise under the same transactions or occurrences as an action brought under 31 U.S.C. § 3730.

9.      This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because the Defendants can be found in, reside in, transact business in, and have committed the alleged acts in Marion County, Indiana, which is in the Southern District of Indiana.

10.     Venue is proper in this District pursuant to 28 U.S.C. § 1392(b)-(c) and 31 U.S.C. §3732(a) because the Defendants can be found in, reside in, and transact business in the Southern District of Indiana and the alleged acts occurred in this District.

11.     Relator knows of no other complaints that have been filed against the Defendants alleging the same or similar fraudulent conduct. To Relator's knowledge, the facts and circumstances alleged in this Complaint were not publically disclosed prior to the inception of this lawsuit. Furthermore, Relator is an original source as defined by the False Claims Act in 31 U.S.C. § 3730(e)(4)(B) and as described in the IFCWPA at IC5-11-5.5-7(f) and the IMFCWPA at IC 5-11-5.7-7(e). Relator made voluntary disclosures to the United States of America and the State of Indiana prior to the filing of this lawsuit.

### III.    PARTIES

12.    The real-parties-in-interest to the claims set forth herein are the United States of America and the State of Indiana.

13.    **Plaintiff/Relator Dr. Judith Robinson** is a resident of Carmel, Indiana.  She received her Doctor of Medicine degree from the University of Illinois in 1981 and performed her residency in Obstetrics and Gynecology at Methodist Hospital in Indianapolis, Indiana from 1983 to 1987.  Dr. Robinson is a Board-certified Ob/Gyn and a Fellow in the American College of Obstetrics and Gynecology.  Among her many honors, Dr. Robinson received the *Indianapolis Monthly* "Top Doc" award for Ob/Gyn physicians annually from 1998 through 2012.  Dr. Robinson had an active private practice for nineteen years, from 1987 through mid-2006.

14.    Dr. Robinson began working part-time at HealthNet in or around October 2005.  In or about mid-2006, Dr. Robinson left private practice completely and began working full time at HealthNet.  In 2010, Dr. Robinson was appointed to the position of Medical Director of Ob/Gyn Services at Methodist Hospital.  She also held the position of Chairperson of Methodist Hospital Ob/Gyn Section and was the Manager of the HealthNet/IU Health Hospitalist Service.  From 2010 through 2012, Dr. Robinson was also the Assistant Ob/Gyn Residency Director for the Methodist Hospital campus.  In 2011, Dr. Robinson was appointed to the position of Director of Women's Services at HealthNet, Inc., which made her the first and only person to hold Director positions at both HealthNet and Methodist Hospital concurrently.

15.    **Defendant Indiana University Health, Inc. ("IU Health")** is an Indiana non-profit corporation that was formed in January 1997 through a consolidation of assets between the Trustees of Indiana University and Methodist Health Group, Inc.  The IU Health system of hospitals, physicians and allied services is the largest in Indiana and provides healthcare

6

throughout the state under various names.  IU Health was previously known as Clarian Health

Partners, Inc. and formally changed its name to Indiana University Health, Inc. effective April 1,

2011.[1]  IU Health is governed by a Board of Directors and employs a staff of approximately

36,000.  Immediate past-president and CEO Dan Evan announced his retirement in September

2015, at which time then-Vice President and COO Dennis Murphy took over the role as

President.  Murphy assumed the role of CEO on May 1, 2016.

16.    IU Health's largest hospital is Indiana University Health – Methodist Hospital

("Methodist Hospital") in Indianapolis.  Methodist Hospital is the site of all patient deliveries,

triage services and ancillary services referenced herein.  Although under the IU Health umbrella,

Methodist Hospital has its own set of executives.  The current President is Herbert C. Buchanan,

Jr., who succeeded James Terwilliger in 2014.

17.    **Defendant HealthNet, Inc. ("HealthNet")** is a non-profit corporation with

primary health care centers and specialty clinic locations throughout metropolitan Indianapolis.

HealthNet, Indiana's largest federally qualified health center, provides healthcare services

primarily to patients who live at or below the federal poverty level.  HealthNet provides services

on a sliding fee scale to those without insurance, but the large majority of its patients are

Medicaid beneficiaries.  The current President and CEO of HealthNet is J. Cornelius "Jimmy"

Brown, who succeeded Booker Thomas in 2012.

18.    According to HealthNet's annual report, 4,077 women received prenatal care at

HealthNet in 2012-2013, including 2,422 deliveries at IU Health's Methodist Hospital.  About

62% of HealthNet's total patient population receives Medicaid and more than 99% of its patients

have incomes at or below 200% of the poverty line.

---

[1] For purposes of clarity, the entity will be referred to as "IU Health" throughout this Complaint.

## IV.    LEGAL AND REGULATORY BACKGROUND

### Federal False Claims Act

19.    The federal False Claims Act, 31 U.S.C. § 3729(a)(1)(A) and (B), imposes liability upon, *inter alia*, those who knowingly present or cause to be presented false claims for payment or approval, and those who make or use, or cause to be made or used, false records or statements material to false claims.  Violators are liable to the United States Government for a civil penalty of not less than $5,500 and not more than $11,000 (as adjusted), plus three times the amount of damages sustained by the Government.  31 U.S.C. § 3729(a)(1)(C) imposes liability on any person who conspires to commit a violation of 31 U.S.C. § 3729(a)(1)(A) or (B).

20.    The federal False Claims Act was amended on May 20, 2009.  For claims arising from December 19, 2003 through and including May 20, 2009, this case is brought under 31 U.S.C. § 3729(a)(1)-(3).  For claims arising from May 21, 2009, through the present, this case is brought under 31 U.S.C. § 3729(a)(1)(A)-(C).

### Indiana False Claims and Whistleblower Protection Act

21.    The Indiana False Claims and Whistleblower Protection Act ("IFCWPA"), modeled after the federal False Claims Act, became effective July 1, 2005.  The IFCWPA proscribes the same conduct as its federal counter-part: "A person know knowingly or intentionally…presents a false claim to the state for payment or approval, [or] makes or uses a false record of statement to obtain payment or approval of a false claim from the state…is…liable to the state for a civil penalty for at least five thousand dollars ($5,000) and for up to three (3) times the amount of damages sustained by the state."  IC § 5-11-5.5-2(b)(1)-(2).

22.    On July 1, 2014, the State of Indiana adopted the Indiana Medicaid False Claims and Whistleblower Protection Act ("IMFCWPA") to specifically address "claims…made or

submitted in relation to the Medicaid program. IC § 5-11-5.7-1, *et seq.* The IMFCWPA mirrors the federal False Claims Act, including the enhanced per-claim penalties of $5,500 to $11,000, as adjusted by the federal Civil Penalties Inflation Adjustment Act. All conduct prohibited under the IFCWPA is also prohibited under the IMFCWPA.

23.     For false claims arising between July 1, 2005, and June 30, 2014, this case is brought under the IFCWPA. For false claims arising from July 1, 2014, through the present, this case is brought under the IMFCWPA.

**Indiana Medicaid**

24.     The federal Medicaid program was created in 1965 as part of the Social Security Act, which authorized federal grants to states for medical assistance to low-income, blind, or disabled persons, qualified pregnant women or children, or members of families with dependent children. The Medicaid program is jointly funded by the federal and state governments. The Secretary of Health and Human Services administers Medicaid on the federal level through the Centers for Medicare and Medicaid Services ("CMS"). Within broad federal rules, each state decides eligible groups, types and ranges of services, payment levels for services, and administrative and operating procedures. The states pay providers (either directly or through contracted intermediaries), and the states then obtain the federal share of the payment from accounts which draw on the United States Treasury. 42 C.F.R. §§ 430.0-430.30. The federal share of Medicaid expenditures varies by state.

25.     Indiana's Medicaid program, the Indiana Health Coverage Program ("IHCP"), is administered by the Indiana Family and Social Services Administration. IHCP offers both fee-for-service and capitated managed care programs. One of Indiana Medicaid's programs is Hoosier Healthwise. Hoosier Healthwise is a mandatory managed care program for certain low-

income families, children up to age 19, parents and guardians of children under the age of 18, and pregnant women.

26.    Healthcare providers who wish to provide and be paid for services to Medicaid beneficiaries under Hoosier Healthwise and any other IHCP program must first become approved Medicaid providers.  This applies to both individual and institutional providers.  To become an approved Medicaid provider, each provider must complete an IHCP Enrollment Packet.  As part of that packet, each provider must execute a "Provider Agreement" which expressly includes the following statement, set forth in all capital letters immediately before the authorized signature line:

> AS A CONDITION OF PAYMENT AND CONTINUED ENROLLMENT IN THE IHCP THE UNDERSIGNED, BEING THE PROVIDER OR HAVING THE SPECIFIC AUTHORITY TO BIND HTE PROVIDER TO THE TERMS OF THIS AGREEMENT, AND HAVING READ THIS AGREEMENT AND UNDERSTANDING IT IN ITS ENTIRELY, DOES HEREBY AGREE TO ABIDE BY AND COMPLY WITH ALL THE STIPULATIONS, CONDITIONS, AND TERMS SET FORTH HEREIN.    THE UNDERSIGNED ACKNOWLEDGES THAT THE COMMISSION OF ANY INDIANA HEALTH COVERAGE PROGRAM RELATED OFFENSE AS SET OUT IN *42 USC 1320a-7b* MAY BE PUNISHABLE BY A FINE OF UP TO $25,000 OR IMPRISONMENT OF UP TO FIVE YEARS OR BOTH.

27.    Among the "stipulations, conditions and terms set forth" in the Provider Agreement are the following relevant provisions:

> (2) To comply with all federal and state statutes and regulations pertaining to the Indiana Health Coverage Programs, as they may be amended from time to time,
> …
>
> (11) To abide by the *Indiana Health Coverage Programs Provider Manual*, as amended from time to time, as well as all provider bulletins and notices…
> …
>
> (13) To certify that any and all information contained on any IHCP billings submitted on the Provider's behalf by electronic, telephonic, mechanical, and/or standard paper means of submission shall be true, accurate and complete….The Provider understands that the submission of false claims, statement, and

documents or the concealment of material fact [sic] may be prosecuted under the applicable federal and/or state law.

### *Specific Indiana Medicaid Regulations Regarding Reimbursement for the Treatments of Medically High-Risk Pregnant Patients*

28.     Indiana Medicaid plainly and unequivocally conditions the payment of public healthcare money for the treatment of medically high-risk pregnant women on the requirement that those patients be treated *only* by physicians.

29.     The *Indiana Health Coverage Programs Provider Manual* was recently reorganized and replaced with IHCP Provider Reference Modules.  The new *Obstetrical and Gynecological Services* module became effective October 1, 2015, and was formally published on February 25, 2016.  The module contains a section titled "High-Risk Pregnancy" which states, "To be considered a high-risk pregnancy, a woman must have at least one medical or psychosocial reason identified in her current pregnancy or obstetrical history that places her at risk for preterm birth or poor pregnancy outcome."  In a sub-section specifically referencing medically high-risk pregnancies,[2] the modules includes a call-out box with bolded and italicized font stating,

> *Note:* ***The IHCP reimburses medically high-risk pregnancy care only when provided by physicians.*** *Nonphysician providers that render pregnancy-related services to pregnant women on Medicaid must refer members identified as having medically high-risk pregnancies only to other appropriate physicians.*

30.     Prior to the current module, the IHCP requirement for the treatment of medically high-risk pregnant women was provided in Chapter 8, page 8-329, *et seq.*, of the *Indiana Health Coverage Program Provider Manual*.  That iteration included two bolded sentences setting forth the provider requirements: "**The IHCP reimburses only for treatment by physician for medically high-risk pregnancy care.**  Nonphysician providers that treat pregnant women on

---

[2] For purposes of this complaint, "high-risk pregnancy" refers to a medically high-risk pregnancy.

Medicaid must refer members identified as having medically high-risk pregnancies only to other appropriate physicians. **The IHCP does not permit treatment or referrals to nonphysicians for high-risk pregnancy-related services.**" (Effective May 1, 2014, emphasis in original.)

31.     The requirement for physician-only treatment of high-risk pregnant women enrolled in the Indiana Medicaid program has not changed for the time period relevant to this complaint.

32.     To document a medically high-risk pregnant patient, providers can complete and submit a Notification of Pregnancy ("NOP") form to Indiana Medicaid. Providers that do so are eligible for an additional $60 reimbursement per pregnancy, as well as additional prenatal care visits beyond the standard fourteen with an additional $10 per prenatal office visit. To receive the increased reimbursement, the provider must use the ICD-10 codes O09.00 through O09.93 for claims submitted after October 1, 2015, ICD-9 codes V23.0 – V23.9 for claims from Sept. 11 through Oct. 1, 2015, or a comprehensive list of ICD-9 codes provided in Table 8 of the IHCP Provider Code Tables for claims made Sept. 10, 2015 or earlier.

33.     The IHCP *Obstetrical and Gynecological Services* module identifies "examples of common high-risk pregnancy conditions" which "is not an inclusive list of all medical conditions that can complicate pregnancy." The list includes asthma (on medication), diabetes (gestational/diet controlled *or* insulin dependent), drug dependence, hypertension (on medication), multiple gestation, obesity more than 20% of weight for height, or previous cesarean delivery, along with 47 other high-risk pregnancy conditions.

**Federally Qualified Health Centers**

34.     A Federally Qualified Health Center ("FQHC") is a health center that receives federal funding under Section 330 of the Public Health Service Act to provide comprehensive

primary care services to uninsured and underinsured populations.  FQHCs must serve an underserved area or population, offer a sliding fee scale, provide comprehensive services, have an on-going quality assurance program, and have a governing board of directors that has autonomy, or independence, in areas of financial management, personnel policies, and provision of health services.  A majority of healthcare providers providing services at an FQHC must be an employee of the FQHC.

35.     Approximately 22 states, including Indiana, offer "wrap-around" payments to compensate FQHCs for the difference between the negotiated health plans rate and the FQHC's cost-based rates.  Wrap-around payments are paid by the state as supplements to certain Medicaid-approved claims.  In Indiana, wrap-around payments are made to an FQHC every 30 days and are reconciled at the year-end.

36.     FQHCs require a provider to engage in a face-to-face meeting to generate a billable encounter that can generate an FQHC wrap-around payment.  42 C.F.R. § 405.2463.   In a 2011 Policy Report assessing the status of FQHC Medicaid Prospective Payment Systems around the country, Indiana defined a "Billable Encounter (that can generate a payment at health center rate)" as "a face-to-face contact between a client and a provider of health care services who exercises independent judgment in the provision of health services to the individual client."[3]

**Disproportionate Share Hospitals**

37.     The Disproportionate Share Hospital ("DSH") program is a funding mechanism to provide additional financing to hospitals that treat disproportionately percentages of indigent patients.  In accordance with the Omnibus Budget Reconciliation Act of 1981, states are required to make DSH payments to hospitals that serve a disproportionate share of low-income and/or

---

[3] McKinney, Dawn, *et al*., "State Policy Report #40: 2011 Update on the Status of the Medicaid Prospective Payment System in the States," NATIONAL ASSOCIATION OF COMMUNITY HEALTH CENTERS, accessed at http://www.nachc.com/client//2011%20PPS%20Report%20SPR%2040.pdf

underinsured patients.  Similar to the standard Medicaid payment, the federal government

contributes to the DSH payments through the Federal Financial Participation "FFP" amount,

which is capped by statewide DSH payment limits and hospital-specific limits.  FFP is not

available for state DSH payments that exceed the hospital's eligible uncompensated care costs,

which is the cost of providing hospital services to Medicaid and uninsured patients less the

payments received by the hospital on behalf of those patients.

38.     A state must classify a hospital as eligible to receive DSH payments.  Although

the requirements are complex, a hospital is typically designated as a DSH if its Medicaid

Inpatient Utilization Rate ("MIUR") or Low-Income Utilization Rate ("LIUR") exceeds a fixed

threshold.  FY 2012-2013, the MIUR qualification threshold was 36.9%.

39.     Methodist Hospital is designated as a Disproportionate Share Hospital.

40.     Payments under the DSH program are substantial.  By way of example, Indiana

reported that IU Health received the following DSH and other Medicaid "add-on" or

supplemental payments from the state under IAC 12-15-16(1-3):

| Year | Recipient | Amount |
|---|---|---|
| 2010 | Clarian Health Partners, Inc.* | $165,000,000 |
| 2010 | IU Health | $42,155,265 |
| 2011 | Clarian Health Partners, Inc. | $114,760,764 |
| 2011 | IU Health | $41,639,236 |
| 2011 | IU Health | $44,921,405 |
| 2011 | IU Health | $42,765,996 |
| 2012 | IU Health | $63,261,000 |
| 2012 | IU Health** | $474,235,000 |
| 2013 | IU Health*** | $185,806,000 |
| | Assessment | ($268,276,000) |
| **TOTAL** | | **$906,268,666** |

* IU Health was formerly known as Clarian Health Partners, Inc.
** Total of increased DSH revenue received in 2012, which includes reimbursements for multiple years
*** Total of increased DSH revenue received in 2013, which includes reimbursement for multiple years

14

**** In April 2012, the Indiana Attorney General Assembly approved a hospital assessment fee program.  Under the program, the Office of Medicaid Policy and Planning ("OMPP") collected an assessment fee from hospitals.  The fee was to be used to increase reimbursement to eligible hospitals for fee-for-service and managed care programs and as the state share of DSH payments.  It was retroactive to July 1, 2011.

**Anti-Kickback Statute**

41.     The federal Anti-Kickback Statute ("AKS") creates a penalty for, *inter alia*, any person who knowingly and willfully offers or pays any remuneration, directly or indirectly, overtly or covertly, in cash or in kind, to refer an individual to a person for the furnishing or arranging of an item or service for which payment can be made in part or in whole under a Federal health care program.  The commission of such an act is a felony punishable by a fine of $25,000, five years in prison, or both.  Any individual who solicits or receives such an offer is equally liable and faces the same punishment.

42.     A violation of the AKS is an express violation of the federal False Claims Act.  In addition, compliance with all applicable federal statutes, such as the AKS, is an express condition of payment for participation in the Indiana Health Coverage Program.

**V.     DEFENDANTS' WRONGFUL CONDUCT**

**Affiliation Relationship Developing No-Interest Line of Credit to HealthNet**

43.     In January 1999, IU Health and HealthNet entered into an Affiliation Agreement whereby IU Health would provide support services and financial support to aid HealthNet, according to an Application Submitted to the U.S. Department of Health and Human Services, Health Resources and Services Administration.  IU Health provides inpatient and specialty physician services to HealthNet patients as required.  IU Health also pays the majority of HealthNet's expenses related to payroll, employee benefits, insurance and other direct costs on behalf of HealthNet.  The total value of the in-kind revenues and expenses for those services is

approximately $1,600,000, according to the HRSA application.  See also Exhibit A (filed under seal).

44.    The Affiliation Agreement establishes two debts owed by HealthNet to IU Health: a current portion and a long-term portion.  Both are unsecured and non-interest bearing.  The current portion of the debt is essentially an advance on HealthNet's receipt of payments from insurers.  The long-term portion of the debt was contractually determined by IU Health and HealthNet.  It is repayable based on HealthNet's future ability to pay, as determined by its Board of Directors, but clearly is intended to be a loan that had to be paid back.  There have been no revisions to the Agreement which would cap or establish a repayment schedule for any additional debt.

45.    Based on conversations with HealthNet COO Elvin Plank, CMO Dr. Donald Trainor, and CEO Booker Thomas, Dr. Robinson understood that the loan was created with the intention to be a stop-gap, not an unfettered entre to IU Health's bank account.  See also Exhibit B (filed under seal).  Yet, fifteen years from the original agreement, the outstanding debt owed by HealthNet to IU Health has ballooned to $13,797,563.

46.    Since that Agreement, IU Health and HealthNet have entered into countless additional arrangements, relationships and contracts.  These subsequent arrangements were created as incentives for HealthNet to exclusively refer its patients to IU Health's Methodist Hospital for in-patient admissions, out-patient procedures and all other ancillary services.  In 2012, Mickki Ashworth, HealthNet Clinic Manager for HealthNet's largest clinic location, described the relationship this way:

> We have a business relationship and partnership with IU Health.  All of our patients deliver at Methodist and are sent to Methodist because that is part of our partnership.

16

**IU Health Offered and HealthNet Accepted Illegal Kickbacks to Induce Referrals**

*Development of Provider-Fee Arrangement as Incentive for Exclusive Referrals for Triage, Labor and Delivery Services*

47.     By 2005, nearly 4,000 deliveries were performed at Methodist Hospitals Labor and Deliver ("L&D") unit, more than 2,200 of which were HealthNet patients.   However, the medical landscape in Indianapolis was rapidly changing.  Methodist Hospital executives estimated that the hospital stood to lose 1,500 deliveries per year to two new hospitals opening in the region.  Ob/Gyn services are particularly valuable to a hospital because it is the only service line where a single patient admission necessarily turns into two (or more) patient admissions at the time of birth.

48.     IU Health struggled to ensure that HealthNet patients continued to fill Methodist's beds and control its costs incurred by Methodist's L&D unit.  The two entities cut a deal for HealthNet to fully staff the L&D unit, including an emergency care triage unit located on same floor.  See Exhibit C (filed under seal).  Dr. Robinson understood that, under the original agreement, IU Health paid HealthNet approximately $1,200,000 plus the cost of 2.5 full-time equivalents for CNM coverage and medical malpractice insurance costs.  Dr. Marshall Keltner told Dr. Robinson that he informed IU Health that HealthNet needed to receive general wage increases, so in 2008, the agreement was amended to increase the payment to $1,500,000 with continuing annual wage increases, plus the full costs of malpractice insurance.  See Exhibit D (filed under seal).  As Dr. Robinson understood, IU Health assigned all billings for Ob/Gyn and advance practice nursing services from Methodist Hospital's L&D and triage units to HealthNet.  HealthNet billed several million dollars per year in patient revenue through the assigned billing arrangement, which includes billing for triage visits as consultations.  The assigned billings were not capped in any way.  This assignment became a lynch pin of the HealthNet-Methodist

Hospital referral relationship: the more patients HealthNet referred to Methodist, the more money it collected.

49.     In exchange, IU Health secured the exclusive referrals from HealthNet's steady stream of Ob/Gyn patients at a time when it expected its patient census to decline.  IU Health also collected fees from all newborn care, as well as tests, procedures and other ancillary services for both the mothers and babies.  Each L&D admission was included in the calculation of Methodist's DSH payments, increasing its share of taxpayer subsidies.  Methodist Hospital billed approximately $40 million per year in the associated newborn care.

### *Expanding Ob/Gyn Referrals to Capture Maternal-Fetal Medicine Patients*

50.     IU Health's desire to capture high-value pregnant patient referrals played a critical role in the creation of a HealthNet Maternal-Fetal Medicine clinic in 2010.  In the early 2000s, Methodist Hospital had its own in-house Maternal-Fetal Medicine program (a group of physicians practicing in the subspecialty of obstetrics for the highest-risk pregnant patients) which dissolved when the specialists left for other hospitals.  HealthNet's patients who were previously referred to Methodist's MFM practice were sent to other delivery systems and their babies, often premature and needing intensive care, went to other NICUs.

51.     In or about November 2008, Dr. Marshall Keltner, then the Director of Ob/Gyn Services for Methodist Hospital, began discussing marketing MFM services as a new revenue stream for HealthNet.  Keltner, a HealthNet physician holding the Director role at Methodist Hospital, was also particularly cognizant of the value MFM services could bring to Methodist Hospital.  Because Keltner and Dr. Robinson worked closely together from the end of 2008 through the beginning of 2009, Keltner regularly discussed with Dr. Robinson in meetings, phone calls and emails his intention to bring MFM patients back to Methodist Hospital while

18

capitalizing on HealthNet's unique ability to collect enhanced payments for the treatment of these patients because of its status as a Federally Qualified Health Center ("FQHC").  Neither Methodist Hospital nor any other entity in the IU Health system is eligible for these payments, so using HealthNet to access the supplemental funds would effectively offset the cost of the program for IU Health.

52.     Keltner, HealthNet CMO Dr. Don Trainor, HealthNet COO Elvin Plank and Methodist Hospital COO John Kohne, among others, began discussing an arrangement where Methodist Hospital would fund the development of an MFM clinic at HealthNet and, in exchange, HealthNet would direct all of its MFM patients to Methodist Hospital for delivery. Dr. Robinson was made aware of these on-going conversations by Trainor, Plank and Keltner. She also was informed of the status of the MFM proceedings while covering shifts for Keltner. See also Exhibit E (filed under seal).

53.     In or about May 2009, Keltner informed Dr. Robinson that the plan for IU Health to develop a HealthNet MFM clinic was well underway.  Because Keltner knew Dr. Robinson had been in private practice before coming to IU Health and HealthNet full-time, he asked Dr. Robinson if she had any physicians she could reach out to who might refer their MFM patients to the HealthNet clinic and then to Methodist Hospital for delivery.  Keltner specifically identified Dr. Beth Soper, Dr. Clara Bernardian, Dr. Julie Lund and Dr. Karen Gallagher as physicians who were sending their MFM patients to other delivery systems and Keltner wanted to redirect their business back to HealthNet and Methodist Hospital.

54.     To make the arrangement with HealthNet possible, Keltner explained to Dr. Robinson, that Methodist Hospital had to cover all expenses of establishing and running the clinic and agree to extend its provider-fee assignment to any referrals sent to Methodist Hospital

by the MFM clinic.  See also Exhibit F.  Methodist Hospital would not be paid for any of the prenatal visits because they would be conducted in the clinic setting so that HealthNet could collect enhanced payments under the FQHC program.  On its face, the arrangement had little financial benefit to Methodist Hospital.

55.    The real value to Methodist Hospital in agreeing to such a significant financial outlay was in filling Methodist's Neonatal Intensive Care Unit beds with the babies of MFM patients.  In or about 2010, Dr. Robinson had a conversation with Dr. Ilana Torine, the then-Director of the NICU at Methodist Hospital.  Dr. Torine stated to Dr. Robinson that she was pleased with the idea of the new MFM program at HealthNet because it meant that the Methodist NICU census increase.  Dr. Robinson understood this to mean that by HealthNet opening a new MFM clinic, Methodist would admit more babies into the its NICU.  See also Exhibit G (filed under seal).  Dr. Robinson was told by Methodist Hospital Director of Clinical Operations Martha Allen that the average cost of a NICU stay was approximately $3,000 per day.  At that cost, filling one additional NICU bed per day could lead to increased revenue of more than $1 million per year.

56.    IU Health provided a lease to HealthNet for rental space on IU Health's campus to house the new MFM clinic.  See Exhibit H (filed under seal).  HealthNet COO Elvin Plank told Dr. Robinson that it didn't matter to HealthNet what the rent was because IU Health would be covering the cost anyway.   Plank reiterated his understanding that the lease would be at no actual cost to HealthNet in communications with IU Health's Property/Leasing Manager, Linda Meredith.  In a January 2010 email about the MFM lease, Meredith wrote, "[IU Health] wants a Maternal Fetal Care facility.  [Plank] is willing to run one for them.  In return [Plank] said that [IU Health] will be reimbursing his costs for the suite."  In addition to the no-cost lease, Dr.

Robinson understood from conversations with Plank that in exchange for MFM funding the clinic in its entirely, HealthNet had an obligation to refer all the patients back to Methodist Hospital for any in-patient admissions, tests or ancillary services.  Because of these arrangements, Plank told Dr. Robinson that the MFM clinic was essentially a risk-free proposition for HealthNet.

57.    The plan to increase MFM services at Methodist Hospital through the operation of the HealthNet MFM clinic was quickly successful.  In or around 2011, Dr. Robinson had a conversation with one of the MFM specialists, Dr. Men-Jean Lee, who conveyed to Dr. Robinson that the MFM physicians needed more staff and more equipment to meet patient demand.  Dr. Lee specifically requested additional genetic counseling services, additional ultrasound technician time and another ultrasound machine.  HealthNet approached IU Health to obtain the additional funding to expand the program.  On or about August 16, 2011, Elvin Plank, COO for HealthNet, emailed Dr. Robinson and various other providers to inform them he had "received the green light yesterday from IU Health to expand MFM services as proposed."

58.    As the Medical Director of Ob/Gyn Services at Methodist Hospital, Dr. Robinson routinely made rounds through the Methodist Hospital NICU.  Additionally, from Nov. 2011 forward, Dr. Robinson regularly attended combined MFM/NICU meetings where the operation of the MFM program and the resulting NICU admissions were discussed.  Prior to the HealthNet MFM clinic opening, Dr. Robinson routinely observed approximately 8to 10 babies in the Methodist NICU at any given time.  However, after the HealthNet MFM clinic opened, Dr. Robinson observed that the Methodist NICU census rarely dropped below 20 babies and was most often between 20 to 25 babies at any given time.

**Additional Relationships wherein Remuneration was Exchanged to Induce Referrals**

59.     IU Health and HealthNet have entered into additional relationships wherein IU Health offered and HealthNet accepted remuneration of various types and values in exchange for HealthNet's referral of its Medicaid patients to Methodist Hospital.  These include:

a.     **Transfer of Pediatric Clinic to HealthNet for Free**.  Shortly after Dr. Robinson took over as the Director of Ob/Gyn Services for Methodist Hospital in February 2010, she participated in a meeting with several HealthNet executives including CMO Don Trainor, then-COO Elvin Plank and then-CEO Booker Thomas to get a complete understanding of the relationship between Methodist Hospital and the various HealthNet clinics.  In that meeting, Plank and Trainor informed Dr. Robinson that Methodist Hospital had approached HealthNet about taking over IU Health's Pediatric and Adolescent Care Center ("PACC") in late 2008 amid concerns that IU Health was losing money on the clinic and that the patients were often being sent to Riley Hospital.  Trainor explained that IU Health "gave" HealthNet the PACC clinic for free, meaning that HealthNet got the patients, the clinic space, the equipment and anything else needed from IU Health with no cost to HealthNet.  See Exhibits I and J (filed under seal).  All HealthNet had to do was render patient care and collect billings with the enhanced FQHC wrap-around payment.   In return, IU Health expected all referrals for in-patient care, tests, procedures, specialist referrals or other ancillary services flowing from the PACC patients to be directed to Methodist Hospital.  Trainor described the 2009 transfer as a "win-win" for both parties.

b.     In 2012, Dr. Robinson attended a meeting at PACC and saw construction to expand the PACC suite, at which time Plank told her that IU Health was building out the

space so HealthNet could increase the size of the clinic.  The new construction significantly increased the size of the clinic; HealthNet still did not pay any additional rent for the space.

c.      As a result of the no-cost transfer and sweetheart lease, IU Health provided HealthNet with immediate access to thousands of FQHC wrap-around payments per year with virtually no overhead costs.  In return, Methodist secured a guarantee of referrals for all ancillary and outpatient services.

d.      **Conditional Funding of Additional HealthNet Clinic Location.**  In her combined role as Director of Women's Services at HealthNet and Director of Ob/Gyn Services at Methodist Hospital, Dr. Robinson engaged in monthly meetings with HealthNet executives including then-COO Elvin Plank and CMO Dr. Don Trainor.  In or about late 2011, Dr. Trainor informed Dr. Robinson at one of these meetings that IU Health had proposed a pilot project to create a Wellness Center in northeast Indianapolis which would involve a combination of medical services and physical fitness resources. IU Health wanted HealthNet to operate the medical clinic.  Plank was resistant to the idea because the facility was very close to an existing HealthNet clinic, the Martindale-Brightwood Health Center ("MBHC").  Plank and Dr. Robinson met with Rene Kugel, the manager of the MBHC, in Kugel's office to discuss the proposal.  Kugel also expressed concerns about the new center reducing the number of patients at MBHC.

e.      However, IU Health was determined to press forward with the project and HealthNet ultimately agreed to operate the clinic.  Plank explained to Dr. Robinson that HealthNet had nothing to lose:  IU Health had offered to pay $5 million for the facility, to cover all operations for at least five years, and provide any support that HealthNet needed

so that the program would cost HealthNet nothing.  See Exhibit K (filed under seal).

Essentially, Plank told Dr. Robinson, this was just like the PACC clinic – all HealthNet

had to do was render care and collect the fees.

f.    After opening the new Avondale clinic, HealthNet moved its Ob/Gyn services

from MBHC to the new location, enabling it to expand care to a larger patient population.

Because IU Health had assigned its professional fees to HealthNet, HealthNet stood to

make more money by sending those new pregnant Avondale patients to Methodist for

triage, labor and delivery services.  Therefore, HealthNet was incentivized to refer all of

its pregnant patients to Methodist Hospital as opposed to any other health care system.

## Use of Certified Nurse Midwives to Treat High-Risk Pregnant Medicaid Beneficiaries

60.    Expressly motivated by a desire to minimize costs and maximize revenues, IU

Health and HealthNet not only conditioned financial support on continued streams of referrals,

but also jointly structured their obstetric care model in such a way that it not only causes the

submission of false claims, but also poses a risk of permanent, devastating injuries to pregnant

women and their babies.  Together, IU Health and HealthNet operated a scheme to maximize

Medicaid reimbursements by using certified nurse midwives and nurse practitioners[4] to treat all

obstetric patients, regardless of risk factors that mandate physician involvement.

61.    Prenatal care is critically important in reducing the risk of pregnancy

complications and infant mortality because, with competent and comprehensive treatment,

conditions that can negatively impact the pregnancy or the health of the woman or the baby can

be identified early.  For many conditions, early diagnosis and treatment are essential to a positive

---

[4] The majority of nonphysician care involved in this complaint relates to the use of certified nurse midwives. However, nurse-practitioners also provided care to high-risk patients beyond the scope of their credentials and despite the IHCP Provider Manual's prohibition.  For simplicity in pleading, the term "CNM" or "nurse-midwife" incorporates nurse practitioners as well, unless otherwise stated.

outcome.  Typically, prenatal care involves regular screenings and tests, measurements, exams, fetal heart monitoring and weight-checks, among other things.

62.    The need for appropriate prenatal care is particularly prescient in Indiana, which has one of the worst infant mortality rates in the country.  Despite state initiatives attempting to address the issue for more than a decade, the state's infant mortality rate still hovers around seven infant deaths per 1,000 live births.

### Use of CNMS in HealthNet clinics

63.    HealthNet employs a policy that requires and ensures that CNMs provide nearly all prenatal care to its patients.

64.    HealthNet promotes its Midwifery Program as the largest midwifery practice in the state of Indiana with 21 midwives on staff.[5]  Mary Blackburn, CNM ("Blackburn"), is and at all times relevant to this complaint, was the manager of HealthNet's nonphysician-provider group.  In a "Frequently Asked Questions" section on the HealthNet website, HealthNet provides, *inter alia*, the following questions and corresponding answers:

**Is it safe to use a nurse-midwife?**
The American College of Nurse-Midwives, which certifies nurse-midwives, reports "nurse-midwifery care has outcomes that are equal to that of physicians with the same type of patients."

**Will I ever meet a doctor?**
Patients with a high-risk condition are scheduled to meet with an OB/GYN physician who will lead the plan of care during your pregnancy.  Many of our patients without medical complications have the option of meeting with a physician whenever they desire.  The physicians and certified nurse midwives work together closely to offer the level of support you need.

**Where will I give birth?**
Births are attended by the HealthNet nurse-midwives at Methodist Hospital.  Your baby may remain in the room with you at all times.

---

[5] http://www.indyhealthnet.org/OBGYN-Services/

The nurse-midwives will follow your recovery while you are in the hospital. A nurse-midwife is available 24 hours a day, seven days a week for any questions or problems that arise.

**What if complications arise?**
If a woman develops a serious health problem or high risk complication during her pregnancy or in labor, her care may need to be transferred completely to the obstetrician. If the problem is less serious, she may be collectively managed by both the nurse-midwives and the physicians.

65.     Prior to the inception of this lawsuit, a previous iteration of the HealthNet website asked the same question regarding "Will I ever meet a doctor?" The previous response stated,

Most women do not see a physician during their pregnancy or birth. However, a physician is available at all times for consultation. If obstetrical or general medical complications arise, a physician will become involved in your care alongside the HealthNet nurse-midwives.

66.     Despite the passing acknowledgement that certain "serious health problem(s) or high risk complication(s)" merit the treatment by or consultation with a physician, CNMs performing prenatal care in the HealthNet clinics knowingly and intentionally fail to notify or consult with physicians when a patient is determined to have medical complications which would cause the patient to be identified as high-risk. Additionally, within the HealthNet clinics, an intake staff member such as a medical assistant or registered nurse completes the Indiana Medicaid NOP and does not identify a patient as high-risk, so Medicaid is not put on notice that the patient should only be treated by a physician. As a result, the HealthNet clinics have created a system whereby CNMs routinely provide and bill for care to high-risk patients without notifying Medicaid that the patient is high-risk and therefore should only have received care from a physician. If HealthNet properly coded the patients as high-risk, the CNMs' prenatal care would not be reimbursable by Medicaid.

67.     Upon information and belief, about 90% of the prenatal visits conducted at HealthNet are performed by nonphysicians. Based on Dr. Robinson's personal experience as

both Medical Director and a physician serving the patient population targeted by Defendants, between 70% and 90% of the obstetric patients served by HealthNet have two or more conditions that put them at risk for either preterm birth or poor pregnancy outcome, thus placing them in the IHCP medically high-risk category.

68.    The policy of using CNMs to treat high-risk patients was developed by HealthNet Chief Medical Officer Don Trainor, but was approved and jointly implemented by IU Health because the systems work in tandem to provide prenatal care.  In a Feb. 1, 2011, email from Trainor to Dr. Robinson and several other staff members, Trainor rhetorically asked himself, "So why a predominately Midwifery model, even still with more CNMs than Ob/Gyns?"  Trainor answered his own question: "The first [reason] is largely financial."  He continued, "CNMs get paid 1/3 – 1/2 what Ob/Gyns get paid but FQHCs get paid the same amount by Medicaid (our primary payor) regardless of who provides the care."  (In 2010, CNMs were paid an average of $108,632, while Ob/Gyn physicians were paid an average of $349,976.)

69.    In the HealthNet clinic settings, CNMs treated as many patients as possible, regardless of the patients' risk status.  On Aug. 11, 2011, CNM Patricia Furner responded to an email from Dr. Robinson inquiring about the amount of support staff available during each shift.  Furner described the role of registered nurses and medical assistants during her shifts and stated, "I could not see the volume of patients I see safely at this time with the high risk nature of many of them with diabetes, hypertension, mental illness etc. without these people."

70.    Even though Dr. Robinson was officially the Director of Women's Services at HealthNet, Blackburn told Dr. Robinson on multiple occasions that doctors should not interfere with the nurse-midwives' practices.  By way of example, on Feb. 20, 2013, Dr. Robinson, Blackburn and CNM Carrie Bonsack had a meeting in Dr. Robinson's office adjacent to

Methodist Hospital's Labor and Delivery unit.  Blackburn physically approached Dr. Robinson, shook her finger and said, "This is a midwife practice, so we decide what patients you docs will see and who you won't see and we will decide what you need to know about them and what you don't need to know.  Do you understand me?  This is a midwife practice and you doctors need to stay out of it unless we tell you otherwise.  If you don't understand this, you need to talk to Don (Trainor) and he will set all you doctors straight.  Now, stay out of it!"

71.     Despite the large number of high-risk pregnant patients, the HealthNet electronic medical records system only provides two options to code a new patient at the initial visit, "pregnancy normal" or "pregnancy incidental."  "Pregnancy incidental" would only be used if a patient presented with a non-pregnancy related concern but also happened to be pregnant.  Therefore, all patients presenting to a HealthNet clinic for prenatal care have to be coded as "pregnancy normal."  Patricia Furner, a CNM and the former Midwife Manager, stated in an email to Dr. Robinson on Aug. 13, 2011, "I am not sure we do accurate high risk vs. low risk coding so I don't think that helps us.  I am not sure if you are aware but the history nurses only have 2 choices for starting a new OB - normal pregnancy or pregnancy incidental.  So most patients get marked normal pregnancy in the history and the providers never change the diagnostic code so the accuracy of this is questionable for determining risk."

72.     HealthNet clinics do not always have a physician physically present at the facility.  By way of example, for the week ending Aug. 30, 2013, 123 prenatal visits occurred at Barrington Health Center, one of the HealthNet clinics serving indigent pregnant women around Indianapolis.  During the week, there was no physician presence at the clinic at all, so all 123 prenatal visits were conducted by nonphysicians, regardless of the patient's risk factors.  That same week, 176 prenatal visits occurred at Southwest Health Center, another HealthNet clinic.

A physician was at that clinic for only one day and saw 22 patients, the bulk of whom were gynecological, not obstetric patients.  Nonphysicians, then, performed at least 154 and possibly more, prenatal visits.  Therefore, for that week, every claim for a high-risk patient from the 154 nonphysician visits at Southwest and 123 nonphysician visits at Barrington was false and ineligible to be paid.

73.    If a physician is physically present at a HealthNet clinic, he or she is typically assigned to gynecological patients almost exclusively, allowing nonphysicians to perform all prenatal case.  This business model necessarily results in CNMs practicing outside the scope of their licensure by managing the care of pregnancies that fall well outside the norm.  By way of example, Dr. Robinson recalls an instance in or around June 2010 when she was assigned to diagnose a teenager's vaginal discharge while, she later learned, a CNM in the room next door treated a medically high-risk pregnant woman with gestational diabetes and preeclampsia who was carrying twins.

74.    As an individual example, patient C.F. a Medicaid beneficiary, was seen at Care Center at the Tower, another of HealthNet's clinics, in November and December, 2013.  C.F. presented with multiple health risks including asthma, diabetes, obesity, tobacco use, substance abuse, anemia, sickle cell trait, and recurrent first-trimester pregnancy loss.  Any two of these complications would place C.F. in IHCP's medically high-risk category.  C.F. was seen by a nonphysician for her initial visit on Oct. 15, 2013, and for each of her subsequent visits on Nov. 7, Nov. 19, Nov. 25 and Dec. 3, 2013.  The patient ultimately transferred to another provider in Indianapolis complaining that she never saw a physician at HealthNet.  All claims submitted to Medicaid for C.F.'s prenatal care at HealthNet were false and ineligible for payment.

*Use of CNMs in IU Health's Methodist Hospital*

75.    IU Health's Methodist Hospital houses a triage unit which serves as an after-hours and emergency care facility for HealthNet patients and is also the entry point for patients who present to Methodist Hospital in active labor.  Providers in HealthNet clinics are required to enter a patient's information into IU Health's electronic medical records system so that a patient's information is accessible if and when the patient arrives to the triage unit for urgent care or to be admitted for delivery.

76.    The triage unit is staffed only by CNMs and a physician is only called in if deemed necessary by the CNM providing triage services.  Upon information and belief, approximately 90% of triage visits are performed by nonphysicians, regardless of the patient's risk status.  However, at the end of each 24-hour shift, the physician who had been on call on the L & D floor reviews the charts of patients who were seen in triage during that shift and signs off on the charts regardless of whether or not the physician actually saw the patient.

77.    CNMs also perform vaginal deliveries of high-risk patient at Methodist Hospital without physician consultation, authorization or oversight.  According to HealthNet's 2012-2103 annual report, HealthNet patients delivered 2,422 babies at Methodist Hospital that year, including both vaginal and cesarean section ("C-section") deliveries.[6]  Upon information and belief, approximately 90% of the vaginal deliveries are performed by nonphysicians.  As with the triage visits, the on-call physician reviews the charts of all patients who delivered on the L & D floor during that shift and signs off on the charts regardless of whether or not the physician actually saw the patient.

---

[6] Upon information and belief, approximately 22% of all deliveries performed at Methodist Hospital are done by C-sections.  C-section deliveries are performed by a physician and are not at issue in this Complaint.

78.    In or about 2011, Blackburn and Trainor informed Dr. Robinson that Medicaid reimburses midwives approximately 75% of what doctors are paid for obstetric care, including deliveries.  Blackburn and Trainor explained to Dr. Robinson that this is why IU Health and HealthNet need to submit all claims co-signed by a physician along with a nonphysician. Blackburn and Trainor explained that both signatures indicated the collaborative practice and physician supervision, and Dr. Robinson objected that such a representation was not true because there was little to no physician supervision or involvement.  Blackburn and Trainor informed Dr. Robinson that it was not an area about which she needed to be concerned.

79.    To conceal the use of nonphysicians to treat high-risk patients and resulting fraudulent claims for reimbursement, IU Health and HealthNet jointly developed a system for the triage unit and L & D floor where the rendering CNM would complete billing paperwork after each triage visit or delivery.  Dr. Robinson, and upon information and belief, the other physicians believed the physician signature to be a simple acknowledgment that the visit, treatment, or delivery had occurred.  However, after her termination, Dr. Robinson read a "white paper" published by Blackburn in January 2013 which stated, "Often CNM services may be billed under the physician at institutions where a physician is present; some believe that these arrangements are needed in order that some practices may be economically viable.  However, these arrangements serve to render the services of the CNMs invisible…."  It was then that Dr. Robinson realized that once the on-call physician signed a patient's chart, the bill would be submitted in the name of the physician using the physician's National Provider Identifier ("NPI") number.

80.    IU Health and HealthNet knew that the treatment of high-risk patients is outside the scope of a CNM's licensure and is not reimbursable under the IHCP.  Not only are the

licensure and reimbursement requirements plainly stated in the statutes and the IHCP billing guidelines, but, upon information and belief, HealthNet COO Elvin Plank specifically raised concerns about using nonphysicians to treat high-risk patients with HealthNet and IU Health executives in or around October 2011.

81.     Additionally, executives at Methodist Hospital were contacted by executives at another Indianapolis hospital, Community Hospital – Anderson, in or around November 2011 after Community was informed by Indiana Medicaid that it would not reimburse Community for using CNMs to treat high-risk patients.  While Community ceased the practice and had to terminate several of its CNMs, IU Health and HealthNet continued the practice at HealthNet clinics and Methodist Hospital.

82.     Every claim submitted in a CNMs name for a patient that was improperly not identified as high-risk, or in a physician's name when a CNM actually rendered the care to a high-risk pregnant patient, is a false claim because (1) it exceeds the licensure of a CNM, (2) it is falsely submitted under a physician's name when the treatment was provided by a CNM and the appropriate billing modifier is not appended, and (3) high-risk prenatal care is not eligible for Medicaid reimbursement when the services are rendered by a nonphysician or CNM.

### Examples of Patient Harm or Near-Misses as a Result of CNM Care

83.     On Nov. 14, 2010, Ob/Gyn physician Dr. Kendra Karner sent an email to Dr. Robinson, Dr. Trainor, and other physicians with the simple subject line, "HELP."  Dr. Karner detailed a hospital shift from Nov. 11, 2010, which she described as "chaos" due to the understaffing of physicians in the labor and delivery unit at Methodist Hospital.  Dr. Karner wrote, "I can honestly say that I truly did not know our service.  I did not physically lay eyes on at least 4 of the high risk patients and did not write notes on several until 8 pm."  After

summarizing the chaotic shift and a similar shift the following day, Dr. Karner concluded with, "It is clear to me that we are not staffed to optimize patient safety, physician safety, or patient satisfaction. Thursday and Friday were not unique days. Those situations are becoming more and more common."

84.    Despite Dr. Karner's pleas, which echoed similar requests Dr. Robinson made to HealthNet and IU Health executives in 2010, the risks of patient harm continued as a result of CNMs seeing patients in lieu of a physician. Dr. Robinson personally observed the following examples of patient or "near misses" as a result of improper medical care by CNMs on high-risk obstetrical patients, or was informed of the incidents by physicians who were or should have been involved in the patient's care. Upon information and belief, care for all of these patients was billed under a physician's name, but was actually provided by unqualified CNMs.

a.    L.E., a Medicaid beneficiary, had a history of preterm labor, preeclampsia,[7] anti-Kell antibodies, and a previous C-section. When a woman's tests indicate that she has anti-Kell antibodies, the baby may develop hemolytic disease of the newborn, which is a condition where the mother's anti-Kell antibodies pass through the placenta and attack the red blood cells in the fetal circulation. This can lead to anemia and, in severe cases, fetal death from heart failure. Although any two of L.E.'s risk factors would qualify her as having a medically high-risk pregnancy, she did not see a physician until her fifth prenatal visit. L.E. went into labor and delivered her baby at 25 weeks gestation. The baby had a prolonged stay in the Neonatal Intensive Care Unit at an average cost of $3,000 per day, but ultimately died from severe prematurity.

---

[7] Preeclampsia is a condition that can develop during pregnancy when there is a sharp rise in blood pressure, swelling, and excess protein in the urine. If untreated, it can lead to eclampsia, which can cause convulsions, coma and death. In addition, if left untreated, preeclampsia can affect the neurological development of the baby.

b.      S.B., a 19-year-old Medicaid beneficiary, did not see a doctor at all during her prenatal care, despite suffering from persistent hypertension that required a prolonged hospital stay.  S.B. developed severe preeclampsia, which placed her in the high-risk category, but a CNM did not admit the patient for observation, assessment or delivery, nor seek a physician consultation.  Instead, the CNM unilaterally made the determination to send the patient home and an electronic message was sent late on a Friday afternoon asking for a physician to review the chart.  By pure coincidence, Dr. Robinson saw that message, immediately determined that the patient was in real and immediate danger, and admitted her.  At 36.3 weeks, for her safety and that of her baby, S.B. required and received an urgent C-section.

c.      T.W., a 40-year-old Medicaid beneficiary, did not have her prenatal care managed by a physician, despite her advanced maternal age and the fact that she had an abnormal quad screen – two factors which placed her in the medically high-risk category.  A quad screen is a genetic test performed between weeks 16 and 18 of a pregnancy, and the results of the test are combined with the mother's age and ethnicity in order to assess the likelihood of certain potential genetic disorders in the baby.  Because it is a screening test and not a diagnostic test (that is, the results will indicate the probable risk of an abnormality but will not rule it in or out definitively), an abnormal quad screen should be followed by diagnostic tests right away.  This is important for several reasons, not the least because there are interventions for some abnormalities that, to be successful, must occur while the baby is still *in utero*.  In addition, if a baby does receive a definitive diagnosis of a severe abnormality, the parents can make an informed decision about whether to continue with the pregnancy and how to structure their lives for the arrival of

34

a child with special needs.  At 38 weeks, far too late for either intervention or informed

decision-making, T.W. had an ultrasound which was highly abnormal, showing severe

growth retardation with elevated umbilical dopplers indicating that the baby needed to be

immediately delivered.  Only at that point was a physician called in to give T.W. the

news of her baby's condition and to schedule delivery.

d.      A.B., a Medicaid beneficiary, had gestational diabetes and a history of previous

C-section, making her a clear high-risk patient.  However, the CNMs providing A.B.'s

care supported and encouraged her desire to only be managed by midwives and to have

VBAC ("vaginal birth after a C-section"), so A.B. was only seen once by a physician

during her prenatal care.  The primary risk associated with a VBAC delivery is a uterine

rupture.  A.B. was admitted to the hospital in labor, at which point a physician was

contacted.  Despite the physician's advice for a C-section, the patient refused because she

did not trust doctors in general and because her desire to have a midwife had been

supported all throughout her prenatal care.  A.B.'s uterus did rupture during delivery, and

her baby suffered permanent neurological injury.  After the delivery, one of the treating

CNMs, Blythe Kinsey, emailed Dr. Robinson the following email in which she

acknowledged that she "did not feel it was necessary" to have a physician consult with

A.B. during prenatal care, which may have given a physician an opportunity to engage

the patient and allay her anxiety about having a C-section.

From: Kinsey, Blythe N
Sent: Mon 9/10/2012 8:29 AM
To: Robinson, Judith A
Subject: Uterine Rupture

Hi Judy,
I wanted to check in with you about A███ B███. Anthony said you had some concerns about how little A███ saw a MD at Barrington. I just wanted to let you know that at her last appt. we had a conversation about the fact that many things were stacking up to make our goal a healthy baby and with the size and the diabetes I was feeling more concerned about her chance for a VBAC. She had very well controlled sugars throughout her pregnancy and with how hard it is to get patients in with an MD, and the fact that she really wanted Midwifery care I did not feel it was necessary. I did tell her she would need to see Dr.Seitz next week to further discuss if she continued to be a VBAC candidate and to come up with a plan of care. From what I hear much of the anger and difficulty came from her husband who I only met at the NewOB appt. I am so sad about the outcome and have talked to her on the phone yesterday and am planning to spend time with her today- workflow permitting. Just wanted to let you know...
~Blythe

e.      N.K., a Medicaid beneficiary, never saw a doctor during her prenatal care.  She was admitted to the hospital at 40.6 weeks for induction of labor due to gestational hypertension.  The overlong duration of her pregnancy and her hypertension put N.K. squarely into the medically high-risk category.  The CNM who managed her care at the hospital sent N.K. home after two days of induction, without physician oversight, because there was no change in N.K.'s cervix.  N.K. returned to the hospital two days later in early labor.  She was placed on a fetal monitor in triage and a highly abnormal fetal heart rate tracing was noted.  Only then was a physician notified and an emergency C-section was performed.  The baby is permanently neurologically impaired.  After delivery, various physicians reviewed the monitor strip from N.K.'s initial two-day admission for induction and determined that, with the abnormal tracing that was evident at the time, N.K. never should have been sent home.

f.      J.W., a Medicaid beneficiary, had at least two medically compromising conditions: she was morbidly obese and had gestational (possibly chronic) hypertension. J.W. was not seen by a physician during her prenatal care until she as more than 37 weeks.  Upon examining J.W. and reviewing her chart, the physician suggested that the

baby's heart be monitored.  A long heart deceleration was seen and J.W. was immediately sent to Methodist Hospital for an emergency C-section.

g.      L., a Medicaid beneficiary, entered triage with multiple medical high-risk factors. At 36 weeks, she had uncontrolled insulin-dependent diabetes, poorly controlled gestational hypertension, and cholestasis of pregnancy (a condition where the flow of bile slows or stops, creating elevated levels of maternal bile which causes stress on the baby's liver).  Cholestasis of pregnancy can lead to fetal distress, preterm birth or stillbirth. Typically, close monitoring is required and induction after the baby's lungs have matured (often at 36 weeks) is recommended.  These medical conditions placed L. squarely in the high-risk category.  However, she was assessed in triage by a CNM, identified as "supervision normal pregnancy" in her records, and sent home with no physician involvement or intervention plan.  Dr. Robinson was working in the OBCC HealthNet clinic and was alerted to this patient by a concerns registered nurse.  Dr. Robinson found which patient was scheduled to see L. and took over care by sending the patient to the hospital for immediate delivery.

85.      On April 27, 2013, Dr. Robinson emailed CNMs Blackburn and Bonsack with a request that the CNMs meet with Dr. Robinson and the entire Ob/Gyn physician group at an upcoming meeting.  The email, copied to Trainor and other executives, explained, "We, as leaders in the HealthNet Ob/Gyn services, need to help devise a process to fix a broken system…we need to work together to ensure excellence in patient care and safety.  Including the situation Dr. Bowsher encountered from last night, we are now up to 14 documented near misses and 2 terrible outcomes…all within the past 6-8 months.  I know you will agree with me that this is unacceptable."

86.    Despite Dr. Robinson's references to at least sixteen instances of a risk to patient safety, Trainor responded to Dr. Robinson's email by stating, "Judy, I believe these meetings you are requesting are premature."

87.    Dr. Robinson has provided additional and ongoing examples of patient harm and near-misses to the Government.  For example, in July 2014, a Medicaid beneficiary named T.T. presented to a HealthNet clinic at 37 weeks gestation with elevated blood pressure, morbid obesity and a neurologic condition called Arnold Chiari malformation (a brainstem abnormality) for which she had previously undergone spinal fusion surgery.  The patient was assessed by CNMs at Methodist's triage unit and determined to be preeclamptic.  Despite all of T.T.'s risk factors, nurse-midwives continued to manager her care and initiated the induction process without physician oversight.  During early labor, a CNM permitted the patient to eat pizza.  The patient ultimately needed to receive general anesthesia for an emergency C-section at which time the on-call physician was finally notified of T.T's condition.  During the C-section, T.T. aspirated into her lungs and received a cut to an internal artery causing massive bleeding.  T.T., the mother of a young girl and the newborn baby boy, died.  Her baby suffered permanent neurologic impairment.

**HealthNet's Submission of Claims for Wrap-Around Payments for Ultrasound Reads without Face-to-Face Visits**

88.    CNMs are permitted by the scope of their licensure and Medicaid billing rules to order routine ultrasounds as part of the prenatal care of a normal pregnancy.  However, it is beyond the scope of a CNM's licensure to review and interpret the results of an ultrasound.  The reading of an ultrasound is only performed by a physician.

89.    In HealthNet clinics, ultrasounds were ordered by a rendering provider and then performed by trained ultrasound technicians.  All ultrasound images were gathered in a

designated drawer or similar location within a HealthNet clinic.  At the end of a shift or whenever a physician was back in the clinic, the Ob/Gyn physician would take the ultrasounds from a drawer, review each ultrasound, and sign off on the review.  If the physician detected any abnormalities, then the patient would be notified either by the physician or HealthNet support staff.  If the physician did not detect any abnormalities, then the physician would sign the attached billing sheet and give the billing sheet to the individual in each clinic who processed the claims.  This procedure was employed regardless of whether the patient was high-risk or had a normal pregnancy.

90.    Because of HealthNet's system, the physician who reviewed the ultrasound did not see the patient face-to-face at the time of the ultrasound review.  However, each ultrasound review was billed to Medicaid and subsequently submitted for an FQHC wrap-around payment as though a face-to-face encounter with the physician occurred.

91.    Trainor and former HealthNet COO Elvin Plank routinely referred to the ultrasound review claims model as a "cash cow."  Trainor specifically explained to Dr. Robinson that, "ultrasounds are reimbursed at the wrap-around rate and don't need to take away a provider from their usual work."  Trainor stated to Dr. Robinson that this enabled HealthNet to "get the biggest bang for [its] buck."

92.    In July 2008, Trainor circulated an email to Dr. Robinson and other HealthNet staff members which described the policy for billing encounters which did not involve a physician face-to-face visit with a payment.

> **From:** Trainor, Donald
> **Sent:** Mon 7/28/2008 2:40 PM
> **To:** Ashworth, Mickki; Robinson, Judith A
> **Cc:** Glenn, Lorie; Plank, Elvin; Flick, Larry T
> **Subject:** FW: New 99211 policy

…

> H.     While the 99211 visit does not require the actual face-to-face encounter between a patient and the physician, it is billed under the name of the supervising physician or provider on-site for that encounter."
>
> One very unique thing about HealthNet billing as an FQHC is that we get "wrap-around" payments for our Medicaid visits such that **all Medicaid visits** are paid the **same to us by the State by Federal mandate.**  So, regardless of what provider billing code that is used, we are **paid the same >$100 amount** whether it is a 99211, 99215, 99201, 99205, etc.  So that is why we want to be sure that we are billing appropriate "nurse" visits that meet the above guidelines and bill for these encounters as 99211 and we do not have to have a provider actually see the patient for these appropriately billed 99211 visits.
>
> Hope this helps.
>
> Thanks.  Don

93.     In 2011, Trainor sent an email to Dr. Robinson which stated that, with the wrap-around payment, Medicaid paid HealthNet the same for a patient visit as it paid for an ultrasound read that the physician could do between scheduled patients, before patients, during lunch, or at the end of the day – all times which would indicate that the physician would not have a face-to-face encounter with the patient while reading the ultrasound.  Trainor touted this as a benefit to the physician because ultrasound reads would be counted towards the physician's monthly productivity.

> **From:** Trainor, Donald
> **Sent:** Sun 2/13/2011 1:32 PM
> **To:** Robinson, Judith A; Thomas, Booker; Plank, Elvin
> **Cc:** Flick, Lawrence T
> **Subject:** Re: important question
>
> Thank you, Judy.
>
> Baseline MD productivity expectations after the 1st year working at HN are 2.75 pts/hr. averaged over the course of a month. This works out to ~8.25 pts. In a 3 hour morning and 11 pts. In a 4 hour afternoon, or ~19.25 pts. in a 7 hour pt. encounter day at one of our outpatient centers. A bonus for our Ob/Gyn Physicians at the locations where we have ultrasound equipment is that, since Medicaid pays HN the same as a pt. visit with our wrap around payment, we count U/S's read toward those Physicians productivity for the month and they are paid additionally each month for reading those U/Ss between their scheduled pts. and/or before pt. care, during lunch or at the end of the day.
> A bit complicated but the basic message should be an ave. of 2.75 pts/day for Physicians which equates to 19-20 pts./day.
> CNM & NPs target is lower at 2.4 pts./hr. in part because of their lower salaries and breadth of knowledge which works out to ~17 pts/day.
>
> Hope this helps & thanks for asking. Don

94.     The financial compensation available to an FQHC facility is provided only for an "encounter" which requires that an approved clinic practitioner (which does not include a medical assistant) see a patient face-to-face.  Specifically, a physician's face-to-face visit with a patient can be billed under the physician's name, or a nurse practitioner's face-to-face visit with a patient can be billed under the nurse practitioner's name.  But, if a medical assistant performs a service for a patient, the service cannot be billed for an FQHC wrap-around payment as though the physician had the face-to-face encounter with a patient.  Therefore, each claim made for an FQHC wrap-around payment for the review of ultrasounds or other services that did not involve a face-to-face visit by an approved clinical practitioner is a false claim.

**COUNT I:**
**Violation of the Federal False Claims Act by Offering and Accepting Kickbacks in Violation of the Anti-Kickback Statute**
***As to All Defendants***

95.     Relator incorporates paragraphs 1 - 94 of this Complaint as though fully set forth herein.  This count sets forth claims for treble damages and forfeitures under the federal False Claims Act, 31 U.S.C. § 3729-3732, as amended.

96.     As described herein, Defendants have knowingly and willfully offered and accepted remuneration, and entered into multiple financial compensation arrangements which were created with the purpose of inducing referrals from Defendant HealthNet to Defendant IU Health's Methodist Hospital.  This conduct is in direction violation of the Anti-Kickback Statute.  Defendants expressly certified their compliance with all applicable federal and state regulations as a condition of payment for the Indiana Medicaid program.  Also, for all claims on or after March 23, 2010, a violation of the Anti-Kickback Statute is an express violation of the False Claims Act.  Therefore, every claim made for a referral stemming from the hospitalist-provider

fee arrangement, the Maternal Fetal Medicine clinic arrangement, the PACC clinic transfer arrangement, or the Avondale facility develop arrangement is a false claim.

97.    Defendants knowingly submitted false claims to the United States and/or the State of Indiana as a result of this conduct.  Defendants knew that submitting false claims to the State of Indiana would, in turn, cause the State of Indiana to submit a claim for reimbursement to the United States of America pursuant to the federal Medicaid program.

98.    By engaging in this conduct, Defendants knowingly violated:

a.    31 U.S.C. § 3729(a)(1)(A) by presenting, or causing to be presented, false and fraudulent claims for payment or approval to the United States; and

b.    31 U.S.C. § 3729(a)(1)(B) by making, using, or causing to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the United States; and

c.    31 U.S.C. § 3729(a)(1)(C) by conspiring with one another to commit violations of 31 U.S.C. § 3729(a)(1)(A) and (B).

99.    To the extent the conduct alleged herein occurred between December 19, 2003 and May 20, 2009, Relator alleges that Defendants knowingly violated 31 U.S.C. § 3729(a)(1), (a)(2) and (a)(3), prior to amendment, by engaging in the conduct described in Paragraph 98(a), (b), and (c) respectively.

100.    Because of the false or fraudulent claims made by Defendants, the United States has suffered and continues to suffer damages, and is therefore entitled to a recovery as provided by the False Claims Act of three times the amount of damages sustained by the United States, plus a civil penalty of $5,500 to $11,000 for each violation.

**COUNT II:**
**Violation of the Indiana False Claims Act by Offering and Accepting Kickbacks in**
**Violation of the Anti-Kickback Statute**
***As to All Defendants***

101.    Relator incorporates paragraphs 1 - 94 of this Complaint as though fully set forth herein.  This Count sets forth claims for treble damages and forfeitures under the Indiana False Claims and Whistleblower Protection Act, IC 5-11-5.5, for claims submitted between July 1, 2005 and June 30, 2014, and the Indiana Medicaid False Claims and Whistleblower Protection Act, IC 5-11-5.7, for claims submitted on or after July 1, 2014.

102.    As described herein, Defendants have knowingly and willfully offered and accepted remuneration, and entered into multiple financial compensation arrangements which were created with the purpose of inducing referrals from Defendant HealthNet to Defendant IU Health's Methodist Hospital.  This conduct is in direction violation of the federal Anti-Kickback Statute.  Defendants expressly certified their compliance with all applicable state *and federal* regulations as a condition of payment for the Indiana Medicaid program.  Therefore, every claim made for a referral stemming from the hospitalist-provider fee arrangement, the Maternal Fetal Medicine clinic arrangement, the PACC facility transfer arrangement, or the Avondale facility develop arrangement which is in violation of the federal Anti-Kickback statute is a false claim.

103.    Defendants knowingly submitted false claims to the State of Indiana as a result of this conduct.

104.    By engaging in this conduct, Defendants knowingly violated the following provisions of the Indiana False Claims and Whistleblower Protection Act for claims submitted between July 1, 2005 and June 30, 2014:

a.    Ind. Code 5-11-5.5-2(b)(1) by presenting a false claims to the state for approval;

      b.     Ind. Code 5-11-5.5-2(b)(2) by making or using a false record or statement to obtain payment or approval of a false claim; and

      c.     Ind. Code 5-11-5.5-2(b)(7) by conspiring with one another to perform acts described in IC 5-11-5.5-2(b)(1) and (2).

105.    For claims submitted from July 1, 2014 through the present, Defendants knowingly violated the following provisions of the Indiana Medicaid False Claims and Whistleblower Protection Act:

      a.     Ind. Code 5-11-5.7-2(a)(1) by presenting, or causing to be presented, a false or fraudulent claim for payment or approval;

      b.     Ind. Code 5-11-5.7-2(a)(2) by knowingly making, using, or causing to be made or used, a false record or statement that is material to a false or fraudulent claim; and

      c.     Ind. Code 5-11-5.7-2(a)(7) by conspiring with one another to perform an act described in IC 5-11-5.7-2(a)(1) and (2).

106.    Because of the false or fraudulent claims made by Defendants, the State of Indiana has suffered and continues to suffer damages, and is therefore entitled to recovery as provided by the IFCWPA and IMFCWPA of three times the amount of damages sustained by the State of Indiana, plus a civil penalty of $5,500 to $11,000 for each violation.

**COUNT III:**
**Violations of the Federal False Claims Act by Submitting Claims for Treatment of**
**Medically High-Risk Pregnant Patients by Nonphysicians**
***As to All Defendants***

107.    Relator incorporates paragraphs 1 - 94 of this Complaint as though fully set forth herein.  This count sets forth claims for treble damages and forfeitures under the federal False Claims Act, 31 U.S.C. § 3729-3732, as amended.

108.    As Indiana Medicaid providers, Defendants have certified and continue to certify that they will comply with all applicable federal and state regulations.  As described above, Defendants have engaged in false or fraudulent activities including using nonphysician Certifed Nurse Midwives to provide treatment to medically high-risk pregnant women and disguising the treatment by submitting claims for reimbursement in the names of physicians who did not actually treat the patients.  By engaging in this conduct, Defendants not only improperly submitted claims and received payment from Indiana Medicaid, but also submitted claims and received reimbursements because of HealthNet's characterization as a Federally Qualified Health Center.  Defendants' false and fraudulent claims also enabled Methodist Hospital to report increased care for Medicaid and uninsured patients, which enabled it to collect enhanced payments as a disproportionate share hospital.

109.    Defendants knowingly submitted false claims to the State of Indiana as a result of this conduct.  Defendants knew that submitting false claims to the State of Indiana would, in turn, cause the State of Indiana to submit claims for reimbursement to the United States of America pursuant to the federal Medicaid program.

110.    In doing so, Defendants knowingly violated:

a.    31 U.S.C. § 3729(a)(1)(A) by presenting, or causing to be presented, false and fraudulent claims for payment or approval to the United States, in the form of claims for reimbursement from the State of Indiana to the United States, claims for reimbursement for FQHC wrap-around payments, and claims for subsidies as a disproportionate share hospital, related to the treatment of high-risk pregnant patients by nonphysicians; and

b.      31 U.S.C. § 3729(a)(1)(B) by making, using, or causing to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the United States by submitting bills in a physician's name when the service was actually performed by a Certified Nurse Midwife; and

c.      31 U.S.C. § 3729(a)(1)(C) by conspiring with one another to commit violations of 31 U.S.C. § 3729(a)(1)(A) and (B).

111.    To the extent the conduct alleged herein occurred between December 19, 2003 and May 20, 2009, Relator alleges that Defendants knowingly violated 31 U.S.C. § 3729(a)(1), (a)(2) and (a)(3), prior to amendment, by engaging in the conduct described in Paragraph 110(a), (b), and (c) respectively.

112.    Because of the false or fraudulent claims made by Defendants, the United States has suffered and continues to suffer damages, and is therefore entitled to a recovery as provided by the False Claims Act of three times the amount of damages sustained by the United States, plus a civil penalty of $5,500 to $11,000 for each violation.

## COUNT IV:
### Violations of the Indiana False Claims Act by Submitting Claims for Treatment of Medically High-Risk Pregnant Patients by Nonphysicians
### *As to All Defendants*

113.    Relator incorporates paragraphs 1 - 94 of this Complaint as though fully set forth herein.  This Count sets forth claims for treble damages and forfeitures under the Indiana False Claims and Whistleblower Protection Act, IC 5-11-5.5, for claims submitted between July 1, 2005 and June 30, 2014, and the Indiana Medicaid False Claims and Whistleblower Protection Act, IC 5-11-5.7, for claims submitted on or after July 1, 2014.

114.    As Indiana Medicaid providers, Defendants have certified and continue to certify that they will comply with all applicable federal and state regulations.  As described above,

Defendants have engaged in false or fraudulent activities including using nonphysician Certified Nurse Midwives to provide treatment to medically high-risk pregnant women and disguising the treatment by submitting claims for reimbursement in the names of physicians who did not actually treat the patients.  By engaging in this conduct, Defendants not only improperly submitted claims and received payment from Indiana Medicaid, but also submitted claims and received reimbursements because of HealthNet's characterization as a Federally Qualified Health Center.  Defendants' false and fraudulent claims also enabled Methodist Hospital to report increased care for Medicaid and uninsured patients, which enabled it to collect enhanced payments as a disproportionate share hospital.

115.    Defendants knowingly submitted false claims to the State of Indiana as a result of this conduct.

116.    In doing so, Defendants knowingly violated the following provisions of the Indiana False Claims and Whistleblower Protection Act for claims submitted between July 1, 2005 and June 30, 2014:

a.    Ind. Code 5-11-5.5-2(b)(1) by presenting a false claims to the state for approval;

b.    Ind. Code 5-11-5.5-2(b)(2) by making or using a false record or statement to obtain payment or approval of a false claim; and

c.    Ind. Code 5-11-5.5-2(b)(7) by conspiring with one another to perform acts described in IC 5-11-5.5-2(b)(1) and (2).

117.    For claims submitted from July 1, 2014 through the present, Defendants knowingly violated the following provisions of the Indiana Medicaid False Claims and Whistleblower Protection Act:

a.    Ind. Code 5-11-5.7-2(a)(1) by presenting, or causing to be presented, a false or

fraudulent claim for payment or approval;

b.    Ind. Code 5-11-5.7-2(a)(2) by knowingly making, using, or causing to be made or

used, a false record or statement that is material to a false or fraudulent claim; and

c.    Ind. Code 5-11-5.7-2(a)(7) by conspiring with one another to perform an act

described in IC 5-11-5.7-2(a)(1) and (2).

118.    Because of the false or fraudulent claims made by Defendants, the State of

Indiana has suffered and continues to suffer damages, and is therefore entitled to recovery as

provided by the IFCWPA and IMFCWPA of three times the amount of damages sustained by the

State of Indiana, plus a civil penalty of $5,500 to $11,000 for each violation.

**COUNT V:**
**Violations of the Federal False Claims Act by Submitting Claims for Reimbursement for**
**FQHC Wrap-Around Payments Without Conducting Face-to-Face Visit**
*As to Defendant HealthNet Only*

119.    Relator incorporates paragraphs 1 - 94 of this Complaint as though fully set forth

herein.  This Count sets forth claims for treble damages and forfeitures under the federal False

Claims Act, 31 U.S.C. § 3729-3732, as amended.

120.    As an FQHC, HealthNet was entitled to submit claims for "wrap-around"

payments in addition to the standard Medicaid reimbursement for certain services, so long as the

service was rendered during a qualifying patient "encounter" which required face-to-face

interaction between the physician and patient.  By submitting claims for wrap-around payments

when Defendant knew that the physician did not have a face-to-face encounter, Defendant

HealthNet submitted false and fraudulent claims for reimbursement.

121.    Defendants knowingly submitted false claims to the State of Indiana as a result of

this conduct.  Defendants knew that submitting the false claim to the State would, in turn, cause

48

the State of Indiana to submit a claim for reimbursement to the United States of America pursuant to the federal Medicaid program.

122. In doing so, Defendants knowingly violated:

a. 31 U.S.C. § 3729(a)(1)(A) by presenting, or causing to be presented, false and fraudulent claims for payment or approval to the United States; and

b. 31 U.S.C. § 3729(a)(1)(B) by making, using, or causing to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the United States.

123. To the extent any of the conduct alleged herein occurred between December 19, 2003 and May 20, 2009, Relator alleges that Defendants knowingly violated 31 U.S.C. § 3729(a)(1) and (a)(2), prior to amendment, by engaging in the conduct described in Paragraph 122(a) and (b), respectively.

124. Because of the false or fraudulent claims made by Defendants, the United States has suffered and continues to suffer damages, and is therefore entitled to a recovery as provided by the False Claims Act of three times the amount of damages sustained by the United States, plus a civil penalty of $5,500 to $11,000 for each violation.

**COUNT VI:**
**Violations of the Indiana False Claims Act by Submitting Claims for Reimbursement for FQHC Wrap-Around Payments Without Conducting Face-to-Face Visits**
***As to Defendant HealthNet Only***

125. Relator incorporates paragraphs 1 - 94 of this Complaint as though fully set forth herein. This Count sets forth claims for treble damages and forfeitures under the Indiana False Claims and Whistleblower Protection Act, IC 5-11-5.5, for claims submitted between July 1, 2005 and June 30, 2014, and the Indiana Medicaid False Claims and Whistleblower Protection Act, IC 5-11-5.7, for claims submitted on or after July 1, 2014.

126.    As an FQHC, HealthNet was entitled to submit claims for "wrap-around" payments in addition to the standard Medicaid reimbursement for certain services, so long as the service was rendered during a qualifying patient "encounter" which required face-to-face interaction between the physician and patient.  By submitting claims for wrap-around payments when Defendant knew that the physician did not have a face-to-face encounter, Defendant HealthNet submitted false and fraudulent claims for reimbursement.

127.    Defendant knowingly submitted false claims to the State of Indiana as a result of this conduct.

128.    In doing so, Defendants knowingly violated the following provisions of the Indiana False Claims and Whistleblower Protection Act for claims submitted between July 1, 2005 and June 30, 2014:

a.    Ind. Code 5-11-5.5-2(b)(1) by presenting a false claims to the state for approval; and

b.    Ind. Code 5-11-5.5-2(b)(2) by making or using a false record or statement to obtain payment or approval of a false claim.

129.    For claims submitted from July 1, 2014 through the present, Defendants knowingly violated the following provisions of the Indiana Medicaid False Claims and Whistleblower Protection Act:

a.    Ind. Code 5-11-5.7-2(a)(1) by presenting, or causing to be presented, a false or fraudulent claim for payment or approval; and

b.    Ind. Code 5-11-5.7-2(a)(2) by knowingly making, using, or causing to be made or used, a false record or statement that is material to a false or fraudulent claim.

130.    Because of the false or fraudulent claims made by Defendants, the State of Indiana has suffered and continues to suffer damages, and is therefore entitled to recovery as provided by the IFCWPA and IMFCWPA of three times the amount of damages sustained by the State of Indiana, plus a civil penalty of $5,500 to $11,000 for each violation.

## PRAYER

**WHEREFORE**, Relator Dr. Judith Robinson respectfully prays for judgment against all Defendants as follows:

A.    That the Court enter judgment against Defendants and order that they cease and desist from violating 31 U.S.C. § 3729, *et seq.*, immediately;

B.    That the Court enter judgment against Defendants and order that they cease and desist from violating 5-11-5.5-2, *et seq.* and 5-11-5.7-2, *et seq.*, immediately;

C.    That the Court enter judgment against Defendants in an amount equal to three times the amount of damages that the United States has sustained because of Defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each claim submitted in violation of 31 U.S.C. § 3729;

D.    That the Court enter judgment against the Defendants in an amount equal to three times the amount of damages that the State of Indiana has sustained because of Defendants' actions, plus a civil penalty of not less than $5,000 for each claim submitted in violation of IC 5-11-5.5-2 on or before June 30, 2014, and not less than $5,500 and not more than $11,000 for each claim submitted in violation of IC 5-11-5.7-2 on or after July 1, 2014;

E.    That Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d), IC 5-11-5.5-6, and IC 5-11-5.7-6 ;

51

F.    That the Court enter judgment against the Defendants for the costs of this action, with interest, including the costs to the United States and the State of Indiana for their expenses related to this action;

G.    That Relator be awarded all costs, attorney's fees, and litigation expenses;

H.    That the United States, the State of Indiana and Relator receive all relief, both at law and in equity, to which they may be reasonably entitled; and

I.    That the Court order any other relief which it deems to be appropriate and just.

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator Dr. Judith Robinson demands a trial by jury on all issues so triable.

Respectfully submitted this 5th day of May, 2016,

**_/s/ Jillian Estes_**
**Robert E. Saint**
rsaint@ewnc-law.com
Of counsel:
EMSWILLER, WILLIAMS, NOLAND & CLARKE, P.C.
8500 Keystone Crossing, Suite 500
Indianapolis, IN   46240
Phone: 317-475-4469
Fax:    317-257-8787

**Jillian Estes**
jestes@jameshoyer.com
**Christopher Casper**
ccasper@jameshoyer.com
JAMES, HOYER, P.A.
4830 W. Kennedy Blvd.
One Urban Center, Suite 550
Tampa, FL   33609
Phone: 813-397-2300
Fax:    813-397-2310

**Chris Jayson**
cjayson@jameshoyer.com
JAYSON, FARTHING, SKAFIDAS &
WRIGHT, P.A.
5401 W. Kennedy Blvd., Suite 600
Tampa, FL   33609
Phone: 813-321-1111
Fax:    813-321-1112

***Counsel for Relator Dr. Judith Robinson***

<u>**CERTIFICATE OF SERVICE**</u>

I, Jillian Estes, hereby certify that the foregoing Second Amended Complaint was served on all parties of record via the CM/ECF electronic case management system this 5th day of May, 2016.

s/ Jillian L. Estes
Jillian L. Estes